UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAVE SAN FRANCISCO BAY ASSOCIATION, *et al.*,<br><br>             Plaintiffs,<br><br>   v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,<br><br>         Defendants. | CIV-F-97-6140 OWW/DLB<br>CIV-F-98-5261 OWW/DLB<br><br>MEMORANDUM DECISION AND ORDER RE ENVIRONMENTAL PLAINTIFFS' APPLICATION FOR FEES AND COSTS UNDER THE EQUAL ACCESS TO JUSTICE ACT, 28 U.S.C. 2412(d)(1)(A) (DOC. 573) |
| SAN LUIS & DELTA-MENDOTA WATER AUTHORITY AND WESTLANDS WATER DISTRICT<br><br>         Plaintiffs,<br><br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*<br><br>         Defendants. | |

## I.   INTRODUCTION

The Bay Institute of San Francisco, Environmental Defense, and Save San Francisco Bay Association ("Environmental Plaintiffs") move for an award of "attorney's fees and litigation expenses for merits work in the amount of $975,135," pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d)(1)(A).  Doc. 573 ("Plaintiff's Motion"), filed May 24, 2004.

1

1

## II.   <u>PROCEDURAL HISTORY</u>

2      Plaintiffs provided notice of its intention to move for

3 attorneys' fees and costs at the same time as they filed their

4 memorandum in support of its motion.  Doc. 573.  Plaintiff

5 initially filed five declarations in support of its motion.  Doc.

6 574, Declaration of Antonio Rossmann; Doc. 575, Declaration of

7 Trent Orr; Doc. 576, Declaration of Philip Atkins-Pattenson; Doc.

8 577, Declaration of Linda M Dardarian; Doc. 578 Declaration of

9 Cynthia Koehler; Doc 579, Declaration of Jeremy L Friedman, all

10 filed May 24, 2004.  The Federal Defendants filed an opposition

11 to this motion, *see* Defendants' Opposition, while San Luis &

12 Delta-Mendota Water Authority and Westlands Water District filed

13 a limited opposition to the Environmental Plaintiff's fee

14 request, Doc. 595, filed August 9, 2004.  Plaintiff replied to

15 Defendants' opposition, Doc. 602, filed November 4, 2004,

16 attaching the supplemental declaration of Jeremy L. Friedman,

17 Doc. 603.

18      In an effort to clarify the parties positions on these

19 issues, environmental plaintiffs were asked at the hearing on the

20 instant fee petition to submit a supplemental brief summarizing

21 the record on this question.  *See* Doc. 610.  The federal

22 defendants and the water authority plaintiffs filed responsive

23 documents.  *See* Docs. 611 & 613.

24      On October 24, 2005, the water authority plaintiffs moved

25 for leave to file a supplemental complaint concerning the

26 Interior's accounting of the 2004 water year.  (Doc. 623, Motion;

27 Doc. 634, Joinder.)  The federal defendants and environmental

28 plaintiffs opposed.  (Docs. 629 and 630.)  In their opposition,

**2**

the federal defendants suggested that it might be inappropriate to rule on this fee petition if the court granted leave to file a supplemental complaint.  However, at oral argument on the motion to supplement, all parties agreed that it is appropriate to resolve the instant fee petition, in part because it concerns claims that have reached final judgment.

### III.   FACTUAL AND PROCEDURAL BACKGROUND

This case has a long and complicated history.  The underlying action involves the United States Department of Interior ("Interior") Bureau of Reclamation's ("Bureau") administration of the Central Valley Project ("CVP"), "the country's largest federal water reclamation project,"[1] and Interior's 1999 water year implementation of section 3406(b)(2) of the Central Valley Project Improvement Act ("CVPIA") in such a way as to allegedly misinterpret and misapply the definition of "CVP yield" to cause an incorrect amount of CVP water to be diverted from the water-districts and the environment.

The CVPIA took effect October 30, 1992, with the express primary purposes to: (1) protect, restore, and enhance fish, wildlife, and associated habitats in the Central Valley and Trinity River Basins; and (2) address the impact of the CVP on fish, wildlife, and their associated habitats.  *See* Pub. L. No. 102-575, Title 34, §§ 3402, 3406(b)(2), 106 Stat. 4600, 4706, 4715-16 (1992).  Section 3406(b)(2) requires the Bureau to

---

[1]   *O'Neill v. United States*, 50 F.3d 677, 680-83 (9th Cir. 1995); *see also United States v. Westlands Water Dist.,* 134 F. Supp. 2d 1111, 1116 (E.D. Cal. 2001).

**3**

1  dedicate and manage annually 800,000 acre-feet of CVP yield for
2  fish and wildlife purposes.  *See id.* at § 3406(b)(2).

3      On November 20, 1997, Interior issued its final
4  administrative proposal ("AP"), "CVPIA Administrative Proposal,
5  Management Section 3406(b)(2) Water (800,000 acre feet)," which
6  adopted a plan to simultaneously implement CVPIA Sections
7  3406(b)(1)-(3).

8      The next day, on November 21, 1997, San Luis-Delta Mendota
9  Water Authority filed this case in the Eastern District of
10 California to challenge the method adopted by Interior in its
11 1997 AP to implement Section 3406(b)(2).  San Luis argued that
12 Interior adopted the AP without considering whether its
13 environmental actions (in Appendix A) would result in dedication
14 of more than 800 TAF for (b)(2) purposes, in direct violation of
15 Section 3602(b)(2).  *See* Doc. 1.

16     The environmental plaintiffs separately challenged the same
17 1997 Interior AP in a February 4, 1998 suit filed in the Northern
18 District of California, arguing insufficient water was to be
19 dedicated to (b)(2) purposes.  On May 7, 1998, the environmental
20 plaintiffs' case was consolidated with this, the lead case.  *See*
21 *Doc. 36.*

22     All parties moved for partial summary judgment in early
23 1999.  The environmental plaintiffs specifically sought a finding
24 that interior violated the statute by treating (b)(2) water as a
25 discretionary allocation, arguing that the AP (1) failed to
26 annually set aside the requisite 800 TAF of CVP yield exclusively
27 for environmental purposes; (2) wrongfully implements
28 §§ 3406(b)(1),(2) and (3) adopted measures that ignore express

**4**

statutory management duties; (3) improperly permitted reuse of (b)(2) water; and (4) failed to adopt the (b)(1) fish program within three years.

A March 19, 1999, decision found in favor of the environmental plaintiffs on some issues.  The district court held that Interior abused its discretion by: (1) "rewriting the water dedication provision of § 3406(b)(2) in merging (b)(1), (2) and (3) compliance and in failing to account for and dedicate annually 800,000 AF of CVP yield;" (2) "failing to comply with the (b)(1) three[-]year time limit for developing and implementing the anadromous fish doubling program;" (3) "making an unauthorized [and unjustified] five year 'no need' finding under 3406(b)(2)(D);" (4) "failing to comply with NEPA, for (b)(1) compliance, which reduces annual CVP contractor deliveries by more than 800,000 AF of CVP yield;" and (5) "relying on an Interior Solicitor's legal opinion that is a post hoc rationalization that rewrites section 3406(b)(2) and justifies agency action that ignores express water dedication requirements."  Doc. 156 at 51.  The issue of (b)(2) compliance was remanded to Interior to formulate and adopt a proper method to calculate CVP yield.  *See id.* at 28.

On April 9, 1999, the AP was found contrary to the CVPIA, and the issue was remanded to Interior to complete a proper (b)(2) accounting.  *See* Doc. 159.  A preliminary injunction issued May 14, 1999, to enjoin Interior from implementing the AP.

**5**

1  *See* Doc. 209.[2]

2      In response, on July 14, 1999, Interior issued an "Interim

3  Decision of Implementation of Section 3406(b)(2) of the Central

4  Valley Project Improvement Act."  *See* Doc. 376 ex. 1 at ex. A

5  ("July, 1999, Interim Decision").[3]  Interior also issued an

6  "Accounting" of CVP yield that was, pursuant to CVPIA

7  § 3406(b)(2), to be dedicated and used from March 1, 1999,

8  through February 28, 2000.  *See* Doc. 431 at ex. A.  Interior's

9  July, 1999, Interim Decision provided that "Interior will

10  continue to credit up to 450,000 AF of CVP water used to meet the

11  [Water Quality Control Plan] obligations toward the (b)(2)

12  requirements."  Doc. 376, Ex. 1, Ex. A at 8.

13      On October 5, 1999, Interior issued its Final Decision,

14  "Decision on Implementation of Section 3406(b)(2) of the Central

15  Valley Improvement Act," which defines the method Interior

16  intended to employ to calculate CVP yield, to account for the use

17  of the dedicated yield, and the procedures to manage the

18  dedicated (b)(2) yield.  *See* Doc. 376 ex. 1 at ex. C.  The Final

19  Decision provides that: (1) Interior will credit water used to

20  meet 1995 WQCP requirements against the 800 TAF (b)(2) mandate,

21  up to a 450 TAF cap; and (2) Interior is not required to, but

22  may, credit water used to meet post CVPIA-enacted ESA

23  requirements against the 800 TAF (b)(2) mandate.

24      After evidentiary hearings on January 31, and February 3,

25  _____

26      [2]   Interior had been temporarily enjoined since April 16,
     1999.  *See* Doc. 174 (TRO).

27

28      [3]   On August 16, 1999, San Luis submitted its comments on
     the Interim Decision to the Bureau.  *See* Doc. 376 ex. 1 at ex. B.

2001, *see* Docs. 310-11 (hearings); Doc. 284 (order maintaining preliminary injunction in effect), a memorandum and order issued March 13, 2000 addressing: (1) the challenge to the Interim Decision's definition of "CVP yield;" and (2) the motion for a preliminary injunction. *See* Doc. 320. That order upheld "Interior's interpretation of the definition of CVP yield, except for the deduction for the modified D-1400 flows in calculating CVP yield, []as lawful, not arbitrary or capricious," *id.* at 31, but found Interior erred by using modified D-1400 flows to calculate CVP yield, because D-893 flows should have been used, *see id.* For the 1999 water year, the calculation of the Clear Creek (b)(2) action below Whiskeytown Dam was ordered reduced by 39,000 acre-feet, for a net use of 13,000, rather than 52,000, acre-feet. *See id.* at 32. The preliminary injunction was dissolved. *See id.*[4] Interior was ordered to recalculate the CVP yield by substituting the D-893 flows for the improperly-utilized

---

[4]    On May 04, 2000, San Luis filed an interlocutory appeal of the order that vacated the preliminary injunction. *See* Doc. 324. On September 21, 2000, the Ninth Circuit affirmed the propriety of dissolving the preliminary injunction, but declined to rule on the underlying merits of the appeal. *See* Doc. 359; *San Luis Delta-Mendota Water Auth. v. United States*, 238 F.3d 430, 2000 WL 1367912 (9th Cir. 2000) (unpublished memorandum).

On November 27, 2000, a scheduling conference was held. *See* Doc. 363. The federal defendants were ordered to submit a statement to the court and all parties concerning their intent to comply with the court order to implement the AFRP requirement of the CVPIA. *See id.* at 3. Any party was given leave to object to the government's position. *See id.* The government was also ordered to provide by December 11, 2000, its accounting for the 1999 water year, showing the various uses of the CVP yield in compliance with CVPIA § 3406(b)(2) and related laws. *See id.* Last, the parties were directed to file their motions for final judgment and interlocutory appeal. *See id.* at 3-4.

modified D-1400 flows, and to submit such recalculation within ten (10) days following date of service of the decision. *See id.* at 32-33.

On March 17, 2000, the Bureau submitted its re-calculated figure for annual CVP "yield," 5,990,000 acre-feet of CVP water. *See* Doc. 424 at ¶34 (federal defendants' statement of undisputed facts in support of summary judgment).

On March 21, 2000, the Bureau submitted the declaration of Ann Lubas-Williams, which confirmed that Interior rectified the only error in the CVP yield calculation by revising the CVP yield study's PROSIM input files to use the D-893 flows, not  the modified D-1400 flows. *See Doc. 322* at 3.

On December 11, 2000, the government filed the declaration of Alan Candlish, which it claimed complied with the order requiring the 1999 water year CVP accounting. *See* Doc. 364. Mr. Candlish represented that "[t]he signing of the [Record of Decision] and finalization of the Anadromous Fish Restoration Program will occur no later than January 19, 2001." *Id.* at 2.

On December 22, 2000, San Luis objected to the 1999 water year accounting, claiming that Mr. Bowling's declaration was "incomplete," because "one cannot tell: (1) the acre[-]foot cost of each individual action, nor (2) the annual acre[-]foot contribution of each individual CVP facility." Doc. 367 at 2-3.

On December 22, 2000, the government responded, noting that at an informational meeting held on December 20, 2000, printed materials that contained the allegedly "missing" information were distributed. *See* Doc. 368 at 3-4 (citing ¶8 of its attached declaration of Derek Hilts: "The Printed Materials contain

information pertaining to (a) the acre[-]foot cost of each individual action taken in compliance with section 3406(b)(2) of the Central Valley Project Improvement Act and (b) the annual acre[-]foot contribution of each individual Central Valley Project Facility."). This aspect of the challenge to the 1999 water year accounting was mooted.

