UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN LUIS & DELTA-MENDOTA WATER AUTHORITY, et al., | 1:97-CV-6140 OWW DLB<br>1:98-CV-5261 OWW DLB |
| Plaintiffs, | ORDER RE MOTION TO FILE A SUPPLEMENTAL COMPLAINT (DOC. 623) |
| SAVE SAN FRANCISCO BAY ASSOCIATION, et al., | |
| Plaintiffs, | |
| PIXLEY IRRIGATION DISTRICT, et al., | |
| Plaintiffs-in-Intervention, | |
| v. | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, et al., | |
| Defendant. | |

## I.   INTRODUCTION

Plaintiffs San Luis & Delta Mendota Water Authority and Westlands Water District joined by Plaintiff-in-intervention Stockton East Water District (collectively the "water authority plaintiffs") move for leave to file a supplemental complaint concerning Interior's accounting of the 2004 water year.  (Doc. 632, Motion; Doc. 634, Joinder.)  The United States Department of the Interior, et al., (the "federal defendants") oppose.  (Doc. 629.)  Plaintiffs in the consolidated action, the Bay Institute

1

1  of San Francisco, Environmental Defense, and Save San Francisco

2  Bay Association (collectively the "environmental plaintiffs"),

3  also oppose.  (Doc. 630.)

4

5                    II.  **FACTUAL BACKGROUND**

6        This case has a long and complicated history that is set

7  forth in great detail in several prior orders.  For purposes of

8  this motion, a review of the pertinent holdings of the district

9  court and the Ninth Circuit, along with a summary of recent

10 events suffices.

11       The water authority plaintiffs' filed their <u>currently</u>

12 <u>operative</u> second amended complaint on April 5, 2001. (Doc. 395)[1]

13 The first cause of action alleged:

14            26.  Adoption of the Final Decision [on implementation
                 of Section 3406(b)(2)] by interior was in excess
15               of its statutory authority, or limitations on that
                 authority, because:
16
17            (a)  The calculation of CVP yield attached to the
                   Final Decision is inconsistent with the
18                 definition of CVP yield contained in CVPIA
                   section 3406(b)(2);
19            (b)  The methodology established by the Final
                   Decision to account for the amount of yield
20                 dedicated and managed annually pursuant to
                   CVPIA section 3406(b)(2) is inconsistent with
21                 CVPIA section 3406(b)(2);

22 //

23 //

24

25      [1]     In addition to the San Luis plaintiffs' currently
26 operative second amended complaint, on December 1, 1999,
   intervenor-plaintiff Stockton filed an amended complaint (Doc.
27 267), as did intervenor-plaintiff Pixley (Doc. 268).
   Environmental plaintiffs filed an amended complaint on December
28 6, 1999.  (Doc. 271.)

                              **2**

        (c)    Implementation of the potential fishery actions described in the Final Decision, when combined with other measures implemented under Section 3406(b)(2), will result in the dedication and management of CVP yield in excess of the 800,000 acre-feet maximum limit resulting in impacts to CVP contractors beyond those authorized by law;

        (d)    The Final Decision does not count against the 800,000 acre-feet maximum limit any water in excess of 450,000 acre-feet that is used to meet the requirements of the 1995 Delta Water Quality Control Plan (WQCP), unless the U.S. Fish & Wildlife Service makes a written finding of biological necessity.

        (e)    The Final Decision allows Interior to decide each year whether water that is used for purposes of complying with the requirements of the Endangered Species Act will be counted toward the 800,000 acre-feet maximum limit.

(Doc. 395 at ¶24-28.)  The remaining claims for relief alleged: Interior's (b)(2) accounting for the October 1, 1999 - September 2000 Water Year was unlawful (*Id*. at ¶¶29-32, Second Claim for Relief); Interior unlawfully failed to consider how its implementation of 3406 (b)(2) would have affected delivery of CVP water during the 1928-1934 period (*Id*. at ¶¶33-35, Third Claim for Relief); Interior's implementation of Section 3406(b)(2) creates unreasonable uncertainty for CVP water users (*Id*. at 36-40, Fourth Claim for Relief); Interior's practice of prioritizing environmental purposes over agricultural, municipal, and industrial purposes violates Section 3402's requirement that Interior "achieve a reasonable balance among competing demands" (*Id*. ¶¶41-45, Fifth Claim for Relief); Interior's conclusion that the proposed fishery restoration actions adopted in the Final Decision would benefit fish, wildlife, and habitat were unsubstantiated (*Id*. at 46-50, Sixth Claim for Relief).