On January 16, 2001, San Luis filed a motion seeking leave to file a second amended complaint ("SAC") and to require the government to supplement the administrative record. *See* Doc. 374; Doc. 376 at ex. 1 (proposed SAC). San Luis argued this amendment was necessary, due to additions related to events that occurred after the November 16, 1999, filing of its first amended complaint ("FAC") (Doc. 263). The SAC included six specific changes: (1) added Westlands as a plaintiff (SAC ¶4); (2) alleged that the August 28, 2000, programmatic ROD modified the October 6, 1999 decision to implement CVPIA § 3406(b)(2) (SAC ¶19); (3) added two assertions to the first claim for relief, i.e., that all CVP yield that is used to meet the requirements of the 1995 Delta Water Quality Control Plan ("WQCP") and the ESA must be counted against the 800,000 acre-foot maximum (SAC ¶¶ 25(d)-(e)); (4) amended the second claim for relief to be retrospective, rather than prospective, because the 1999-2000 water year had passed (SAC ¶¶ 28-31); (5) added a third claim for relief, which alleged that the government will dedicate and manage more than 800,000 acre-feet of CVP yield under CVPIA § 3406(b)(2) during the 2000-2001 water year (SAC ¶¶ 32-34); and (6) added a fourth claim for relief, which alleged that since October, 1999, the government implemented its final decision CVPIA § 3406(b)(2) in a

**9**

manner that was arbitrary, capricious, and an abuse of discretion, because it created substantial uncertainty concerning the extent and timing of water releases for particular (b)(2) actions, did not count all water being dedicated and managed for (b)(2) purposes against the statutory limit, and allowed Interior to carry-over stored (b)(2) water from one year to the next, which contravenes § 3406(b)(2)'s 800,000 acre-foot limit for (b)(2) purposes (SAC ¶¶ 35-40).

In order to "satisfy the concerns of the federal defendants and environmental plaintiffs," San Luis and Westlands agreed to: (1) "file joint briefs for all aspects of the case, including any appeals;" and (2) "to the extent that th[e] Court or any appellate court imposes time limits for oral argument, trial or other proceedings, the Authority and Westlands will be deemed to be a single party for time-allocation purposes and will share the time allocated to them." *See* Doc. 375 at 3.

On March 26, 2001, the parties appeared for oral argument on San Luis' motion to file its SAC and to require Interior to supplement the administrative record. *See* Doc. 393. The motions were granted orally during the hearing, and a confirming written order issued April 10, 2000. *See* Doc. 396.

On April 05, 2001, San Luis filed its SAC, *see* Doc. 395, which the federal defendants answered on April 17, 2001, *see* Doc. 409.

On April 10, 2001, San Luis and Westlands moved for a preliminary injunction to prevent Interior from releasing in excess of the statutorily-capped 800,000 acre-feet of water under CVPIA § 3406(b)(2). *See* Doc. 397.

**10**

On April 16, 2001, oral argument was held on the motion for preliminary injunction.  The parties agreed an evidentiary hearing was needed to determine how much (b)(2) water, if any, Interior had released in violation of the 800,000 acre-foot floor/cap.  *See* Doc. 406.[5]

A hearing on the motion for preliminary injunction was held on April 25, 2001, and evidence taken.  *See* Doc. 419.  On April 26, 2001, the parties appeared telephonically to determine what further action should be taken on plaintiffs' motion for a preliminary injunction.  Plaintiffs withdrew their preliminary injunction motion, which defendants did not oppose.  On May 14, 2001, plaintiffs' motion for preliminary injunction was vacated and ordered off calendar without prejudice.  *See* Doc. 436.

On May 03, 2001, the environmental plaintiffs moved: (1) to sever under Rules 42(b) and 54(b) of the Federal Rules of Civil Procedure; and (2) to enter judgment and certify under Rule 54(b), as to: (a) paragraphs 55(a), (d)-(e) of their second cause of action; and (b) the first and second causes of action filed by San Luis, the Pixley Irrigation District ("Pixley"), and the Stockton East Water District ("SEWD").  *See* Doc. 422 at 2.  Oral argument was held Monday, June 18, 2001, where the parties agreed the ruling on that motion should await disposition of the pending

---

[5]   Because of the time urgency of the availability of CVP water for fish restoration and the irrevocable loss of such water use once it is released, on April 19, 2001, the parties were ordered to submit declaration(s) to explain why it was impossible, not merely inconvenient, to produce any of their expert witness(es) by April 25, 2001, the scheduled preliminary injunction hearing date.  *See* Doc. 411.  No party submitted a declaration.

**11**

cross-motions for summary judgment.

On May 4, 2001, the federal defendants moved for summary judgment against the environmental plaintiffs and water-district plaintiffs on all claims. *See* Doc. 423 at 2.

On May 7, 2001, the water-district plaintiffs moved for partial summary judgment that:

> (1) Interior's calculation of CVP yield is not in accordance with law because it calculates the baseline using modified D-1400 flows instead of D-893 flows;
>
> (2) the Final Decision is contrary to law because it does not calculate the amount of CVP yield, as defined by the statute, that is dedicated to (b)(2) purposes;
>
> (3) the Final Decision is not in accordance with law because Interior does not count all water used to meet the requirements of the 1995 WQCP and other legal obligations imposed after enactment against the 800,000 acre-foot limit; and
>
> (4) to the extent Interior uses "reset" and "offset" to avoid counting yield dedicated and managed pursuant to (b)(2), it is acting contrary to law.

Doc. 426 at 2.

On May 7, 2001, the environmental plaintiffs moved for partial summary judgment against the federal defendants on paragraphs 55(a), (c)-(e) of their second claim for relief. *See* Doc. 430 at 2.[6]   The environmental plaintiffs sought judgment on

_____

[6]   On August 1, 2001, federal defendants moved to continue the scheduled August 13, 2001, hearing for sixty (60) days due to the change in federal administration, *e.g.,* a new Commissioner of Reclamation and new Secretary for Water and Science. *See* Doc. 457 at 2.  Westlands and San Luis joined in that motion on August 2, 2001. *See* Doc. 460.  The environmental plaintiffs refused to join the other parties, and argued that because the new water year began in two months, the hearing should proceed as scheduled. *See* Doc. 462.  On August 8, 2001, federal defendants' motion to continue this hearing was denied. *See* Doc. 461.

**12**

their allegations that the "Final Decision and DOI's

implementation of the CVPIA misinterpret[] the requirements of

Section 3406(b)(2) of the CVPIA in several important respects,"

including:

> (1)   DOI improperly elevates the secondary purposes of the (b)(2) water over and above the primary purposes for which Congress directed the water to be dedicated and managed;
>
> (2)   DOI improperly appropriates to itself unlimited discretion in charging the water used to fulfill obligations under the Endangered Species Act, 16 U.S.C. § 1531 et seq., ("ESA") against the 800,000 acre-feet of water that is to be dedicated under Section 3406(b)(2);
>
> (3)   the Final Decision fails to properly implement the banking provisions of Section 3408(d);
>
> (4)   the Final Decision improperly purports to provide Interior with discretion to provide (b)(2) water for other CVP purposes, including irrigated agriculture, in the absence of the required finding that the (b)(2) water is not necessary for the fish, wildlife and habitat restoration purposes of the CVPIA, and
>
> (5)   the Final Decision contains several errors in technical methodology that are likely to result in a dedication of less then [sic] the full 800,000 acre-feet of water required to be dedicated to the CVPIA's fish, wildlife and habitat restoration purposes and measures.

Doc. 431 at 2:12-3:4.

A series of final orders were issued in response to the

parties' cross motions.[7]   The environmental plaintiffs achieved

essentially no success at the district court level on this round

---

[7]     The district court rulings are set forth in Doc. 484, Supplemental Memorandum and Order: Re Summary Judgment Motion on Offset and Reset, filed February 2, 2002; Doc. 486, Amended Memorandum Decision and Order Re: Motions to Sever Claims: to Enter Final Judgment; and to Certify for Interlocutory Appeal, filed February 22, 2003; Doc. 487, Memorandum Decision and Order Re: Federal Defendants' Motion to Amend 'Memorandum Decision and Order Re: Motions to Sever Claims; to Enter Final Judgment; and to Certify for Interlocutory Appeal, filed February 28, 2002.

of cross motions for summary judgment.  The district court ruled in favor of the federal defendants against the environmental plaintiffs on all issues presented.

First, the environmental plaintiffs argued that using up to 450 TAF of (b)(2) water to satisfy ESA and WQCP requirements is contrary to the plain language of CVPIA § 3406(b)(2) and contravenes the CVPIA as a whole.  *See* Doc. 431 at 13-22.  The district court ruled that:

> Section 3406(b)(2) unambiguously directs Interior to "dedicate and manage annually eight hundred thousand acre-feet of Central Valley Project yield for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title."  Interior has no discretion whether to annually provide more or less than 800 TAF of CVP yield (approximately 5.99 MAF) for (b)(2) purposes, unless it makes certain findings under CVPIA § 3406(b)(2)(C)... Interior is also directed to annually dedicate and manage the mandatory 800 TAF of CVP yield "to assist the State of California in its efforts to protect the waters of the San Francisco Bay/Sacramento-San Joaquin Delta Estuary [*i.e.*, the WQCP]; and to help to meet such obligations as may be legally imposed upon the [CVP] under State or Federal law following the date of enactment of this title, including but not limited to additional obligations under the Federal Endangered Species Act."  *Id.* at 4715-16.  As a matter of law, this language is not ambiguous -- water used to meet WQCP or post-CVPIA ESA requirements is an additional (b)(2) purpose and <u>must</u> be charged against the 800 TAF (b)(2) mandate if so used.
>
> The CVPIA is not silent on what amount of water used for these so-called "secondary" purposes is to be credited against the 800 TAF (b)(2) mandate.  (*E.g.*, could all 800 TAF of (b)(2) water be used to meet post-CVPIA-enactment ESA requirements?).  Congress mandates that exactly 800 TAF of CVP yield (≈ 5.99 MAF) be dedicated for (b)(2) purposes, whether "primary" or "secondary."  To hold otherwise would render the 800 TAF figure superfluous.  This leaves to Interior, the discretion to annually determine how much CVP yield to devote to WQCP or post-CVPIA ESA requirements.  However, if it were left to Interior's "discretion" whether or not to count CVP yield used for such (b)(2) purposes, the annual 800 TAF cap would be illusory.  The 800,000 TAF is intended by Congress as an immutable

**14**

floor and ceiling on annual reallocation of water from
CVP yield for (b)(2) purposes.  If Interior uses more
than 800 TAF for (b)(2) purposes in any year, but does
not count all CVP yield used for such purposes, it
violates CVPIA § 3406(b)(2).  Water-districts' motion
for summary judgment on whether Interior has the
discretion to limit credits against (b)(2) for water
used for WQCP or post-CVPIA ESA purposes to 450 TAF is
GRANTED, Interior has no such discretion.  Any amount
of CVP yield water annually used for a (b)(2) purpose
must be counted as part of the 800 TAF.  The
environmental plaintiffs' motion for summary judgment
on this issue is denied.

Doc. 466 at 32-33 (internal citations and footnotes omitted).

The bottom line of this ruling was that although Interior had

full discretion to determine how much CVPIA yield should annually

be dedicated to each of the enumerated (b)(2) purposes, whether

primary or secondary, all CVPIA yield annually dedicated for

(b)(2) purposes had to be "counted."

Second, the environmental plaintiffs argued that the Final

Decision's system of "banking" water for fish and wildlife

purposes violates the CVPIA because it proscribes banking if it

interferes with other CVP purposes and relegates banking to the

lowest priority in the (b)(2) system.  The district court held:

This is not the case, but even assuming, *arguendo*, the
truth of this statement, the CVPIA is not violated,
because CVPIA § 3408(d) does not prioritize (b)(2)
water for banking.  Cf. CVPIA § 3406(b)(2) (deducting
800 TAF before water for other uses, such as meeting
existing water-service contracts with various water-
districts).  Rather, this section simply extends
discretion to, but does not require, Interior to bank
(b)(2) water, consistent with State law, if CVP project
facilities are not otherwise committed or needed to
meet CVP project purposes or other federal obligations.
It is for Interior, in its reasonable discretion, to
annually determine what "priority" water-banking for
fish or wildlife purposes shall have, if project
facilities are available.

*Id.* at 37.

Third, environmental plaintiffs challenged the Final Decision's conclusion on "reuse" of CVPIA yield devoted to (b)(2) purposes that "[a]fter water released for upstream [(b)(2) purposes] has served the purpose for which its release was prescribed, it is available for recapture and reuse by the [CVP], including for export south of the Delta."   The district court confirmed that such reuse is permissible under California law:

> Fish and wildlife measures under the CVPIA must conform to non-conflicting California law, 3411(a), which permits re-use of water to achieve its most beneficial use.   The COA between the United States and the California DWR for coordinated operation of the CVP with the State Water Project recognizes the State's right to divert water from the CVP that cannot be used or diverted after it fulfills (b)(2) purposes. AR 4193. The statute does not prevent Interior from exercising its discretion to manage (b)(2) water for multiple uses, so long as the environmental requirements of (b)(2) are achieved.

*Id.* at 37.

Finally, the district court found Environmental plaintiffs argument that "Interior has no discretion to employ modeling methodologies or assumptions in the accounting for the (b)(2) dedicated yield that are likely to result in an under-allocation of the (b)(2) water in any given year," Doc. 431 at 24, was a request for an advisory opinion and denied it.

An evidentiary hearing was ordered "to address the sole, discrete issue whether under the reset and offset methods, Interior releases more than 800 TAF CVP yield for (b)(2) purposes and actually resulted in the dedication and use of more than 800,000 AF of CVP yield for (b)(2) purposes in 1999-2000 water year.   The water district plaintiff's summary judgment motion was granted; federal defendants were prohibited from using its

**16**

"reset" or "offset methods."  The ruling required every use of
CVP yield for (b)(2) purposes in any water year to be counted and
not reversed or ignored.  Doc. 484.