**3**

1    In May 2001, the parties filed cross-motions for summary

2 judgment on most, but not all, of the claims raised in the

3 complaint.  Among other arguments, the water district plaintiffs

4 moved for judgment that "The Final Decision is not in accordance

5 with law because Interior does not count all water used to meet

6 the requirements of the 1995 WQCP and other legal obligations

7 imposed after enactment against the 800,000 acre-foot limit..."

8 (hereinafter referred to as the "failure to account" claim).

9    On October 19, 2001, the district court issued an order on

10 the cross motions for summary judgment.  With respect to the

11 failure to account claim, the district court ruled that Interior

12 had "discretion to annually determine how much CVP yield to

13 devote to WQCP or post-CVPIA ESA requirements" but had no

14 discretion "whether or not to count CVP yield used for such

15 (b)(2) purposes" (i.e., all such uses must be counted):

16         Section 3406(b)(2) unambiguously directs Interior to
           "dedicate and manage annually eight hundred thousand
17         acre-feet of Central Valley Project yield for the
           primary purpose of implementing the fish, wildlife, and
18         habitat restoration purposes and measures authorized by
           this title."  Interior has no discretion whether to
19         annually provide more or less than 800 TAF of CVP yield
           (approximately 5.99 MAF) for (b)(2) purposes, unless it
20         makes certain findings under CVPIA § 3406(b)(2)(C)...
           Interior is also directed to annually dedicate and
21         manage the mandatory 800 TAF of CVP yield "to assist
           the State of California in its efforts to protect the
22         waters of the San Francisco Bay/Sacramento-San Joaquin
           Delta Estuary [i.e., the WQCP]; and to help to meet
23         such obligations as may be legally imposed upon the
           [CVP] under State or Federal law following the date of
24         enactment of this title, including but not limited to
           additional obligations under the Federal Endangered
25         Species Act."  Id. at 4715-16.  As a matter of law,
           this language is not ambiguous -- water used to meet
26         WQCP or post-CVPIA ESA requirements is an additional
           (b)(2) purpose and must be charged against the 800 TAF
27         (b)(2) mandate if so used.

28

**4**

The CVPIA is not silent on what amount of water used for these so-called "secondary" purposes is to be credited against the 800 TAF (b)(2) mandate. (*E.g.*, could all 800 TAF of (b)(2) water be used to meet post-CVPIA-enactment ESA requirements?). Congress mandates that exactly 800 TAF of CVP yield (≈ 5.99 MAF) be dedicated for (b)(2) purposes, whether "primary" or "secondary." To hold otherwise would render the 800 TAF figure superfluous. <u>This leaves to Interior, the discretion to annually determine how much CVP yield to devote to WQCP or post-CVPIA ESA requirements.</u> <u>However, if it were left to Interior's "discretion" whether or not to count CVP yield used for such (b)(2) purposes, the annual 800 TAF cap would be illusory.</u> The 800,000 TAF is intended by Congress as an immutable floor and ceiling on annual reallocation of water from CVP yield for (b)(2) purposes. If Interior uses more than 800 TAF for (b)(2) purposes in any year, but does not count all CVP yield used for such purposes, it violates CVPIA § 3406(b)(2). Water-districts' motion for summary judgment on whether Interior has the discretion to limit credits against (b)(2) for water used for WQCP or post-CVPIA ESA purposes to 450 TAF is GRANTED, Interior has no such discretion. Any amount of CVP yield water annually used for a (b)(2) purpose must be counted as part of the 800 TAF. The environmental plaintiffs' motion for summary judgment on this issue is denied.

(Doc. 466 at 32-33 (emphasis added)(internal citations and footnotes omitted)). A partial judgment was entered under Fed. R. Civ. P. 54 and certified for interlocutory appeal to the Ninth Circuit.

The water authority plaintiffs, environmental plaintiffs, and federal defendants cross-appealed aspects of the district court's partial judgment to the Court of Appeals. The federal defendants later abandoned their appeal.

The Ninth Circuit issued a decision on June 3, 2003 and an amended decision on January 23, 2004. *Bay Inst. of San Francisco v. United States*, 66 Fed. Appx. 734, 735 (9th Cir. 2003); *Bay Inst. of San Francisco v. United States*, 66 Fed. Appx. 734, 735 (9th Cir. 2003), affirming the district court decision in all but

1    one respect.  On the failure to account issue, the Ninth Circuit

2    held:

3                    The district court erred in concluding that Interior
                     lacks discretion to refrain from crediting the amount
4                    of Project yield actually used for any (b)(2) purpose
                     against the designated 800,000 acre feet of Project
5                    yield.  To hold otherwise would defeat the primary
                     purpose for which the 800,000 acre feet were
6                    designated-fish, wildlife, and habitat restoration.
                     Section 3406(b)(2) provides that the "primary purpose"
7                    to which the 800,000 acre feet should be dedicated is
                     the implementation of "fish, wildlife, and habitat
8                    restoration purposes authorized by this title...."
                     Section 3406(b)(2) also provides that the 800,000 acre
9                    feet may be used to "help" meet obligations under the
                     Endangered Species Act and to "assist" in meeting water
10                   quality standards.  If Interior were required to deduct
                     some or all the water it uses for water quality and
11                   Endangered Species Act purposes from the (b)(2)
                     dedication, the water needed for implementation of the
12                   Improvement Act's restoration mandate could be
                     relegated to a secondary role, or perhaps no role at
13                   all.  Such a scenario would directly conflict with the
                     Interior's mandate to give effect to the hierarchy of
14                   purposes established in Section 3406(b)(2).

15   *Bay Inst.*, 87 Fed. Appx. at 637.  The appeal is now final as no

16   petition for certiorari was filed by any party.  The balance of

17   Plaintiffs' claims were held in abeyance pending the appeal and

18   are technically still before the district court.

19        In their proposed supplemental complaint, Plaintiffs contend

20   that Interior's accounting for (b)(2) water during the period for

21   October 1, 2003 through September 30, 2004 (the "2004 (b)(2)

22   Accounting Year") fails to comply with the statute as interpreted

23   by the district court and the Ninth Circuit.  Specifically,

24   Plaintiffs contend that the quantity dedicated for (b)(2)

25   purposes during the 2004(b)(2) Accounting Year exceeded 800,000

26   acre-feet because interior excluded from its accounting 159,200

27

28

                                      **6**

1  acre feet used in "non-(b)(2) Fishery Actions."[2]  This 159,200

2  acre-feet figure apparently consisted of 150,000 acre-feet in

3  reduced CVP export pumping from the Sacramento-San Joaquin Delta

4  for the purpose of benefitting fish, as well as 9,200 acre-feet

5  in releases to the American and Stanislaus Rivers to meet Bay-

6  Delta Water Quality Control Plan requirements.

7

8                    III.  **DISCUSSION**

9       A.  **Applicable Legal Standards**.

10      The filing of amended and supplemental pleadings is governed

11  by Federal Rule of Civil Procedure 15(d), which provides:

12              Upon motion of a party the court may, upon reasonable
               notice and upon such terms as are just, permit the
13              party to serve a supplemental pleading setting forth
               transactions or occurrences or events which have
14              happened since the date of the pleading sought to be
               supplemented. Permission may be granted even though the
15              original pleading is defective in its statement of a
               claim for relief or defense. If the court deems it
16              advisable that the adverse party plead to the
               supplemental pleading, it shall so order, specifying
17              the time therefor.

18  The Ninth Circuit has entrusted application of this rule to the

19  district court's broad discretion.

20              Rule 15(d) is intended to give district courts broad
               discretion in allowing supplemental pleadings. The rule
21              is a tool of judicial economy and convenience. Its use
               is therefore favored. As Judge Haynsworth observed more
22              than two decades ago:

23                  Rule 15(d) of the Federal Rules of Civil Procedure
                   provides for...supplemental pleading. It is a
24                  useful device, enabling a court to award complete

25  ───────────────

26      [2]  The water authority plaintiffs attach to the proposed
   supplemental complaint a spreadsheet that purportedly records
27  interior's accounting for the 2004 (b)(2) Accounting Year.  This
   spreadsheet indicates that 159,200 acre-feet went to "non-(b)(2)
28  Fishery Actions."

                              **7**

1  
2  
3  
4  
5  
6  

        relief, or more nearly complete relief, in one action, and to avoid the cost, delay and waste of separate actions which must be separately tried and prosecuted. So useful they are and of such service in the efficient administration of justice that they ought to be allowed as of course, unless some particular reason for disallowing them appears, though the court has the unquestioned right to impose terms upon their allowance when fairness appears to require them.

        ....The clear weight of authority, however, in both the cases and the commentary, permits the bringing of new claims in a supplemental complaint to promote the economical and speedy disposition of the controversy....

7  
8  
9  
10  
11  

*Keith v. Volpe*, 858 F.2d 467, 473 (9th Cir 1988)(internal citations omitted).

12  
13  

    Leave should be "freely given," "[i]n the absence of any

14  

apparent or declared reason - such as <u>undue delay</u>, <u>bad faith</u> or

15  

<u>dilatory motive</u> on the part of the movant, repeated failure to

16  

cure deficiencies by amendments previously allowed, <u>undue</u>

17  

<u>prejudice</u> to the opposing party by virtue of allowance of the

18  

amendment, <u>futility of amendment</u>, etc." *Foman v. Davis*, 371 U.S.