On October 24, 2002 environmental plaintiffs filed an
expedited motion to stay the March 20, 2002 Final Partial
Judgment, pending their appeal in the Ninth Circuit.  Doc. 527 at
2.  Environmental plaintiffs also moved to enjoin federal
defendants from "issuing any new agency policy which would alter
existing [CVIPA] 3406(b)(2) water allocation and accounting
procedures pursuant to the March 20, 2002 Final partial
Judgment."  *Id*. at 2 & 5.

The Ninth Circuit heard oral arguments May 12, 2003.  The
Circuit Court's amended decision addresses five issues.  *See Bay
Inst. of San Francisco v. U.S.*, 66 Fed. Appx. at 735, as amended
on, January 23, 2004.

The Ninth Circuit agreed with the district court's rejection
of the water authority plaintiffs' principal contention that
§ 3406(b)(2) requires Interior to calculate the costs of
3406(b)(2) actions against a hypothetical model of Project
operations during the 1928-34 drought period.  *Id*. at 735.
Interior and the environmental plaintiffs both opposed this
contention.  The second finding affirmed that "the Improvement
Act does not prohibit Interior from reusing water initially
released for (b)(2) purposes.  Because the CVPIA does not

**17**

specifically address reuse, Interior's reasonable interpretation of the statute is entitled to deference." *Id.* (citing *Wilderness Soc'y*, 316 F.3d at 921-22).  This ruling was against the environmental plaintiffs.  Third, the Ninth Circuit found:

> The district court erred in concluding that Interior lacks discretion to refrain from crediting the amount of Project yield actually used for any (b)(2) purpose against the designated 800,000 acre feet of Project yield.  To hold otherwise would defeat the primary purpose for which the 800,000 acre feet were designated-fish, wildlife, and habitat restoration. Section 3406(b)(2) provides that the "primary purpose" to which the 800,000 acre feet should be dedicated is the implementation of "fish, wildlife, and habitat restoration purposes authorized by this title...." Section 3406(b)(2) also provides that the 800,000 acre feet may be used to "help" meet obligations under the Endangered Species Act and to "assist" in meeting water quality standards.  If Interior were required to deduct some or all the water it uses for water quality and Endangered Species Act purposes from the (b)(2) dedication, the water needed for implementation of the Improvement Act's restoration mandate could be relegated to a secondary role, or perhaps no role at all. Such a scenario would directly conflict with the Interior's mandate to give effect to the hierarchy of purposes established in Section 3406(b)(2).

*Bay Inst.*, 87 Fed. Appx. 637.  The parties dispute who prevailed on appeal of this issue and to what extent.

The Ninth Circuit upheld the District Court's decisions on another of the environmental plaintiffs' claims:

> Interior may not exclude from its calculation of CVPIA yield certain water flows implemented in connection with the Auburn Dam.  Section 3406(b)(2) requires Interior to exclude from its Project yield calculation only those "flow and operational requirements imposed by terms and conditions existing in licenses, permits, and other agreements..."  The record reflects no such license, permit or other agreement concerning the Auburn Dam flows.

*Id.*  The water authority plaintiffs' allegation that Interior should be "prohibited [] from using offset/reset matrices in accounting for use of water under § 3406(b)(2), to impermissibly

alter the 800,000 acre feet designated by Congress" was also affirmed. *Id*.  This was contrary to the environmental plaintiffs' position, which was the same as Interior's.

> The district court's decision on these two issues found: Interior's decision to credit a maximum 450,000 AF...against (b)(2) 800,000 AF mandate is not provided for by statute, is arbitrary, and violates (b)(2);...The use of reset is unlawful, arbitrary, and capricious;...Offset is unlawful arbitrary, and capricious...[.]

Doc. 491, The District Court's Final Partial Judgement on Accounting Issues, at 3, ¶¶ e, h & I, filed March 20, 2002.

## IV.   DISCUSSION

### A.   Threshold Requirements.

#### 1.   The Statute of Limitations.

The EAJA provides that an application for fees under the Act must be filed within thirty days of final judgment.  Final judgment means "final and not appealable."  28 U.S.C. § 2412(d)(2)(G).  In this case, the Ninth Circuit issued its decision on June 3, 2003.  *See Bay Institute*, 66 Fed. Appx. at 734.  The parties had ninety days after the Court of Appeals' judgment in which to apply to the Supreme Court for a writ of certiorari, pursuant to 28 U.S.C. § 2101(c); they did not.  On September 1, 2003, the ninety-day period expired, and the decision of the appellate court became final.  The Appeals Court decision was thereafter amended, and a new ninety day period began to run on January 23, 2004.  This period technically expired on May 23, 2004, a Sunday.  Plaintiffs timely filed their petition the following day, Monday, May 24, 2004.  The statute of limitations is not a bar.

**19**

## 2.   **Financial Eligibility.**

As an additional threshold matter, a party must show that it is either:

> (I)  an individual whose net worth did not exceed $2,000,000 at the time the civil action was filed, or

> (ii) any owner of an unincorporated business, or any partnership, corporation, association, unit of local government, or organization, the net worth of which did not exceed $7,000,000 at the time the civil action was filed, and which had not more than 500 employees at the time the civil action was filed; except...

28 U.S.C. § 2412(d)(2)(B).  However, an organization that operates as a 501(c)(3) tax exempt organization "may be a party regardless of the net worth of such an organization." *Id*.

Environmental plaintiff's initial declarations contained no information as to the financial or tax-exempt status of the plaintiff organizations.  Defendants argue in their opposition that the environmental plaintiffs bear the burden of proving eligibility to seek fees and failed to do so within the 30-day statute of limitations.  (Environmental plaintiffs did file a supplemental declaration setting forth their tax-exempt status, but this declaration was not filed within the 30-day window.) Environmental plaintiffs point out that the statute provides that an organization operating as a 501(c)(3) tax exempt organization "may be a party regardless of the net worth of such an organization," and maintain that this provision releases them from the burden of proving their party status within the statute of limitations.  Environmental plaintiffs also point out that their tax-exempt status is clearly set forth in the complaint and

**20**

amended complaint.

Defendants cite several cases in which fee petitions were deemed untimely for failure to set forth all elements of eligibility. *SAI Industries, Corp. v. United States*, 63 Fed. Cl. 1 (2004); *Favret v. United States*, 341 F. Supp. 2d 613 (E.D. La. 2004). In *SAI Industries*, plaintiff filed a "bill of costs" within the statutory window, but filed its application for fees and expenses under the EAJA after the deadline. The fee petitioner in that case argued that the EAJA application should relate back to the filing of the bill of costs, but the Court of Federal Claims rejected that argument because the initial bill of costs did not give the government any notice that an EAJA application would be forthcoming. *Favret* simply does not address the issue at hand. In that case, the fee petitioner initially failed to include a showing that she had a net worth of less than $2 million, a requirement of the applicable fee statute. However, *Favret* cured this defect within the statutory time limit, so her petition was allowed to proceed. Environmental plaintiffs stand in a very different position from the plaintiffs in either *Favret* or *SAI Industries*. Environmental plaintiffs timely filed their fee petition without providing any proof of financial eligibility because the statute deems them eligible parties by virtue of their nature as 502(c)(3) tax exempt organizations, a fact they specifically alleged in many pleadings filed during the course of this litigation, including the first page of the fee petition itself. *See* Doc. 573 at 1. Moreover,

the Ninth Circuit recently permitted a Hyde Amendment[8] fee

petitioner to amend his defective fee petition out of time to

include required information concerning his net worth and an

itemized statement of attorney's fees:

> When the government can show no prejudice from allowing
> an amendment to a fee application, it is unduly harsh
> not to allow an amendment to bring the application in
> conformity with a technical pleading requirement.

*United States v. Hristov*, 396 F.3d 1044, 1048 (9th Cir. 2005).

The government does not allege prejudice.  Environmental

plaintiffs are exempt from the net worth requirements.  They

refer to their tax exempt organization status in the fee

petition.  This unambiguously informed the government of the

basis for environmental plaintiffs' claimed eligibility for EAJA

fees.  No authority has been provided to require an affirmative

assertion of eligibility in the petition.  An amendment of the

petition will serve the interests of justice.

<b>3.    Threshold Eligibility Requirements Under the EAJA.</b>

"The Equal Access to Justice Act (EAJA) directs a court to

award fees and other expenses to private parties who prevail in

litigation against the United States if, *inter alia*, the

Government's position was not 'substantially justified.'"  *INS v.

Jean*, 496 U.S. 154, 158 (1990) (quoting 28 U.S.C.

§ 2412(d)(1)(A)).  "The clearly stated objective of the EAJA is

to eliminate financial disincentives for those who would defend

against unjustified governmental action and thereby to deter the

---

[8]   The Hyde Amendment, Pub. L. No. 105-119, Title VI, § 617,
111 Stat. 2440, codified at 18 U.S.C. 3006A, specifically
incorporates the filing requirements of the EAJA.  *See Hristov*,
396 F.3d at 1046.

<b>22</b>

unreasonable exercise of Government authority." *Ardestani v. INS*, 502 U.S. 129, 138 (1991) (citations omitted).

Eligibility for fees under the EAJA is established by meeting the remaining conditions set out by the statute:

(1)      that the claimant be a "prevailing party";

(2)      that the Government's position was not "substantially justified"; and

(3)      that no "special circumstances make an award unjust".

*Jean*, 496 U.S. at 158; *Shalala v. Schaefer*, 509 U.S. 292, 302 (1993); *see also Perez-Arellano v. Smith*, 279 F.3d 791, 793 (9th Cir. 2002)("For the court to award attorney's fees and costs pursuant to EAJA, it must be shown that (1) the plaintiff is the prevailing party; (2) the government has not met its burden of showing that its positions were substantially justified or that special circumstances make an award unjust; and (3) the requested attorney's fees and costs are reasonable.").

But, "no award of fees is automatic." *Jean*, 496 U.S. at 163. A district court retains substantial discretion in fixing the amount of any EAJA award. Exorbitant, unfounded, or procedurally defective fee applications –– like any other improper position that may unreasonably protract proceedings –– are matters that the district court can recognize and discount. "A request for attorney's fees should not result in a second major litigation." *Id.* at 163.

//

//

**23**

### a.   *Prevailing Party*.

"The Supreme Court identified two judicial outcomes under which a party may be considered a 'prevailing party' for the purpose of awarding attorney's fees: (1) an enforceable judgment on the merits; or (2) a settlement agreement enforceable through a court-ordered consent decree." *Perez-Arellano*, 279 F.3d at 793-94 (citing *Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 603-04 (2001)). An enforceable judgment "provides the necessary foundation for a plaintiff's status as a prevailing party because the plaintiff has received at least some relief based on the merits of the claim." *Id*.

While the EAJA contains no applicable definition of "prevailing party," claimants are classified as "prevailing parties" for attorney's fees purposes if they "succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Nat'l Wildlife Fed'n v. Fed. Energy Regulatory Comm'n,* 870 F.2d 542, 544 (9th Cir. 1989); *see also Friend v. Kolodzieczak*, 72 F.3d 1386, 1393 (9th Cir. 1995). "A prevailing party is one who succeeds on any significant issue even though other issues are unreached, remanded, or prove unsuccessful." *Id*.

In this case, the environmental plaintiffs experienced substantial success in the early stages of litigation. The district court's March 19, 1999, decision found Interior abused its discretion in adopting the November 20, 1997 final administrative proposal, finding for environmental plaintiffs on

**24**

most of the issues presented.   The federal defendants appear to concede that this ruling was at least a partial victory for the environmental plaintiffs.  *See* Doc. 583 Opp. at 8.

The environmental plaintiffs experienced more limited success, however, in later stages of the litigation, prevailing on appeal with respect to a single (and perhaps partially a second) of the five discrete issues appealed to the Ninth Circuit.  Environmental plaintiffs acknowledge that they "lost some of the issues and arguments raised in the litigation" but insist that this "does not rob them of prevailing party status." Doc. 573, Mot. at 8.  Environmental plaintiffs are absolutely correct that "[w]hile limited success may become a factor in the calculation of the amount of reasonable fees... there can be no doubt that plaintiffs are entitled to an award."  *Id*. Environmental plaintiffs did succeed on at least one significant issue, rendering them sufficiently successful to qualify as a prevailing party for purposes of eligibility for EAJA fees.[9]

### b.   Substantial Justification.

"The EAJA mandates the award of attorney's fees and expenses to the prevailing party unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust."  *See Or. Natural Res.*

---

[9]   While environmental plaintiffs' success on at least one significant issue is enough to qualify them as a prevailing party, the degree of their success (or lack thereof) is otherwise relevant to the amount of fees awarded.  The parties do not agree on the degree of success experienced by the environmental plaintiffs at various stages of the litigation.  This issue is discussed at length in Part IV.B.5.

*Council v. Madigan*, 980 F.2d 1330, 1331 (9th Cir. 1992).  "The government has the burden of demonstrating substantial justification."  *Id*.  In order to demonstrate that its position was substantially justified, the government must show that its position has a reasonable basis in law and fact.  *Id*. (citing *Pierce v. Underwood*, 487 U.S. 552, 563-65 (1988)).  The Government's underlying action must be justified to a degree that would satisfy a reasonable person.  *Pierce*, 487 U.S. at 563-64.  "Put another way, substantially justified means there is a dispute over which reasonable minds could differ."  *Gonzales v. Free Speech Coalition*, 408 F.3d 613, 618 (9th Cir. 2005).