178, 182 (1962) (emphasis added).

19  
20  

    However, supplementation may not be used "to introduce a

21  

separate, distinct and new cause of action." *Planned Parenthood*

22  

*of S. Ariz. v. Neely*, 130 F.3d 400, 402-03 (9th Cir. 1997).  In

23  

*Neely*, the Ninth Circuit found supplementation was inappropriate,

24  

after considering the relatedness of the initial and supplemental

25  

complaints, whether final judgment had been rendered, and whether

the district court retained jurisdiction over the case:

26  
27  
28  

        The supplemental complaint filed by plaintiffs involved a new and distinct action that should have been the subject of a separate suit. Although both the original suit and the supplemental complaint sought to challenge Arizona's parental consent law, the supplemental

**8**

complaint challenged a <u>different statute</u> than the one
that had been successfully challenged in the original
suit. Additionally, a <u>final judgment had been rendered</u>
in the original action four years prior to plaintiffs'
request to supplement their complaint. That judgment
was not appealed and in no way would be affected by
plaintiffs' supplemental complaint. <u>Nor did the</u>
<u>district court retain jurisdiction</u> after entering that
order.

130 F.3d at 402 (emphasis added).  The *Neely* court also

considered whether the filing of a supplemental complaint would

serve the interests of judicial economy:

To determine if efficiency might be achieved, courts
assess "whether the entire controversy between the
parties could be settled in one action...." In the case
at hand there would necessarily be two actions since
the original suit had been settled for some time.
There were also no "technical obstacles" to plaintiffs
bringing a new, separate action to challenge [the
statute] as amended.

*Id.* at 402-03 (internal citations omitted).

   *Neely* specifically distinguished a number of prior cases,

including *Keith*, recognizing the nature of affirmative

obligations previously imposed upon the defendant by those courts

and that the proposed supplemental complaints in those cases

alleged that the defendant violated a prior court order:

In both *Keith* and [two other cases] the courts retained
jurisdiction over later developments despite rendering
final judgments.  In [these] cases, the courts, as part
of their final orders, required the parties to comply
with broad, aspirational directives.  Finally, in each
of the cases, the actions of the defendants which the
plaintiffs sought to challenge through supplemental
pleading were alleged to be specific attempts by the
defendants to contravene the courts' earlier rulings.
These factors are not present in the case at hand.  The
district court did not retain jurisdiction nor did it
enter an order guiding the parties' future affirmative
duties.  Further, plaintiffs did not aver that the
defendants were defying the court's []decision
enjoining them from enforcing the original parental
consent statute.

**9**

*Id.* at 403.[3]

Under *Keith*, *Foman*, and *Neely*, the following factors were applied in deciding whether the complaint should be supplemented:

    (1)  The relatedness of the original and supplemental complaints;

    (2)  Whether allowing supplementation would serve the interests of judicial economy;

    (3)  Whether there is evidence of delay, bad faith or dilatory motive on the part of the movant, or evidence of repeated failure to cure deficiencies by amendments previously allowed;

    (4)  Whether amendment would impose undue prejudice upon the opposing party;

---

[3] The federal defendants also cite *Wagner v. Professional Engineers in California Government*, 354 F.3d 1036 (9th Cir. 2004) as an example of a case in which amendment was denied. But *Wagner* is distinguishable. The plaintiffs in *Wagner* initially represented in a joint status report to the district court that neither party anticipated amending the pleadings. The trial court issued a scheduling order, which provided that "[n]o further joinder of parties or amendments to pleadings is permitted except with leave of Court, <u>good cause having been shown</u>." *Id.* at 1051 (emphasis added). Six months later, the *Wagner* plaintiffs moved to amend the complaint to incorporate allegations concerning two subsequent events. The motion was denied on the ground that plaintiffs failed "to focus on the Rule 16 good cause standard in their amendment motion." *Id.* Despite this ruling, the *Wagner* plaintiffs argued that the scope of the <u>original</u> allegations was broad enough to effectively include liability for the subsequent events. The district court rejected this argument and the Ninth Circuit affirmed on the ground that plaintiffs were <u>unsuccessful</u> in their attempt to gain leave to supplement the complaint under Rule 15. *Id.* The federal defendants have failed to demonstrate why *Wagner* would control the outcome of the instant motions. Critically, here, the water authorities are under no obligation to show "good cause" for their amendment.