     In evaluating whether a position is "substantially justified," objective indicia "such as the terms of a settlement agreement, the stage in the proceedings at which the merits were decided, and the views of other courts on the merits can be relevant, but not necessarily dispositive."  *Gonzales*, 408 F.3d at 618 (citing *Pierce*, 487 U.S. at 568).  "A string of losses can be indicative; and even more so a string of successes."  *Id*.  Where objective indicia are not available or do not provide a conclusive answer, the court will examine the "merits of the government's litigating position."  *Id*.

      In this case, the district court's March 19, 1999, decision found in favor of the environmental plaintiffs on several issues, holding that Interior abused its discretion by: (1) "rewriting the water dedication provision of § 3406(b)(2) in merging (b)(1), (2) and (3) compliance and in failing to account for and dedicate annually 800,000 AF of CVP yield;" (2) "failing to comply with

1   the (b)(1) three[-]year time limit for developing and

2   implementing the anadromous fish doubling program;" (3) "making

3   an unauthorized [and unjustified] five year 'no need' finding

4   under 3406(b)(2)(D);" (4) "failing to comply with NEPA, for

5   (b)(1) compliance, which reduces annual CVP contractor deliveries

6   by more than 800,000 AF of CVP yield;" and (5) "relying on an

7   Interior Solicitor's legal opinion that is a post hoc

8   rationalization that rewrites section 3406(b)(2) and justifies

9   agency action that ignores express water dedication

10  requirements."  Doc. 156 at 51.  The issue of (b)(2) compliance

11  was remanded to Interior to formulate and adopt a proper method

12  to calculate CVP yield.  *See id.* at 28.  The court denied the

13  environmental plaintiff's motions on (1) the "reuse" issue and

14  (2) whether Interior was required to dedicate (b)(2) water to

15  address other adverse environmental issues.

16      The district court's conclusion in the March 19, 1999

17  opinion states:

18      The CVPIA is a complex and ambiguous statutory
        construct that reflects a legislative choice to reorder
19      the priorities of the CVP to make environmental
        protection a co-equal statutory objective.  <u>The CVPIA</u>
20      <u>invests Interior with broad discretion</u> to implement the
        management and operations changes that will drive the
21      reallocation of CVP water, subject to finite limits.
        The court and parties must defer to the expertise and
22      good faith of Interior to manage the CVP to comply with
        the CVPIA.  <u>Interior has gone beyond the legislative</u>
23      <u>grant of discretion</u>: 1) by rewriting the water
        dedication provisions of §3406(b)(2) in merging (b)(1),
24      (2) and (3) compliance and in failing to account for
        and dedicate annually 800,000 AF of CVP yield; 2) by
25      failing to comply with the (b)(1) three year time limit
        for developing and implementing the anadromous fish
26      doubling program; 3) by making an unauthorized five
        year "no need" finding under §3406(b)(2)(D); 4) by
27      failing to comply with NEPA, for (b)(1) compliance,
        which reduces annual CVP contractor deliveries by more

28

1    than 800,000 AF of CVP yield; and 5) by relying on an
     Interior Solicitor's legal opinion that is a post hoc
2    rationalization that rewrites section 3406(b)(2) and
     justifies agency action that ignores express water
3    dedication requirements.  Interior has the legal
     authority within its broad grant of CVPIA water.  It
4    does not have the discretion to fail to annually make
     any section 3406(b)(2)(D) finding of "no need."

5

6    Doc. 156 at 50-51 (emphasis added).  This finding -- that

7    Defendants actions exceeded the broad discretion afforded it

8    under the statute and was based on a post hoc solicitor's opinion

9    -- is equivalent to a finding that the government's position was

10   not substantially justified.

11       Defendants concede the March 19, 1999 opinion rejected

12   Interior's initial attempt to interpret and implement §

13   3406(b)(2).  Opp. at 13.  Defendants insist, however, that their

14   initial interpretation was substantially justified because the

15   question was one of first impression and because they argued

16   their position "forcefully and well."  *Id*.

17       The Ninth Circuit rejects the argument that a position is

18   substantially justified simply because it concerns a matter of

19   first impression.

20            There is no per se rule that EAJA fees cannot be
              awarded where the government's position contains an
21            issue of first impression...we have never held that the
              government is automatically shielded from a fee award
22            because its argument involves any issue on which this
              court has not ruled.
23
     *United States v. Real Prop. At 2659 Roundhill Drive*, 283 F.3d
24
     1146, 1153 (9th Cir. 2002).  The federal defendants cite *Bay Area
25
     Peace Navy v. United States*, 914 F.2d 1224, 1231 (9th Cir. 1990)
26
     for the proposition that substantial justification may be shown
27
     where the "government has argued its position forcefully and
28

**28**

well." But, when read in context, the forcefulness of the

government's argument was only part of the Ninth Circuit's basis

for a "substantial justification" finding in *Bay Area Peace Navy*:

> It was [] not unreasonable for the government to try to
> uphold the [] regulation when confronted with
> litigation. In other words, "substantial justification"
> is shown in this case <u>because the government has argued
> its position "forcefully and well,"</u> [citations],
> <u>"difficult questions" were raised and there is an
> absence of adverse precedent on point.</u> [citations]  <u>The
> disagreement within this panel regarding the merits of
> the government's appeal further suggests that a finding
> of substantial justification is appropriate.</u>

*Id.* (emphasis added)(internal citations omitted). Mere forceful

argument alone does not necessarily reflect a position that has a

reasonable basis in law and fact. Here, none of the other

factors considered in *Bay Area Peace Navy* are present. The

government's position on most issues in the initial round of

summary judgment motions was essentially untenable and was based

on erroneous analysis by a government lawyer. There was little

room for disagreement on that matter.

The federal defendants also cite *Gonzales v. Free Speech

Coalition*, 480 F.3d 613 (9th Cir. 2005), in which the Ninth

Circuit found that the United States' defense of a congressional

statute against a constitutional challenge was substantially

justified. In *Gonzales*, the Ninth Circuit based its finding of

substantial justification on several factors. First, the

government made "appropriate arguments" in defense of the

statute. Second, the government had a string of successes

defending the statute against attack in four other circuits and

the district court. Finally, the Ninth Circuit panel issued a

**29**

split decision on the merits of the case.[10]   Here, the government
cannot boast a prior "string of successes" on any of the issues
raised in the first round of summary judgment motions.   Nor can
the government find post-hoc support for the positions it took in
the form of a split panel decision on those issues.   *Gonzales* is
distinguishable.

    The absence of substantial justification for the position
taken by the government prior to March 1999 is all that is
required for environmental plaintiffs' fee petition to proceed.
The analysis of "substantial justification" is a one time
threshold determination.

> The single finding that the Government's position lacks
> substantial justification, like the determination that
> a claimant is a "prevailing party," thus operates as a
> one-time threshold for fee eligibility. In EAJA cases,
> the court first must determine if the applicant is a
> "prevailing party" by evaluating the degree of success
> obtained. If the Government then asserts an exception
> for substantial justification or for circumstances that
> render an award unjust, the court must make a second
> finding regarding these additional threshold
> conditions. As we held in *Hensley v. Eckerhart*, 461
> U.S. 424, 40 (1983), the "prevailing party" requirement
> is "a generous formulation that brings the plaintiff
> only across the statutory threshold. It remains for the
> district court to determine what fee is 'reasonable.'"
> *Id.*, at 433.

*Jean*, 496 U.S. at 160.   Here, although the federal defendants and

---

    [10]   The district court in *Gonzales* had dismissed these
factors as inconclusive, relying instead on the Supreme Court's
subsequent decision on the merits, which held that the statute
was unconstitutional, to find that the government's position was
not substantially justified.   The Ninth Circuit found that the
district court put "undue weight on the Supreme Court's holding
on the merits" and criticized the district court's reliance "on
hindsight, rather than an assessment of the reasonableness of the
government's position at the time of the litigation."   *Id*. at
620.

water authority plaintiffs raise serious questions as to the
extent of the environmental plaintiffs' success in later stages
of the litigation, such challenges are more appropriately
considered in calculating the amount of the fee award.

### c.    *Special Circumstances*.

"Where the position of the government as a whole is not
substantially justified, an award of attorney fees to the
prevailing party is required unless 'special circumstances make
an award unjust.'" *Gutierrez v. Barnhart*, 274 F.3d 1255, 1261
(9th Cir. 2001) (quoting 28 U.S.C. § 2412(d)(1)(A)).  "This
provision, however, should only be invoked with caution" and
"should be narrowly construed." *Lucas v. White*, 63 F. Supp. 2d
1046, 1056 (N.D. Cal 1999) (citing *J & J Anderson, Inc. v. Town
of Erie*, 767 F.2d 1469, 1474 (10th Cir. 1985); *Martin v. Heckler*,
773 F.2d 1145, 1150 (11th Cir. 1985)).  Such a narrow reading of
this provision is in accord with the purpose of the EAJA, a
"clearly stated objective of [which] is to eliminate financial
disincentives for those who would defend against unjustified
governmental action and thereby to deter the unreasonable
exercise of Government authority." *Ardestani*, 502 U.S. at 138.

"It is the government's burden to show that its position was
substantially justified or that special circumstances exist to
make an award unjust." *Gutierrez*, 274 F.3d at 1258.  Defendants
have not identified any special circumstances that would make an
award of fees or costs unjust.  The rule initially adopted did
not conform to the requirements of
§ 3406(b)(2) et seq. and required court intervention to order
Interior to formulate a rule that complied with the CVPIA.  The
federal defendants have not met their burden of proof.

**31**

**d.   Conclusion Re: Eligibility for EAJA fees**

Environmental plaintiffs timely filed a complete fee application.   They were prevailing parties on at least one important claim in which the federal defendants' position was not substantially justified.   Finally, the government has not shown that special circumstances make an award unjust.


**B.   Reasonable Costs and Fees**.

**1.   Legal Framework.**

Once threshold eligibility under the EAJA is established, the court must then determine an appropriate award.   The EAJA provides that, in non-tort civil actions against the United States, a district court "shall award...fees and other expenses" to a prevailing plaintiff.   28 U.S.C. § 2412(d)(1)(A).   Under the terms of 28 U.S.C. § 2412(d)(2)(A) fees and other expenses include:

> (1)   the reasonable expenses of expert witnesses,
>
> (2)   the reasonable cost of any study, analysis, engineering report, test, or project which is found by the court to be necessary for the preparation of the party's case, and
>
> (3)   reasonable attorney fees (The amount of fees awarded under this subsection shall be based upon prevailing market rates for the kind and quality of the services furnished, except that (I) no expert witness shall be compensated at a rate in excess of the highest rate of compensation for expert witnesses paid by the United States; and (ii) attorney fees shall not be awarded in excess of $ 125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee.)

The phrase "fees and other expenses" is defined to include "reasonable attorney fees."   24 U.S.C. § 2412(d)(2)(A).   "In

determining what a reasonable attorney's fee entails, the district court must apply the hybrid approach adopted in *Hensley v. Eckerhart*, 461 U.S. 424, 433 [] (1983)." *United States v. $12,248 U.S. Currency*, 957 F.2d 1513, 1520 (9th Cir. 1992).[11] "The most useful starting point for determining the amount of a reasonable fee is [1] the number of hours reasonably expended on the litigation [2] multiplied by a reasonable hourly rate." *Sorenson v. Mink*, 239 F.3d 1140, 1145 (9th Cir. 2001)(relying upon *Hensley*, 461 U.S. at 433).  The resulting figure is known as the "Lodestar."

To determine what qualifies as reasonable attorney's fees, the Ninth Circuit has adopted the twelve Lodestar Factors as "guidelines [and] as appropriate factors to be considered in the balancing process required in a determination of reasonable attorney's fees:"

(1)   the time and labor required,

(2)   the novelty and difficulty of the questions involved,

(3)   the skill requisite to perform the legal service properly,

(4)   the preclusion of other employment by the attorney due to acceptance of the case,

(5)   the customary fee,

---

[11]   Although "*Hensley* was an attorney-fee proceeding under § 1988; however, it also is applicable to awards of fees under the EAJA." *Sorenson v. Mink*, 239 F.3d 1140, 1145 (9th Cir. 2001) (citing *INS v. Jean*, 496 U.S. 154, 161 (1990) (stating that, when a plaintiff has demonstrated eligibility for attorney fees under the EAJA, "the district court's task of determining what fee is reasonable is essentially the same as that described in *Hensley*")); *Atkins v. Apfel*, 154 F.3d 986, 988 (9th Cir. 1998) (finding *Hensley* governs the award of attorney fees under EAJA).

(6)   whether the fee is fixed or contingent,

(7)   time limitations imposed by the client or the circumstances,

(8)   the amount involved and the results obtained,

(9)   the experience, reputation, and ability of the attorneys,

(10)  the "undesirability" of the case,

(11)  the nature and length of the professional relationship with the client, and

(12)  awards in similar cases.

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 71 (9th Cir. 1975) (suits brought pursuant to 29 U.S.C. §§ 412 and 529) (citing *Johnson*, 488 F.2d 714); *see also $12,248 U.S. Currency*, 957 F.2d at 1520 (applying the twelve factors outlined in *Kerr* to the EAJA).  "[Although] the lodestar determination has emerged as the predominate element of the analysis....the court [can still] make adjustments to the lodestar figure based on the 'riskiness' of the lawsuit and the quality of the attorney's work." *Jordan v. Multnomah Co.*, 815 F.2d 1258, 1262 n.5 (9th Cir. 1986).  In addition, the court may reduce the fee award "if the relief, however significant, is limited in comparison to the scope of the litigation as a whole." *Hensley*, 461 U.S. at 440.