1    (5)   Whether amendment would be futile;

2    (6)   Whether final judgment had been rendered;

3    (7)   Whether the district court retains jurisdiction over

4          the case;

5    (8)   Whether any prior court orders imposed a future

6          affirmative duty upon defendant; and

7    (9)   Whether the proposed supplemental complaint alleges

8          that defendants defied a prior court order.

9

10   **B.   Application of the *Keith/Foman/Neely* Factors.**

11        **1.   The relationship between the original and
               supplemental complaints.**

12

13        The water authority plaintiffs suggest that the claims set

14   forth in the proposed supplemental complaint are mere extensions

15   of the claims of their currently operative second amended

16   complaint (SAC).  (Doc. 395.)  The SAC sets forth seven causes of

17   action, the first of which is the most relevant here:

18        26.  Adoption of the Final Decision [on implementation
             of Section 3406(b)(2)] by interior was in excess
19           of its statutory authority, or limitations on that
             authority, because:
20
          (a)  The calculation of CVP yield attached to the
21               Final Decision is inconsistent with the
                 definition of CVP yield contained in CVPIA
22               section 3406(b)(2);

23        (b)  The methodology established by the Final
                 Decision to account for the amount of yield
24               dedicated and managed annually pursuant to
                 CVPIA section 3406(b)(2) is inconsistent with
25               CVPIA section 3406(b)(2);

26        (c)  Implementation of the potential fishery
                 actions described in the Final Decision, when
27               combined with other measures implemented
                 under Section 3406(b)(2), will result in the
28               dedication and management of CVP yield in

11

1                                      excess of the 800,000 acre-feet maximum limit resulting in impacts to CVP contractors beyond those authorized by law;

        (d)   The Final Decision does not count against the 800,000 acre-feet maximum limit any water in excess of 450,000 acre-feet that is used to meet the requirements of the 1995 Delta Water Quality Control Plan (WQCP), unless the U.S. Fish & Wildlife Service makes a written finding of biological necessity.

        (e)   The Final Decision allows Interior to decide each year whether water that is used for purposes of complying with the requirements of the Endangered Species Act will be counted toward the 800,000 acre-feet maximum limit.

(Doc. 395 at ¶26.)

The proposed supplemental complaint is an as-applied challenge to Interior's implementation of (b)(2) accounting in light of the district court and Ninth Circuit's subsequent rulings on the failure to account and incorrect accounting claims.  It directly challenges Interior's accounting for the 2004 Water Year, alleging that Interior specifically omitted from its annual (b)(2) accounting 150,000 acre-feet in reduced CVP export pumping from the Sacramento-San Joaquin Rivers Delta "for the purposes of benefitting fish" and 9,200 acre-feet in releases to the American and Stanislaus Rivers to meet 1995 Bay-Delta Water Quality Control Plan Requirements.  The proposed supplemental complaint alleges that as a result, Interior dedicated 959,000 acre-feet of CVP water for (b)(2) purposes, 159,000 acre-feet more than the 800,000 acre-feet limit of section 3406(b)(2).  The proposed complaint also impliedly challenges two management documents issued by Interior: (1) the "Department of the Interior Decision on Implementation of Section 3406(b)(2) of the Central Valley Improvement Act," issued May 9,

**12**

1    2003; and (2) the "Guidance for the Implementation of Section

2    3406(b)(2)," issued December 17, 2003, which supplements the May

3    9 document in light of the Ninth Circuit's subsequent rulings.

4         In the context of this entire litigation, the proposed

5    supplemental complaint tests the effect and measuring of the

6    Ninth Circuit's holding on (b)(2) accounting:

7              The district court erred in concluding that Interior
               lacks discretion to refrain from crediting the
8              amount of Project yield actually used for any (b)(2) purpose
               against the designated 800,000 acre feet of Project
9              yield. To hold otherwise would defeat the primary
               purpose for which the 800,000 acre feet were
10             designated-fish, wildlife, and habitat restoration.
               Section 3406(b)(2) provides that the "primary purpose"
11             to which the 800,000 acre feet should be dedicated is
               the implementation of "fish, wildlife, and habitat
12             restoration purposes authorized by this title...."
               Section 3406(b)(2) also provides that the 800,000 acre
13             feet may be used to "help" meet obligations under the
               Endangered Species Act and to "assist" in meeting water
14             quality standards. <u>If Interior were required to deduct
               some or all the water it uses for water quality and
15             Endangered Species Act purposes from the (b)(2)
               dedication, the water needed for implementation of the
16             Improvement Act's restoration mandate could be
               relegated to a secondary role, or perhaps no role at
17             all. Such a scenario would directly conflict with the
               Interior's mandate to give effect to the hierarchy of
18             purposes established in Section 3406(b)(2).</u>

19   *Bay Inst.*, 87 Fed. Appx. at 637. Put another way, the water

20   authorities' proposed supplemental complaint asks, among other

21   things: Does Interior have the discretion to elect not to deduct

22   water used for implementation of the CVPIA's <u>restoration mandate</u>

23   from the designated 800,000 acre-feet? This and several related

24   questions arguably raised by the proposed supplemental complaint

25   are closely and directly related to the issues decided in earlier

26   stages of this litigation. (The issues are so closely related

27   that, if the initiation of a new case were required, the new case

28   would likely be a related case to this case).