### 2.   Summary of the Government's Objections to the Fee Request.

Here, the government raises a number of threshold objections to the fee petition.  First, the government argues that the environmental plaintiffs "have failed to exercise billing discretion" by "failing to exclude excessive, redundant or

**34**

1  otherwise unnecessary fees," and by using "block billing."  Doc.

2  583, Opp. at 20-21.  Second, the government objects to

3  environmental plaintiffs' request that their lead attorney be

4  reimbursed at $400.00 per hour.  These objections are not well

5  founded.

6      The government's primary objection is that environmental

7  plaintiffs' success was "limited in comparison to the scope of

8  the litigation as a whole."  The government and the water

9  authority plaintiffs also question whether plaintiff is entitled

10 to fees for work performed in opposition to motions filed by the

11 water authority plaintiffs.  These objections are discussed at

12 length below.

13     Finally, the government disputes environmental plaintiffs'

14 entitlement to requested costs and expert fees.

15         **3.   Alleged Billing Inadequacies.**

16     "Where the documentation of hours is inadequate, the

17 district court may reduce the award accordingly.  The district

18 court also should exclude from this initial fee calculation hours

19 that were not 'reasonably expended.'"  *Sorenson*, 239 F.3d at 1146

20 (quoting *Hensley*, 461 U.S. at 433-34).  If the court finds that

21 "portions of the fee request are documented inadequately and

22 reflect duplicative efforts and excessive staffing," it may lower

23 the fee award.  *Id*.  Although "[a] district court has wide

24 latitude in determining the number of hours that were reasonably

25 expended by the prevailing lawyers,...it must provide enough of

26 an explanation to allow for meaningful review of the fee

27 award....[it must] explain how or why the unspecified reduction

28 in hourly rate fairly balanced the unspecified number of

improperly billed hours."  *Id*.

1

### a.   Excessive billing.

2    Defendants offer several examples of excessive billing.

3  First, the government suggests that it was excessive for an

4  experienced attorney such as Save San Francisco Bay's Koehler to

5  take 66 hours to draft the complaint in this case.  Environmental

6  plaintiffs responds that in order to understand the complex

7  claims against the federal defendant, Koehler had to "meet with

8  her client organizations, confer with co-counsel, familiarize

9  herself with the available administrative records, research the

10  law of CVPIA and federal judicial review of administrative

11  actions, and draft, revise and edit the pleading which would

12  commence a long-running lawsuit against the federal government."

13  Doc. 602, Reply, at 12.  The government's objection is not

14  persuasive.  Sixty-six hours is not an unreasonable amount of

15  time to spend drafting the complaint in this case which is

16  legally and technically complex.

17    Second, the government protests the 155 hours spent by Ms.

18  Koehler and Mr. Friedman preparing their fee application,

19  especially in light of the fact that Friedman states in his

20  declaration that fee litigation "has been one of the principal

21  focuses of my 17 years of practice."  The environmental

22  plaintiffs respond that the time spent (75 hours by Friedman, who

23  served as retained fee counsel, and 81 by Koehler) was actually

24  an exercise in efficiency.  Environmental plaintiffs attempted to

25  settle the fee dispute but point out that, when not settled, such

26  disputes, by reason of the meticulous detail and volume of

27  information required, absorb enormous amounts of time.  The

28  environmental plaintiffs' position is supported by the caselaw

which recognizes that fee litigation can become a "case within a

**36**

1  case" and a burden on the parties and the court.  Jean, 497 U.S.
2  at 163 (cautioning that "[a] request for attorney's fees should
3  not result in a second major litigation").  It has taken the
4  court far more than 155 hours to evaluate and analyze this fee
5  petition.  The hours spent by environmental plaintiffs on the fee
6  petition are not unreasonable.

7                    ***b.   Block Billing.***

8      Federal defendants also protest that environmental
9  plaintiffs employ the "block billing" format.  In block billing,
10 an attorney groups several functions within one block for a
11 specific date and a total figure is provided for all of the
12 services performed in that block.  With block billing it is
13 impossible to determine what time was spent on a specific task.

14     The "fee applicant bears the burden of establishing
15 entitlement to an award and documenting the appropriate hours
16 expended and hourly rates."  *Hensley*, 461 U.S. at 437.  "The
17 applicant should exercise 'billing judgment' with respect to
18 hours worked...and should maintain billing time records in a
19 manner that will enable a reviewing court to identify distinct
20 claims."  *Id.*  Though "there is no certain method of determining
21 when claims are related or unrelated[,] [and] Plaintiff's
22 counsel...is not required to record in great detail how each
23 minute of his time was expended[,]...counsel should [still]
24 identify the general subject matter of [] time expenditures."
25 *Id.* at 437 n.12.

26     Here, it does not appear that block billing was used.  The
27 lengthy detailed billing records submitted by environmental
28 plaintiffs identify particular tasks, the dates they were

                              **37**

1  performed, and the amount of time taken to complete the

2  particular tasks.  This documentation provides sufficient detail

3  to allow the parties and the court to evaluate the amount of time

4  billed and its relationship to the work performed.

5        **4.   Hourly Rates.**

6      Environmental plaintiffs request that their lead counsel,

7  Ms. Koehler, be compensated at an hourly rate of $400.  They

8  request that all other lawyers be compensated at $150 (the

9  statutory maximum of $125 plus an allowable adjustment for cost

10  of living).

11      Under the EAJA, though attorney's fees are generally set at

12  the market rate, they are nevertheless capped at $125 per hour.

13  *Atkins v. Apfel*, 154 F.3d 986. 987 (9th Cir. 1998).  Although the

14  EAJA sets a ceiling of $125 per hour, the court may determine

15  "that an increase in the cost of living or a special factor, such

16  as the limited availability of qualified attorneys for the

17  proceedings involved, justifies a higher fee."  28 U.S.C. §

18  2412(d)(2)(A).

19      With respect to the unopposed request to adjust the $125 cap

20  to $150 for all attorneys other than Ms. Koehler, to adjust for

21  the cost of living, the Ninth Circuit applies the consumer price

22  index for all urban consumers (CPI-U).  *Jones v. Espy*, 10 F.3d

23  690, 692-93 (9th Cir. 1993).  Here, such a CPI adjustment is

24  necessary to raise the $125 cap to the $150 level requested for

25  all attorneys other than Ms. Koehler.  The environmental

26  plaintiffs submit their own calculation based on a CPI calculator

27  available online through the Federal Reserve Bank of Minneapolis.

28

**38**

1   *See* Friedman Decl., Doc. 579.[12]   This calculation indicates that

2   an hourly rate of $125 in 1996 (the year the cap was set by

3   Congress) equates to more than $150 in today's dollars.   The

4   requested $150 per hour figure is appropriate.

5       The federal defendants vehemently object, however, to

6   awarding Ms. Koehler fees at $400 per hour.   To determine whether

7   $400 per hour is appropriate, the court must determine whether

8   the statutory exception for limited availability of qualified

9   attorneys applies here.   *See* 28 U.S.C. § 2412(d)(2)(A).   This

10  provision "refers to attorneys having some distinctive knowledge

11  or specialized skill needful for the litigation in question."

12  *Rueda-Menicucci v. INS*, 132 F.3d 493, 496 (9th Cir. 1997)

13  (permitting an exceeding of the $125 cap because immigration law

14  is a specialty); *Pierce*, 487 U.S. at 552 (recognizing patent law

15  as a specialty whose attorneys may be entitled to extra fees);

16  *Pirus v. Bowen*, 869 F.2d 536 (9th Cir. 1989) (finding lawyers who

17  specialize in social security may be entitled to extra fees);

18  *Animal Lovers Volunteer Assoc. v. Carlucci*, 867 F.2d 1224, 1226

19  (9th Cir. 1989) (finding environmental litigation an identifiable

20  practice specialty that requires distinctive knowledge).

21      Three conditions must be met for an award in excess of the

22  $125 cap to be awarded:

23      (1)   The attorney must possess distinctive knowledge and

24            skills developed through a practice specialty.

25      (2)   Those distinctive skills must be needed in the

26

27  ───────────────

28  [12]   The calculator is available at
    http://minneapolisfed.org/research/data/us/calc/

**39**

1    litigation.

2        (3)  Those skills must not be available elsewhere at the

3             statutory rate.

4    *Pirus*, 869 F.2d at 541-42; *United States v. 22249 Dolorosa St.*,

5    190 F.3d 977, 984-85 (9th Cir. 1999).  "Environmental litigation

6    is an identifiable practice specialty that requires distinctive

7    knowledge."  *Love*, 924 F.2d at 1496 (citing *Animal Lovers*, 867

8    F.2d at 1226).[13]

9        The parties do not seriously dispute that environmental

10   plaintiffs have satisfied the first two *Love* requirements.  Ms.

11   Koehler has extensive experience in the field of environmental

12   litigation, with particular emphasis on water law and aquatic

13   species protection.  Among other credentials, she served as Legal

14   Director for Save San Francisco Bay Association for approximately

15   five years, where she litigated numerous federal and state water

16   policy cases.  From 1995 through 2000, she served on the CALFED

17   Ecosystem Roundtable. Other distinguished attorneys in the field

18   have described her as "one of the top water law attorneys in

19   California."  Rossman Decl., at ¶6.  Such expertise is absolutely

20   necessary for effective litigation of cases involving CVIPA water

21

22       [13]  The federal defendants cite *Select Milk Producers, Inc.*

23   *v. Johanns*, 400 F.3d 939, 950-51 (D.C. Cir. 2005), in which the

     D.C. Circuit applied its long-standing rule that "an attorney

24   cannot be awarded enhanced fees under the special factor

     exception based solely on expertise the lawyer acquired through

25   practice in a specific area of administrative law."  Critically,

     however, the Ninth Circuit applies a <u>contrary rule</u>.  *See Love*,

26   924 F.2d 1492  (environmental expertise may constitute a special

     factor).  The D.C. Circuit has acknowledged this split in

27   *Truckers United for Safety v. Mead*, 329 F.3d 891, 895 n.6 (D.C.

     Cir. 2003)(noting contrary rule from *Love*).  *Love* controls here.

28

**40**

1   issues.[14]  Ms. Koehler's performance as lead counsel demonstrates

2   she is a highly competent and effective advocate in a very

3   complex sub-specialty of environmental law, water resource

4   preservation and management.

5        The government's objections primarily concern the third Love

6   requirement: that the specialized skills of the attorney must not

7   be available elsewhere at the statutory rate.  Specifically, the

8   Federal defendants argue that (1) environmental plaintiffs have

9   failed to demonstrate that few attorneys would have been

10  available to take this case at $150 per hour; (2) the requested

11  hourly rate of $400 is based upon fees charged by attorneys in

12  San Francisco, not Fresno; and (3) it is improper to award fees

13  for Ms. Koehler's work because she received a salary from Save

14  San Francisco Bay during the course of this litigation

15       With respect to the first objection, the federal defendants

16  rely upon the district court's prior ruling in this case on the

17  water authority plaintiffs' fee petition.  In that ruling, an

18  enhanced rate was not awarded because the water authority

19  plaintiffs failed to "provide evidence that the specialized

20  skills required for this case were not available elsewhere at the

21  statutory rate."  Doc. 567 at 49-50.  Here, however, evidence has

22  been submitted on the general unavailability of public interest

23  specialty lawyers for this type of complex and extended

24  litigation.

25

26       [14]    Ms. Koehler's qualifications served to justify an
    enhanced fee award in another case in this District.  Koehler
27  Decl., Doc. 578, at ¶28; *NRDC v. Patterson*, Case No. 2:88-CV-1658
    LKK GGH.
28

**41**

1     Environmental plaintiffs have established that no other

2  attorney with Ms. Koehler's distinctive skills would have been

3  available at the statutory rate (adjusted for inflation) of $150

4  per hour.  For example, environmental plaintiffs provide the

5  declaration of Antonio Rossman, Esq., a well-known and highly

6  experienced natural resource attorney, who states that "there are

7  only a few individuals anywhere in the state who could have

8  effectively served as a lead counsel in [this] case, and I

9  believe none of them would have been willing to work on the case

10  with a capped fee rate."  Rossman Decl., at ¶8.

11     The government's second objection is that the requested rate

12  of $400 is based upon the San Francisco market, not the local,

13  Fresno market.  As a general rule, a court should base a fee

14  award on "the prevailing market rates in the relevant community,

15  which typically is the community in which the district court

16  sits."  *Schwartz v. Secretary of Health and Human Serv.*, 73 F.3d

17  895, 906 (9th Cir. 1995).  However, in *Gates v. Deukmejian*, 987

18  F.2d 1392 (9th Cir. 1993), the Ninth Circuit articulated a narrow

19  exception to this rule.  In *Gates*, the Ninth Circuit permitted an

20  award of fees to San Francisco lawyers at San Francisco market

21  rates-even though the forum district was Sacramento, because

22  plaintiff proved that "Sacramento firms could not successfully

23  have provided the expert representation required to effectively

24  represent the litigants in [that] matter."  *Id.* at 1405.  Mr.

25  Rossman's declaration that "there are only a few individuals

26  anywhere in the state who could have effectively served as a lead

27  counsel in [this] case, and I believe none of them would have

28  been willing to work on the case with a capped fee rate" is

**42**

1  sufficient to justify application of the Gates exception here.