13

1    The federal defendants emphasize the "fact that the October

2   1999 Final Decision [challenged in the initial complaint] is now

3   superceded entirely by the May 2003 Decision."  (Doc. 629, Fed.

4   Deft's Opp'n, at 5.)  This is of little moment.  Federal Rule of

5   Civil Procedure 15(d) is "designed to permit expansion of the

6   scope of existing litigation to include events that occur after

7   the filing of the original complaint."  *Keith,* 354 F.2d at 471.

8   The federal defendants point to no authority that suggests

9   amendment should be denied on such a ground.

10                    **2.   Judicial Economy.**

11    The district court has developed extensive knowledge of the

12   relevant law, background, and scientific considerations governing

13   the complex water accounting and CVPIA technical CVP operational

14   requirements.  Retaining the new claims as part of the existing

15   case serves the interests of judicial economy.

16    Although no party disputes the practical advantages of

17   allowing the proposed claim to proceed in this court, the federal

18   defendants suggest that it is more appropriate to follow the

19   Ninth Circuit's holding in *Neely*.  In that case, the Ninth

20   Circuit found that the interests of judicial economy would not be

21   served by amendment, reasoning that:

22              To determine if efficiency might be achieved, courts
            assess "whether the entire controversy between the
23          parties could be settled in one action..."  6A Charles
            Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal
24          Practice and Procedure: Civil 2D § 1506 (1990).  In the
            case at hand there would necessarily be two actions
25          since the original suit had been settled for some time.
            There were also no "technical obstacles" to plaintiffs
26          bringing a new, separate action to challenge § 36-2152
            as amended.  See United States v. Reiten, 313 F.2d 673,
27          675 (9th Cir. 1963) (stating that, "the general purpose
            of the Rules [regarding amended and supplemental
28          complaints is] to minimize technical obstacles to a
            determination of the controversy on its merits").

                                  **14**

*Id.* at 402-03.  The federal defendants assert that, as in *Neely*, there are no "technical obstacles" here to the filing of a separate case.  But the federal defendants cite *Neely* out of context.  There, the original complaint challenged a particular statute as unconstitutional.  The district court entered a final order declaring the statute unconstitutional and no party appealed.  *Id.* at 401-02.  Several years later, the State of Arizona amended and reenacted the statute in question and the original plaintiffs filed a motion with the district court to file a supplemental complaint.  *Id.* at 402.  The Ninth Circuit ruled that it was an abuse of discretion for the district court to permit the filing of a supplemental complaint, because "while leave to permit supplemental pleading is favored, it cannot be used to introduce a separate, distinct and new cause of action." *Id.*  Here, unlike in *Neely*, there need not "necessarily be two actions."  This case, which concerns the interpretation of the same statute, 3406(b)(2), is still pending, there is no final judgment that decides all claims of the complaint.  The water authority plaintiffs now challenge subsequent administrative interpretations and implementation of the same statutory provision in a later water year.  Supplementation for such a purpose has already been permitted in this case, when Plaintiffs challenged Interior's first revision of its (b)(2) Final Policy.

### 3.   Evidence of delay, bad faith, dilatory motive, or repeated failure to cure.

No party argues that the proposed supplemental complaint has been lodged in bad faith or for any dilatory motive, nor has there been a repeated failure to cure.  The federal defendants do

**15**

1  argue, however that the water authority plaintiffs have delayed
2  unreasonably the filing of their motion to supplement.

3      The 2004 (b)(2) Accounting Year ended on September 30, 2004,
4  and the Bureau's final accounting for that water year became
5  available on December 1, 2004.  The water authority plaintiffs
6  filed no formal protest or motion to supplement the complaint
7  until October 4, 2005, nearly a year later.  The federal
8  defendants further point out that there has been no substantive
9  activity in this case for nearly three years.  What the federal
10 defendants have failed to establish is that this delay is
11 unreasonable, prejudicial, or that it would warrant denial of the
12 present motion to supplement.[4]  The amended decision in the Court
13 of Appeals was not issued until January 23, 2004.  "[D]elay in
14 and of itself is not sufficient reason to deny a motion to
15 supplement the complaint..."  *Bromley v. Michigan Educ.*
16 *Association-NEA*, 178 F.R.D. 148, 154 (E.D. Mich. 1998).