2      The district court, as an expert in attorney's fees, *see*

3  *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 561

4  (5th Cir. 2004), *Env'tl Defense Fund, Inc. v. Reilly*, 1 F.3d

5  1254, 1256 (D.C. Cir. 1993), recognizes that although water

6  attorneys are available in the Fresno Division at the $250.00 to

7  $300.00 hourly rate, these attorneys generally represent water

8  districts and water users.  The court is unaware of any Fresno

9  Division lawyers practicing public interest water law who

10 actively try comparable cases in federal or state court.  Nor is

11 the court aware of any private water law attorneys in the Fresno

12 Division representing plaintiffs with the level of expertise

13 exhibited by Ms. Koehler.

14     The government points out that Ms. Koehler's may have

15 received a salary from Save San Francisco Bay during the course

16 of this litigation.  The government suggests that it may be

17 improper to award Ms. Koehler fees at an hourly rate beyond the

18 hourly-rate equivalent of her salary.  But, the government points

19 to no authority that is on point.[15]  In fact, the actual expense

20 incurred by the client (in this case the salary paid by the non-

21 profit) is irrelevant to the amount of an EAJA award.

22

23     [15]   The government does cite *Curran v. Department of*

24 *Treasury*, 805 F.2d 1406 (9th Cir. 1986), in which the Ninth
   Circuit considered the ethical implications of an award of fees

25 to a non-profit organization.  *Curran* held that fee-splitting is
   appropriate where the non-profit maintains a "separate operating

26 account for legal services."  Although *Curran* suggests that there
   may be ethical consequences to an EAJA award under certain

27 circumstances, *Curran* does not bar an attorney salaried by a non-
   profit organization from seeking EAJA attorneys fees in the

28 amount of the reasonable value of the services performed.

**43**

> The computation of attorney fees should be based on prevailing market rates without reference to the fee arrangements between attorney and client.... The fact that attorneys may be providing services at <u>salaries or hourly rates below the standard commercial rates</u> which attorneys might normally receive for services rendered is not relevant to the computation of compensation under the [EAJA].

*Cornella v. Schweiker*, 728 F.2d 978, 986 (11th Cir. 1984)(citing H.R. Rep. No. 1418, 96th Cong., 2d Sess., at 15, reprinted in 1980 U.S.C.C.A.N 4953, 4994).

Environmental plaintiffs' evidence justifies a higher rate for Ms. Koehler.  Her time shall be compensated at the rate of $400.00 per hour.

## 5.   **Extent of Environmental Plaintiffs' Success**.

The crux of the dispute in this case is whether the environmental plaintiffs' fee award should be reduced to account for the extent (or lack thereof) of their success.  "[A] court may reduce the fee award in cases where the plaintiff only received partial or limited success."  *Sorenson*, 239 F.3d at 1147 (quoting *Hensley*, 461 U.S. at 436-37).  A prevailing plaintiff is "not entitled to compensation for attorney's fees for time expended unsuccessfully pursuing claims unrelated to those on which plaintiff ultimately prevailed."  *Id*. at 434-35.  However, "where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised."  *Id*. at 440.  The Ninth Circuit has interpreted this holding "as establishing the general rule that plaintiffs are to be compensated for attorney's fees incurred for services that contribute to the ultimate victory in the lawsuit."  *Cabrales v.*

**44**

*Co. of L.A.*, 935 F.2d 1050, 1052 (9th Cir. 1992).

The Ninth Circuit has adopted a two part test to determine which legal services contributed to the ultimate victory in the lawsuit and whose fees were deserving of restitution.

### Part I

> The first step is to consider whether "the plaintiff failed to prevail on claims that were unrelated to the claims on which he succeeded." *Id*. [*Hensley*, 461 U.S.] at 434. Claims are "unrelated" if they are "entirely distinct and separate" from the claims on which the plaintiff prevailed. *Odima* [*v. Westin Tucson Hotel*], 53 F.3d 1484, 1499 [(9th Cir. 1995)]. Hours expended on unrelated, unsuccessful claims should not be included in an award of fees.

### Part II

> The second step of the *Hensley* analysis is to consider whether "the plaintiff achieved a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award." *Id*. [*Hensley*, 461 U.S.] at 434. In answering that question, a district court "should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id*. at 435. "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Id*. A plaintiff may obtain excellent results without receiving all the relief requested. *Id*. at 435 n.11.

*Sorenson*, 239 F.3d at 1147.

Under the EAJA, recovery may only be awarded "to the prevailing party in any civil action <u>brought by or against the United States or any agency or any official of the United States acting in his or her official capacity</u>." 28 U.S.C. § 2412(a)(1). The EAJA allows for the recovery of "[f]ees and other expenses" but only from "an agency over which the party prevails." *Id*. at (d)(4). As a result, the prevailing party may not use the EAJA

**45**

1   to recover from a private party or non federal agency against

2   whom it prevailed.  As a general rule, "attorney's fees are only

3   appropriate for portions of the litigation made necessary by

4   government opposition to legitimate claims of the party seeking

5   the award."  *Love*, 924 F.2d at 1496 (citing *Avoyelles Sportsmen's*

6   *League v. Marsh*, 786 F.2d 631 (5th Cir. 1986)).  "[A]n award is

7   not appropriate for a phase of the litigation in which the party

8   seeking an award was opposed only by other, non-governmental

9   parties...."  *Id*.  The burden is on a plaintiff to show that

10  "their claimed expenses were incurred in opposing improper

11  government resistance to their rightful demands."  *Id*. at 636

12  (emphasis added).

13      Environmental plaintiffs urge the application of a more

14  flexible rule relied upon by several courts in other

15  jurisdictions, including *American Lung Ass'n v. Reilly*, 144

16  F.R.D. 622, 629 (E.D.N.Y. 1992), *Jenkins by Agyei v. Missouri*,

17  967 F.2d 1248, 1251 (8th Cir. 1992), and *Environmental Defense*

18  *Fund v. EPA*, 672 F.2d 42 (D.C. Cir. 1982), all of which found

19  time expended on issues raised by a non-governmental interest to

20  be compensable.  Although *American Lung* does articulate a rule

21  favorable to environmental plaintiffs, it is contrary to Ninth

22  Circuit precedent.  The *American Lung* court specifically

23  disregards the Ninth Circuit rule from *Love*, choosing another

24  approach:

25          The Love/Avoyelles test is overly formalistic because
            it turns exclusively on whether or not the government
26          participates in a phase of a lawsuit. [The D.C. Circuit
            case] *EDF v. EPA* [672 F.2d 42] recognizes that
27          alignment of interests between government and a private
            intervenor-defendant might exist even when the
28          government takes no position on a matter. The *EDF v.*

**46**

> *EPA* approach is preferable because it instructs district courts to examine the facts and circumstances surrounding the government's abstention.
>
> Applying the *EDF v. EPA* test to the instant motion, it is clear that an alignment of interests existed between the EPA and Alabama Power. Alabama Power filed a provisional answer to plaintiffs' complaint raising defenses almost identical to the EPA's answer.

144 F.R.D. 629.  In this circuit, however, *Love* controls.  The environmental plaintiffs do not point to any cases from this circuit adopting the *American Lung* approach over the rule enunciated in *Love*.  Fees cannot be recovered for litigating discrete issues that were raised by non-governmental parties.

The parties do not agree on the degree of success experienced by the environmental plaintiffs in this case.  The parties also dispute the environmental plaintiffs' entitlement to fees for time spent opposing certain motions filed by the water authority plaintiffs.  In order to evaluate the fee request in light of these concerns, it is helpful to break the litigation into three phases: (1) challenges to the initial Administrative Proposal; (2) requests for injunctive relief following the decision on the Administrative Proposal; and (3) subsequent litigation concerning the Interim Decision and related appeals.[16]

---

[16]    The water authority plaintiffs suggest breaking down the litigation differently, into the following three phases: (1) the initial summary judgment motions and injunctive relief requests regarding the AP, (2) the second round of summary judgment motions regarding the Interim Decision, and (3) the appeals before the Ninth Circuit.  But, the appeals before the Ninth Circuit are directly relevant to a determination of the environmental plaintiffs' success on the second round of summary judgment motions.  If a party is successful on appeal, time spent litigating that issue in the trial court is also compensable. *See Larez v. city of Los Angeles*, 946 F.2d 630, 649 (9th Cir. 1991).  Therefore, it is more helpful to analyze these two phases together.

The extent of the environmental plaintiffs' success at each of these stages is discussed below, as is the propriety of awarding fees claimed for time spent opposing motions filed by the water authority plaintiffs.

### a.   *Litigation Concerning the Administrative Proposal.*

The environmental plaintiffs experienced considerable success in the early stages of litigation, leading up to the issuance of a decision on the initial round of summary judgment motions concerning Interior's final administrative proposal.  The environmental plaintiffs break this early stage of litigation into five central issues/arguments, each of which is discussed below.

### (1)   Dedicate and Manage.

Environmental plaintiffs' assert that their "bedrock" claim during the first round of summary judgment motions was that the final AP was an abuse of discretion because it treated (b)(2) water as a discretionary allocation, thereby failing to satisfy the statutory requirement that Interior "dedicate and manage" the 800 TAF dedicated yield.  The district court found that the AP was contrary to (b)(2)'s requirement that Interior calculate, dedicate, and manage 800 TAF for (b)(2) purposes.  Doc. 156 at 28-33.

### (2)   Five Year "No Need" Finding.

The environmental plaintiffs successfully argued that Interior's inclusion in the AP of a five-year 'no-need' finding to justify rededication of any unused portion of (b)(2) water was a misapplication of the statute.  Doc. 159 at 7.

**48**

1

(3)   <u>Plan for Anadromous Fish</u>.

2   Environmental plaintiffs obtained summary adjudication on

3   their claim that Interior's failure to timely develop a plan for

4   doubling anadromous fish populations violated section 3406(b)(1).

5   Doc. 159 at 7.

6

(4)   <u>Reuse of (b)(2) Water</u>.

7   Environmental plaintiffs also unsuccessfully argued that it

8   was an abuse of discretion for Interior to allow the recapture

9   and/or reuse of (b)(2) water for other consumptive uses.  The

10  district court rejected this contention, finding instead that

11  Interior had "discretion to manage (b)(2) water for multiple

12  uses, so long as the environmental requirements of (b)(2) are

13  achieved."  Doc. 156 at 38.  Environmental plaintiffs concede

14  that they were not successful on this ground, but maintain that

15  this claim shared a common core of facts and law and are

16  therefore compensable under *Hensley/Sorenson*.  Nevertheless, to

17  account for their lack of success on this issue, the

18  environmental plaintiffs have reduced the fees claimed on the

19  initial round of summary judgment motions by 10%, or 21 hours.

20

(5)   <u>Other Identified Adverse Impacts</u>.

21  Finally, environmental plaintiffs argued that Interior

22  failed to address "other adverse environmental impacts" as

23  required by 3406(b)(1).[17]  Environmental plaintiffs acknowledge

24

25      [17]   Section 3406(b)(1) requires the Secretary of the
26  Interior to:

27      develop within three years of enactment and implement a
        program which makes all reasonable efforts to ensure that,
28      by the year 2002, natural production of anadromous fish in

**49**

that they did not prevail on this issue, but explain that most of the work on this issue was performed by counsel for NRDC, for whom no fees are requested.  Environmental plaintiffs make no claim for work performed by Ms. Koehler on this issue.

The federal defendants appear to concede that the ruling on this initial round of summary judgment motions was at least a partial victory for the environmental plaintiffs. *See* Doc. 583, Opp. at 8.  However, the federal defendants insist that the environmental plaintiffs' success was "modest, and any award of fees should reflect that fact."  Specifically, the federal defendants take issue with the characterization of the "dedicate and manage" argument as a "bedrock" claim.  The federal defendants point to language from this court's decision on the water authorities' application for fees and costs, which characterized the "bedrock claim" as whether "the 1928-34 drought regime should be the measuring criterion for [the] yield calculation."  Doc. 567 at 30.  This is true in part.  The water authority plaintiffs' main claim concerned the standard that should be applied to (b)(2).  However, the dedicate and manage

Central Valley rivers and streams will be sustainable, on a long-term basis, at levels not less than twice the average levels attained during the period of 1967-1991...And provided further, That in the course of developing and implementing this program the Secretary shall make all reasonable efforts consistent with the requirements of this section to address *other identified adverse environmental impacts* of the Central Valley Project not specifically enumerated in this section.

(emphasis added).

claim was equally important to cause Interior to rewrite the
Final Decision to comply with the law.

The environmental plaintiffs have already accounted in part
for those issues on which they did not prevail at this initial
stage of the litigation.  They voluntarily deducted 10% of the
time spent on the initial round of summary judgment motions to
account for their lack of success on the "reuse of b(2) water"
issue and they are essentially not claiming fees for time spent
on the "other identified adverse impacts" issue.  An additional
10% must be deducted for time spent opposing the water authority
plaintiffs' claims.  The environmental plaintiffs should reduce
their fee request by an additional 10% of the hours spent on the
first phase of the litigation, up to and including the issuance
of the district court's decision on the first round of summary
judgment motions.