17              **4.   Prejudice to the opposing parties**.

18     The federal defendants do not suggest that they would be
19 prejudiced by the filing of the supplemental complaint.  The
20 environmental plaintiffs, however, insist that prejudice will
21 result:

22

23 ────────────────────────

24     [4]     The federal defendants frame the issue as follows: "If,
   as the Authority avers, it will challenge the propriety of the
25 Bureau's accounting practices for the 2004 Water Year in one
   forum or another, the question for the court is whether it makes
26 sense to prolong the present case beyond its eight-year life
   span."  (Doc. 629-1 at 7.)  But, this is not exactly the point.
27 If it serves the interests of judicial economy to allow these
   claims to be brought in the present lawsuit, this would weigh in
28 favor of expanding the eight year life-span of this suit.

**16**

[I]n the event that the motion is granted, environmental plaintiffs in these consolidated proceedings would become parties to disputes raised by the supplemental complaint, despite not being sued and not, at this stage of the administrative proceedings, having challenged the Interior's implementation of the CVPIA as to the 2004 Water Year.  Leave would thus prejudice the rights of the environmental plaintiffs, who have a very real and important interest in bringing their action against Interior to its successful and final conclusion.  The Districts should not be permitted to disturb that concluding process by filing the proposed supplemental complaint.

(Doc. 630 at 5-6.)  The water authority plaintiffs do not respond directly to this contention.

As to the environmental Plaintiffs, these concerns are valid.  As of the date of filing of the motion to supplement, the claims raised by the environmental plaintiff' have been concluded, except for a decision on their claimed EAJA legal fees.  The proposed supplemental complaint has been submitted. If the environmental plaintiffs do not have an interest in the issues presented, a severance can be granted, removing them from this phase of the case if that is their wish.

### 5.   Futility of amendment.

The federal defendants suggest that leave to file the proposed supplemental complaint should be denied because it fails to state a claim upon which relief may be granted.  (Doc. 629 at 3-4.)  The relevant inquiry is whether amendment would be legally futile.  A complaint may be deemed futile if it would fail to state a claim under Federal Rule of Civil Procedure, Rule 12(b)(6).  *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988).

The federal defendants are correct that the proposed supplemental complaint sets forth allegations regarding the 2004

**17**

(b)(2) Water Year in a section entitled "general allegations," rather than under a particular cause of action.  In fact, the proposed complaint does not formally state any "cause of action." But, it does assert that Interior's accounting for 2004 is "arbitrary and capricious, an abuse of discretion, and not in accordance with law, within the meaning of 5 U.S.C. § 706(2)(A), and is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, within the meaning of 5 U.S.C. section 706(2)(C)."  (Doc. 623-1 at ¶10.)  This language arguably states a claim under the Administrative Procedure Act sufficient to satisfy the liberal requirements of Federal Rule of Civil Procedure 8.

The environmental plaintiffs raise a more substantive challenge to the supplemental complaint, arguing that "the excluded 159,000 acre-feet of CVP water were non-discretionary fish actions taken in 2004 to comply with the Water Quality Control Plan and the Endangered Species Act."  (Doc. 630 at 4.) The environmental plaintiffs maintain that the exclusion of this water from the accounting "was necessary to ensure the higher priority of the restoration efforts, consistent with the Ninth Circuit mandate."  (*Id.*)

The Ninth Circuit's opinion facially authorizes Interior to refrain from counting water used for secondary (b)(2) purposes:

> The district court erred in concluding that Interior lacks discretion to refrain from crediting the amount of Project yield actually used for any (b)(2) purpose against the designated 800,000 acre feet of Project yield.  To hold otherwise would defeat the primary purpose for which the 800,000 acre feet were designated-fish, wildlife, and habitat restoration. Section 3406(b)(2) provides that the "primary purpose" to which the 800,000 acre feet should be dedicated is the implementation of "fish, wildlife, and habitat

**18**

1    restoration purposes authorized by this title...."
2    Section 3406(b)(2) also provides that the 800,000 acre
     feet may be used to "help" meet obligations under the
     Endangered Species Act and to "assist" in meeting water
3    quality standards.  If Interior were required to deduct
     some or all the water it uses for water quality and
4    Endangered Species Act purposes from the (b)(2)
     dedication, the water needed for implementation of the
5    Improvement Act's restoration mandate could be
     relegated to a secondary role, or perhaps no role at
6    all.  Such a scenario would directly conflict with the
     Interior's mandate to give effect to the hierarchy of
7    purposes established in Section 3406(b)(2).