### b. Requests for Injunctive Relief Following the Ruling on the Administrative Proposal.

Immediately following the decision on the initial round of
summary judgment motions concerning the Administrative Proposal,
the water agency plaintiffs applied for a temporary restraining
order, seeking to enjoin (b)(2) operations for the 1999 water
year and alleging that Interior's then-operative accounting
methods would exceed the 800 TAF dedication cap.  On April 16,
1999, the court issued a temporary restraining order, enjoining
Interior from implementing certain "Delta Actions" described in
the "Final Administrative Proposal on the Management of
3406(b)(2) Water."  *See* Doc. 174.  A preliminary injunction

eventually issued, which precluded Interior from "implementing Section 3406(b)(2) of the [CVPIA] in the 1999 water year...in a manner that results in the dedication and management of more than or less than 800,000 acre-feet of CVPIA yield for 3406(b)(2) purposes."  Doc. 209, filed May 14, 1999.

Environmental plaintiffs request 50% of the time counsel spent responding to the application for a temporary restraining order.  The water authority plaintiffs and the federal defendants object to any award of fees for this work on the ground that the environmental plaintiffs were not aligned against the government when addressing the TRO request.  *See* Doc. 314 at 8 (Fed. Deft's Suppl. Opp'n) & Doc. 611 at 3 (Water Auth. Suppl. Opp'n).

As discussed above, the applicable rule is set forth in *Love*:

> [A]ttorney's fees are only appropriate for portions of the litigation made necessary by government opposition to legitimate claims of the party seeking the award....[A]n award is not appropriate for a phase of the litigation in which the party seeking an award was opposed only by other, non-governmental parties...[T]he burden on the plaintiffs to show that "their claimed expenses were incurred in opposing improper government resistance to their rightful demands."

924 F.2d 1495-96 (citing *Avoyelles*, 786 F.2d at 632, 636).

Both the water authority plaintiffs and the federal defendants insist that the federal defendants and environmental plaintiffs were aligned with one another throughout the temporary restraining order proceedings.  Environmental plaintiffs correctly point out, however, that they consistently highlighted one issue not advanced by the federal defendants -- the possibility that Interior's implementation of 3406(b)(2) in the

1   1999 water year might result in the dedication of <u>less</u> than

2   800,000 acre-feet of CVPIA yield for 3406(b)(2) purposes.  This

3   concern was embodied in the injunctive relief issued by the

4   court.  Doc. 174 at 3 ("...this order shall not be construed to

5   modify this Court's earlier ruling that I must provide the full

6   and entire 800,000 acre-feet dedication to the 3406(b)(2)

7   purposes enumerated in this statute.").  To a certain extent,

8   environmental plaintiffs hijacked the injunctive relief

9   proceedings to effectuate their own purposes.

10       The standard from *Love* is not easily applied under these

11  circumstances.  In a technical sense, environmental plaintiff's

12  participation in the injunctive relief proceedings <u>does not</u>

13  constitute an expense "incurred in opposing improper government

14  resistance to their rightful demands."  On the other hand,

15  environmental plaintiffs' efforts to interject their concerns

16  into the injunctive relief process represents a natural extension

17  of <u>otherwise compensable</u> (successful) efforts to obtain relief

18  during the initial round of motions for summary judgment.  The

19  environmental plaintiffs' work related to the issuance of

20  injunctive relief arose out of a <u>three-sided</u> debate over

21  accounting that began well before the water authority plaintiff's

22  request for injunctive relief.

23       In this light, the work done by environmental plaintiffs to

24  shape the form of injunctive relief was made necessary by

25  positions taken by the government on accounting issues in related

26  proceedings.  The environmental plaintiffs were protecting past

27  victories from erosion.  However, given the Ninth Circuit's

28  expressed reluctance to compensate parties for time spent in

**53**

proceedings opposed only by non-governmental parties,
environmental plaintiff's request for 50% of the time spent on
the injunctive relief proceedings is excessive.[18]   The
environmental plaintiffs ultimately sought the inclusion of a
provision in the injunction that the annual (b)(2) dedication not
be <u>less</u> than 800,000 acre-feet.   Plaintiffs are entitled to 20%
of the time spent responding to the temporary restraining order
and participating in related injunctive relief proceedings.   This
figure accounts for the extent to which the form of injunctive
relief that eventually issued successfully protected
environmental plaintiffs' previous victories against the
government.   Environmental plaintiffs are directed to adjust
their fee request accordingly.

### c.   Challenges after the Issuance of the Interim Decision.

The final stage of the litigation breaks down into eight
separate challenges/issues.   The environmental plaintiffs raised
three main challenges to the interim decision: (1) that the
"primary purpose" of restoration was not being adequately
advanced; (2) that the Interim Decision made several modeling
errors resulting in an overstatement of water dedicated to (b)(2)
purposes; and (3) that the Interim Decision used an inappropriate

---

[18]      The environmental plaintiffs also volunteer to deduct
an additional 10% from the time spent on the preliminary
injunction proceedings to reflect their lack of success on the
"change of storage metric" issue.   (*See infra* at p. 61.)
Environmental plaintiffs should increase this to a total
deduction of 80% of the time spent on the temporary and
preliminary injunctive relief proceedings.

cut-off date for use of the upstream action "change of storage metric."  The environmental plaintiffs raised four other legal challenges concerning: (4) American River Flows; (5) Banking Issues; (6) Section 3406(b)(2)(D) Findings; and (7) Offset/Reset. Finally, (8) environmental plaintiffs unsuccessfully sought a stay pending appeal.

(1)  <u>Primary Purpose</u>.

The environmental plaintiffs alleged that using up to 450 TAF of (b)(2) water to satisfy ESA and WQCP requirements is contrary to the plain language of CVPIA § 3406(b)(2) and contravenes the CVPIA as a whole.[19]  *See* Doc. 431 at 13-22.  The district court ruled that:

> Section 3406(b)(2) unambiguously directs Interior to "dedicate and manage annually eight hundred thousand acre-feet of Central Valley Project yield for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title."  Interior has no discretion whether to annually provide more or less than 800 TAF of CVP yield (approximately 5.99 MAF) for (b)(2) purposes, unless it makes certain findings under CVPIA § 3406(b)(2)(C)... Interior is also directed to annually dedicate and manage the mandatory 800 TAF of CVP yield "to assist

---

[19]   In their opening appellate brief, the environmental plaintiffs summarized the parties positions on summary judgment of this issue:

> Environmental Appellants moved for summary judgment on the ground that the Final Decision fails to allocate most of the 800,000 AF dedication to the "primary purpose" of implementing the ecosystem restoration measures authorized by the CVPIA. The Water Agencies sought the opposite ruling: that Interior must use the (b)(2) water to cover all of the CVP's water quality and endangered species obligations as a first priority. The Court granted to the Water Agencies' motion and denied Environmental Appellants' motion.

Envt'l Pltf's Opening Appellate Brief, 200 WL 32123196, at 28.

55

the State of California in its efforts to protect the waters of the San Francisco Bay/Sacramento-San Joaquin Delta Estuary [*i.e.*, the WQCP]; and to help to meet such obligations as may be legally imposed upon the [CVP] under State or Federal law following the date of enactment of this title, including but not limited to additional obligations under the Federal Endangered Species Act." *Id.* at 4715-16.  As a matter of law, this language is not ambiguous -- water used to meet WQCP or post-CVPIA ESA requirements is an additional (b)(2) purpose and must be charged against the 800 TAF (b)(2) mandate if so used.

The CVPIA is not silent on what amount of water used for these so-called "secondary" purposes is to be credited against the 800 TAF (b)(2) mandate.  (*E.g.*, could all 800 TAF of (b)(2) water be used to meet post-CVPIA-enactment ESA requirements?).  Congress mandates that exactly 800 TAF of CVP yield (≈ 5.99 MAF) be dedicated for (b)(2) purposes, whether "primary" or "secondary."  To hold otherwise would render the 800 TAF figure superfluous.  This leaves to Interior, the discretion to annually determine how much CVP yield to devote to WQCP or post-CVPIA ESA requirements.  However, if it were left to Interior's "discretion" whether or not to count CVP yield used for such (b)(2) purposes, the annual 800 TAF cap would be illusory.  The 800,000 TAF is intended by Congress as an immutable floor and ceiling on annual reallocation of water from CVP yield for (b)(2) purposes.  If Interior uses more than 800 TAF for (b)(2) purposes in any year, but does not count all CVP yield used for such purposes, it violates CVPIA § 3406(b)(2).  Water-districts' motion for summary judgment on whether Interior has the discretion to limit credits against (b)(2) for water used for WQCP or post-CVPIA ESA purposes to 450 TAF is GRANTED, Interior has no such discretion.  Any amount of CVP yield water annually used for a (b)(2) purpose must be counted as part of the 800 TAF.  The environmental plaintiffs' motion for summary judgment on this issue is denied.

This ruling recognized that interior had the discretion to decide how much CVPIA yield to use annually for each of the enumerated CVPIA purposes, but if Interior used such yield for any (b)(2) purpose it had to be counted as a (b)(2) use and subtracted from the 800,000 acre-feet supply.

Initially, both the environmental plaintiffs and the federal defendants appealed on this issue.  Their positions were similar,

**56**

1   but not identical.

2       The environmental plaintiffs argued extensively in their

3   opening appellate brief that the district court erred "in

4   relegating the primary purpose of the §3406(b)(2) dedication to

5   the lowest priority of use."  Specifically, the environmental

6   plaintiffs first argued that "the plain language of the statute

7   establishes that most of the 800,000 acre-feet must be reserved

8   for the 'primary purpose' of the dedication," because "when

9   Congress uses the term 'primary,' its ordinary meaning of

10  predominant, 'first importance' or 'principally must be given

11  effect."  *Id.* at 33-34.

12      Second, the environmental plaintiffs argued that "the

13  district court improperly elevated the subordinate purpose of the

14  (b)(2) dedication over the primary purpose" by holding that "all

15  CVP water used for endangered species or water quality

16  obligations must be subtracted from the 800,000 AF, even if this

17  means that little, or no, water remains for the primary purpose

18  of the (b)(2) dedication."  *Id.* at 36.  Specifically, the

19  environmental plaintiffs insisted that "[t]he 800 TAF is intended

20  by Congress as an immutable floor and ceiling on annual

21  reallocation of water-from CVP yield for (b)(2) purposes. If

22  Interior uses more than 800 TAF for (b)(2) purposes in any year,

23  but does not count all CVP yield used for such purposes, it

24  violates CVPIA §3406(b)(2)."  *Id*. at 37.  This interpretation,

25  according to the environmental plaintiffs, rendered the therm

26  "primary" meaningless.

27      Finally, the environmental plaintiffs argued that the

28  district court's ruling "cannot be reconciled with the CVPIA as a

**57**

whole." Specifically, the environmental plaintiffs pointed to interior's "non-discretionary duty to use water from the (b)(2) account to 'achieve' the salmon doubling mandate." *Id.* at 39-40. The environmental plaintiff's acknowledge that "Section 3406(b)(1)(C) directs Interior to 'avoid duplicative obligations' which may be imposed on the CVP and to credit CVP contributions to water quality standards against the (b)(2) account 'to the greatest extent practicable.'" But, the environmental plaintiffs insisted that

> this practicability limitation establishes that Congress was aware that it would not be practicable to deduct all of the CVP's water quality obligations from the (b)(2) account. Congress intended to authorize Interior to deduct the CVP's water quality obligations from the (b)(2) account only where these actions would be duplicative with the CVPIA's restoration mandate.

*Id.*

The federal defendants initially filed a cross-appeal, but later abandoned their appeal. The federal defendants insist, however, that their position on "primary purpose" was markedly similar to the position taken by the environmental plaintiffs (which was eventually adopted by the Ninth Circuit). For evidence of its position on this issue, federal defendants point only to a brief filed in an earlier stage of the litigation on May 31, 2000 (well before the appeal was taken), in which the government argued:

> [T]he Secretary correctly reads 3406(b)(2) which first mandates that the Secretary "dedicate and manage annually eight hundred thousand acre-feet of Central Valley Project yield for the primary purpose [emphasis in original brief] of implementing the fish, wildlife and habitat restoration purposes and measures authorized by this title." Then the Secretary has the discretion "to assist" the State of California in its efforts to protect the water of the San Francisco

**58**

1
2

> Bay/Sacramento San Joaquin Delta Estuary." Finally, the
> Secretary also has the discretion to use (b)(2) water
> "to help meet such obligations as may be legally
> imposed upon the Central Valley Project***.

3
4

(emphasis in original brief).  The government further argued that

5

"the language of 3406(b)(2)...prioritizes how (b)(2) water shall

6

be used...."  *Id.* at 15.

7

On this issue, the Ninth Circuit's reversed the district

8

court's judgment, reasoning that:

9
10
11
12
13
14
15
16
17
18
19
20

> The district court erred in concluding that Interior
> lacks discretion to refrain from crediting the amount
> of Project yield actually used for any (b)(2) purpose
> against the designated 800,000 acre feet of Project
> yield.  To hold otherwise would defeat the primary
> purpose for which the 800,000 acre feet were
> designated-fish, wildlife, and habitat restoration.
> Section 3406(b)(2) provides that the "primary purpose"
> to which the 800,000 acre feet should be dedicated is
> the implementation of "fish, wildlife, and habitat
> restoration purposes authorized by this title...."
> Section 3406(b)(2) also provides that the 800,000 acre
> feet may be used to "help" meet obligations under the
> Endangered Species Act and to "assist" in meeting
> water quality standards.  If Interior were required to
> deduct some or all the water it uses for water quality
> and Endangered Species Act purposes from the (b)(2)
> dedication, the water needed for implementation of the
> Improvement Act's restoration mandate could be
> relegated to a secondary role, or perhaps no role at
> all. Such a scenario would directly conflict with the
> Interior's mandate to give effect to the hierarchy of
> purposes established in Section 3406(b)(2).

21

*Bay Inst.*, 87 Fed. Appx 637.