8   *Bay Inst.*, 87 Fed. Appx. 637.  But, the Ninth Curcuit's ruling

9   arguably <u>does not</u> address the discrete question the water

10  authority plaintiffs raise in the proposed supplemental

11  complaint:  Whether Interior can classify a fish restoration

12  action (arguably a "primary" use) as a "secondary" use simply

13  because it was a "mandatory" action taken to ensure compliance

14  with the Water Quality Control Plan and/or the Endangered Species

15  Act, which allegedly emasculates the 800,000 AF maximum limit on

16  dedication of CVP yield to (b)(2) purposes.  The water authority

17  plaintiffs contend that "Nothing in the Ninth Circuit's opinion

18  excuses Interior from counting water used for the 'primary' fish

19  and wildlife restoration purpose."  (Doc. 632, Reply, at 4.)

20  This is a question not considered and left unanswered by the

21  Ninth Circuit's decision.  Put another way, if Interior is free

22  to use all CVP yield for purposes it characterizes as

23  "secondary," the 800,000 AF limit means nothing and there is no

24  effective annual ceiling on CVP yield use for (b)(2) purposes.

25     **6.** **Whether the district court retains jurisdiction**
         **over the case/ Whether final judgment had been**
26       **rendered.**

27    Both the federal defendants and the environmental plaintiffs

28  assert that this case is effectively over and point out that the

1   only recent activity has been litigation concerning attorneys

2   fees.[5]   The water authority plaintiffs respond that, in fact, a

3   number of claims remain outstanding:

> The Partial Final Judgment resolved some of the claims
> in this action.  It resolved "the environmental
> plaintiffs' second claim; San Luis and Delta-Mendota
> Authority's first, second and third claims; Pixley
> Irrigation District's first and second claims; and
> Stockton East Water District's first and second
> claims."  Partial Final Judgment On Accounting Issues,
> 2:12-15, (Docket # 491).  Other claims remain.  In
> their action, the Environmental Plaintiffs allege five
> claims.  In this action, the Authority alleges six
> claims, Pixley four, and Stockton East five.  (Docket
> ## 395, 268, 267.)  Accordingly, even if the
> Authority's motion for leave to file a supplemental
> complaint were denied, this action would not be over.
> The remaining claims would still not be resolved.  The
> Federal Defendants' argument that this case will be
> over if only the Court denies this motion to file a
> supplemental complaint is mistaken.

14   (Doc. 632 at 2-3 (emphasis added).)  But, no party has made any

15   attempt to bring these dormant claims to resolution.  During oral

16   argument on the motion to supplement, the parties were given 30

17   days, until April 24, 2006, to either dismiss existing dormant

18   claims or assert new claims, as necessary.  Assuming that the

19   parties will dismiss the dormant claims, this is the only factor

20   that weighs in favor of denying the motion to supplement.

21      In sum, the proposed supplemental complaint is a discrete

22   and logical extension of the original claims in this case.  In

23   addition, allowing supplementation serves the interest of

24   judicial economy, as consuming administrative and judicial

25   resources of the court in not having to open a new case, randomly

---

27   [5] In a related argument, the federal defendants assert that
28   the May 9, 2003 (b)(2) accounting policy moots all claims based
upon the October 1999 (b)(2) policy.  This argument has been
rejected.  See Part B.1 at 12-13.

**20**

1  assigning it, going through the related-case low number analysis,

2  and initiating Rule 16 scheduling as if this were a new case, do

3  not serve judicial economy.   The federal defendants and

4  environmental plaintiffs have failed to establish that any delay

5  that has occurred is prejudicial.   No other incurable prejudice

6  has been demonstrated.   The filing of the proposed supplemental

7  complaint is not futile, as it raises at least one valid and

8  discrete legal challenge to Interior's (b)(2) accounting

9  practices and (b)(2) implementation in the 2004 water year.

10

11                    **IV.   CONCLUSION**

12       For the reasons set forth above, the water authority

13  plaintiffs' motion to supplement is **GRANTED.**

14       Notwithstanding contrary deadlines set at the hearing on the

15  motion to supplement, the parties shall have until **May 27, 2006**

16  to either dismiss existing dormant claims or assert new claims.

17  Any responsive pleadings shall be filed by **June 15, 2006.**   A

18  hearing on any motions to dismiss the supplemental complaint

19  shall be held on **July 17, 2006,** at 10:00 a.m. in Courtroom 3.

20

21  **DATED:   May 17, 2006.**

22                              /s/ OLIVER W. WANGER

23                              _____

24                                 OLIVER W. WANGER
                                United States District Judge

25

26

27

28


                              **21**