22

The government insists that the Ninth Circuit's reasoning

23

vindicated its own position that Interior has discretion to use

24

(b)(2) water to (a) assist the State's Bay Delta Estuary

25

protection efforts and (b) help meet other obligations legally

26

imposed upon the Central Valley Project.  From a strictly

27

theoretical perspective, this is true.  Had the government

28

continued its participation in the appeal, perhaps Love would

**59**

1  have barred environmental plaintiffs from recovering fees.  But,

2  in practice, the government <u>abandoned this position</u> when it

3  <u>abandoned the appeal</u>.  In effect, this abandonment withdrew

4  opposition to the water authorities' position on this issue.  The

5  government's position on Interior's primary purpose discretion

6  would never have been vindicated by the Ninth Circuit were it not

7  for environmental plaintiffs' continued pursuit of the appeal.

8  The environmental plaintiffs' appellate work was made necessary

9  by the government's abandonment, which is compensable, but not

10  the work in the district court which was not opposed by the

11  government and was only adverse to the water authority

12  plaintiffs.[20]

13      Fees on this issue should be limited to the appellate work

14  by environmental plaintiffs.  The environmental plaintiffs should

15  deduct an additional 10% of the time spent briefing and arguing

16  the second round of motions for summary judgment before the

17  district court.

                    (2)   <u>Modeling Errors.</u>

19      During a series of evidentiary proceedings held in July 1999

20  and February 2000, environmental plaintiffs argued that the

21  federal defendants made several modeling errors in the water

22  distribution plan.  *See* paragraphs 55(a), (c)-(e) of

23

24      [20]   Under a narrow reading of *Love* no fees may be recovered
   for any stage of work unless (a) the government is directly
25  involved in that stage of the case and (b) the government is
   standing in opposition to the party requesting fees.  Here,
26  however, because of the unique circumstances presented –- where
   the government abandoned an appeal of an issue on which the
27  environmental plaintiffs eventually prevailed –- application of
   such a narrow reading is not appropriate.
28

1  environmental plaintiffs' second claim of their amended
2  complaint, concerning accounting issues.  The environmental
3  plaintiffs obtained a favorable judgment from the district court
4  on this issue.  *See* Doc. 320, at 25-28.

5                (3)  <u>Change of Storage Metric</u>.

6        Environmental plaintiffs challenged Interior's choice of a
7  cut off date for the use of the upstream action "change of
8  storage metric," but this challenge was rejected.  Doc. 320 at
9  30-31.  Environmental plaintiffs have volunteered to deduct 10%
10 of the time expended on the preliminary injunction proceedings
11 (13 hours) to account for this limited success.  As discussed,
12 supra at 54, environmental plaintiffs should increase this to a
13 total deduction of 80% of the time spent on the temporary and
14 preliminary injunctive relief proceedings.

15                (4)  <u>American River Flows</u>.

16        Throughout the course of the litigation, the water authority
17 plaintiffs raised challenges to Interior's treatment of certain
18 American River flows.  The environmental plaintiffs acknowledged
19 that they experienced "limited success" on these issues and
20 accordingly reduced by 20% (38 hours) the number of hours
21 expended briefing, preparing, and participating in the January
22 and February 2000 hearings which resulted in the issuance of a
23 memorandum opinion and order concerning this and other issues.
24 Doc. 320.[21]  In addition, the environmental plaintiffs deducted

25 _____

26        [21]   Although the interests of the federal defendants and
   the environmental plaintiffs were largely aligned with respect to
27 the American River flows, the proceedings leading up to the
   issuance of this particular order concerned other issues (e.g.,
28 the modeling errors) on which the environmental plaintiffs

1   25% (65 hours) of the time spent briefing the interlocutory

2   appeal to the Ninth Circuit and 10% (21 hours) of the time spent

3   on the Ninth Circuit briefing after entry of Final Partial

4   Judgment.

5        Under *Love*, the deduction must be increased to 100% of the

6   time expended on proceedings related to this issue because the

7   environmental plaintiffs were not opposed by the federal

8   defendants on this issue.  Accordingly, environmental plaintiffs

9   must recalculate their fee request to deduct a total of 50% of

10  the time spent briefing, preparing, and participating in the

11  January and February 2000 hearings.  Similarly, they must deduct

12  a total of 50% of the time spent briefing the interlocutory

13  appeal to the Ninth Circuit.  (The January and February 2000

14  hearings and the interlocutory appeal covered a number of topics,

15  including the American River flows issues.  Accordingly, the

16  remainder of the time billed at these stages is not barred by

17  *Love*.)

18                   (5)   Banking Issues.

19       Environmental plaintiffs also raised an argument regarding

20  water banking, which comprised less than one page of their

21  opening summary judgment brief.  Doc. 431 at 23.  The district

22  court ruled against them on this issue.  Doc. 466 at 36-38.

23  Environmental plaintiffs did not pursue the matter further.  They

24  have reduced billing by 5% (7 hours) of the time spent on

25  briefing summary judgment motion.  No further reduction is

26  required.

27

28

eventually prevailed and were opposed by the federal defendants.

1                        (6)    Section 3406(b)(2)(D) Findings.

2           District court also ruled against environmental plaintiffs

3    on the issue of 3406(b)(2)(D) findings.  Specifically, the

4    district court pointed out that this argument was rejected in the

5    initial round of summary judgment motions, Doc. 156, and that

6    environmental plaintiffs raised the same issue in the second

7    round of summary judgment motions without raising any new

8    arguments in support of their allegations.  *See* Doc. 466 at 39.

9    Environmental plaintiffs have deducted 46 hours to account for

10   their lack of success on this issue (representing 10% of time

11   spent on the summary judgment motions and, 15% of time spent on

12   appeal).  Having reviewed the documents pertaining to this

13   renewed allegation, this deduction adequately accounts for any

14   and all time spent by environmental plaintiff's on this issue.

15                        (7)    Offset/Reset.

16          The water authority plaintiffs challenged certain metrics

17   incorporated in Interior's accounting methodology (the

18   "offset/reset" metrics).  The Environmental plaintiffs

19   participated in briefing of the matter in mid-2001 and in a

20   related evidentiary hearing in 2002.  The interests of the

21   federal defendants, however, were aligned with the environmental

22   plaintiffs on this issue.  The district court and the Ninth

23   Circuit ruled in favor of the water authority plaintiffs on this

24   issue.  Environmental plaintiffs have already reduced their

25   request by 161 hours (80% of time expended on those trial

26   proceedings; and 15% expended on briefing before Ninth Circuit).

27          Under *Love*, the deduction must be increased to 100% of the

28   time expended on the trial proceedings related to this issue

     because the environmental plaintiffs were not opposed by the

                                    **63**

1   federal defendants on this issue.  Environmental plaintiffs must
2   adjust their fee request to reflect this deductions.  No further
3   deduction for time spent briefing the Ninth Circuit is required,
4   as the 15% deduction already made is sufficient to account for
5   the time spent on the appeal of this issue.

6                   (8)   Request for Stay Pending Appeal.

7       After the district court entered partial final judgment in
8   March 2002, environmental plaintiffs sought an expedited motion
9   for a stay pending appeal, which the district court denied.  Doc.
10  544, filed November 13, 2002.  The environmental plaintiffs have
11  already reduced their request by 45 hours, representing 100% of
12  the time spent pursuing the stay.  No further reduction is
13  warranted.

14

15          **6.   Costs.**

16       Under 28 U.S.C. § 2412 (a)(1) a prevailing party can recover
17  costs under the following circumstances:

18              Except as otherwise specifically provided by statute,
                a judgment for costs, as enumerated in section 1920 of
19              this title, but not including the fees and expenses of
                attorneys, may be awarded to the prevailing party in
20              any civil action brought by or against the United
                States or any agency or any official of the United
21              States acting in his or her official capacity in any
                court having jurisdiction of such action.  A judgment
22              for costs when taxed against the United States shall,
                in an amount established by statute, court rule, or
23              order, be limited to reimbursing in whole or in part
                the prevailing party for the costs incurred by such
24              party in the litigation.

25  Section 1920, to which § 2412 (a)(1) refers, adds the following
26  considerations to a prevailing party's recovery of costs:
27  //
28  //

**64**

> A judge or clerk of any court of the United States may tax as costs the following:
>
> (1)  Fees of the clerk and marshal;
>
> (2)  Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;
>
> (3)  Fees and disbursements for printing and witnesses;
>
> (4)  Fees for exemplification and copies of papers necessarily obtained for use in the case;
>
> (5)  Docket fees under section 1923 of this title;
>
> (6)  Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

Environmental plaintiffs do not appear to seek reimbursement for any expenses specifically listed in § 1920. Rather, they seek $3979 in travel, telephone, and other associated litigation expenses not specifically listed in § 1920. Under *International Woodworkers, Local 3-98 v. Donovan*, 792 F.2d 762, 767 (9th Cir. 1986) an award of costs may include compensation for telephone calls, postage, courier expenses, travel and other similar costs that are routine under other fee statutes.

> The Secretary appeals the district court's award of costs for <u>telephone calls, postage, air courier and attorney travel expenses</u> on the ground that such costs are not specifically listed in Section 2412(b). However, awards of such costs--costs that are ordinarily billed to a client--are routine under all other fee statutes. Moreover, in awarding costs, the district court noted that the <u>expenses enumerated in Section 2412(d)(2)(A) are set forth as examples, not as an exclusive list</u>. The district court's award of costs under Section 2412(b) is proper.

*Id*. *See also Jean v. Nelson*, 863 F.2d 759, 778 (11th Cir. 1988); *Kelly v. Bowen*, 868 F.2d 1333, 1335 (9th Cir. 1988); *In re*

*Application of Mgndichian*, 312 F. Supp. 2d 1250, 1266 (C.D. Cal. 2003).  The federal defendants cite no binding authority that contradicts *Woodworkers*.  Under *Woodworkers*, the $3979 requested for travel, telephone, and related litigation expenses is recoverable.  Furthermore, having reviewed the relevant records, this amount is reasonable in the context of this extraordinarily long-lived and complex case.

## 7.   **Expert Witness Fees**.

In addition, environmental plaintiffs seek to recover expert fees.  Section 2412(d)(2)(A) allows for compensation of expert witness fees and reasonable expenses of those witnesses:

> fees and other expenses" includes the reasonable expenses of expert witnesses, the reasonable cost of any study, analysis, engineering report, test, or project which is found by the court to be necessary for the preparation of the party's case, and reasonable attorney fees (The amount of fees awarded under this subsection shall be based upon prevailing market rates for the kind and quality of the services furnished, except that (I) no expert witness shall be compensated at a rate in excess of the highest rate of compensation for expert witnesses paid by the United States....

Environmental plaintiffs seek expert witness fees for A. Spreck Rosekrans (306 hours at $150 per hour), Christina Swanson (32 hours at $100 per hour), and Betty Andrews (72.5 hours at $135 per hour), plus $419 in expert expenses.  Federal defendants object that Rosekrans was never qualified as an expert during trial and another did not testify at trial.  Environmental plaintiffs correctly point out that, in fact, all three did testify before the court and that the federal government stipulated to Rosekrans' qualifications as an expert.  The federal defendants raise no other objections as to the number of

66

1    hours billed by these experts.  The experts were necessary in

2    this technical case and the amounts claimed are reasonable.  This

3    request is approved.

4

5                              **V. <u>CONCLUSION</u>**

6        For the reasons set forth above, environmental plaintiffs

7    fee petition is granted in part and denied in part.

8    Environmental plaintiffs must modify their fee request as

9    follows:

10       (1)   Deduct a total of 20% of time spent on the entire first

11             phase of the litigation, up to the decision on the

12             first round of summary judgment motions (as opposed to

13             the voluntary reduction of 10% suggested by

14             environmental plaintiffs).

15       (2)   Deduct a total of 80% of the time spent responding to

16             the request for a temporary restraining order and on

17             proceedings concerning the preliminary injunction (as

18             opposed to the voluntary reductions of 50% of the time

19             spent on the TRO and 10% of the time spent on the

20             preliminary injunction proceedings suggested by

21             environmental plaintiffs).

22       (3)   Deduct an additional 10% of the time spent briefing and

23             arguing the second round of summary judgment motions

24             before the district court to account for the time spent

25             on the "primary purpose" issue <u>prior</u> to the appeal.

26             (Environmental plaintiffs are entitled to fees for the

27             time spent appealing this issue.)

28

                                    **67**

(4)  Deduct a total of 50% of the time spent on the January and February 2000 hearings (as opposed to the voluntary reduction of 25% suggested by environmental plaintiffs) to account for non-compensable time spent litigating American River flows issues.

(5)  Deduct a total of 50% of the time spent on the interlocutory appeal (as opposed to the voluntary reduction of 25% suggested by environmental plaintiffs) to account for non-compensable time spent litigating American River flows issues.

(6)  Deduct a total of 100% of the time spent on the offset/reset trial proceedings (as opposed to the voluntary reduction of 80% suggested by environmental plaintiffs).

No further reductions, beyond those previously volunteered by environmental plaintiffs, are warranted.[22]  Environmental plaintiffs shall submit the requested deductions within 10 days of service of this order for the court's approval.

**SO ORDERED.**

**Dated: March 29, 2006**

                                    **/s/ OLIVER W. WANGER**
                                          **Oliver W. Wanger**
                                    **UNITED STATES DISTRICT JUDGE**

---

[22]  Unless specifically altered by this memorandum opinion and order, any voluntary reductions previously suggested by environmental plaintiffs should be incorporated into the revised fee request.