1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN LUIS & DELTA-MENDOTA WATER AUTHORITY AND WESTLANDS WATER DISTRICT, | 1:97-CV-6140 OWW DLB<br>1:98-CV-5261 OWW DLB |
| Plaintiffs, | MEMORANDUM DECISION AND ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT RE (B)(2) ACCOUNTING FOR 2004 (B)(2) ACCOUNTING YEAR |
| v. | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, | |
| Defendants. | |
| SAVE SAN FRANCISCO BAY Assoc., *et al.*, | |
| Plaintiffs, | |
| v. | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, | |
| Defendants. | |

## I. INTRODUCTION

Before the court for decision are the November 19, 2007 cross-motions for summary judgment on all claims raised by the supplemental complaint of San Luis & Delta-Mendota Water Authority ("Authority") and Westlands Water District ("Westlands")(collectively, "Plaintiffs").  (Docs. 680 & 685.)

1

The supplemental complaint raises an as-applied challenge to the manner by which two branches of the Department of the Interior, the U.S. Bureau of Reclamation ("Bureau") and the U.S. Fish and Wildlife Service ("FWS") (collectively, "Federal Defendants" or "Interior"), implemented accounting procedures pursuant to Section 3406(b)(2) ("Section (b)(2)" or "(b)(2)") of the Central Valley Improvement Act ("CVPIA"), Pub. L. No. 102-575, 106 Stat. 470o, 4714 (1992), during the 2004 (b)(2) accounting year.  (Doc. 646.)

Specifically, Plaintiffs allege that Federal Defendants acted unlawfully by not crediting certain uses of CVP water during the 2004 water year toward the statutory mandate, set forth in Section 3406(b)(2), to allocate 800,000 acre-foot ("AF") of CVP yield to certain purposes, including fish, wildlife, and habitat restoration goals.

Plaintiffs assert there are no material facts in dispute and that the Federal Defendants acted unlawfully in implementing CVP accounting procedures during 2004.  (Doc. 686.)  Federal Defendants argue that Plaintiffs lack standing, their claims are moot, and, in the alternative, that the Bureau acted lawfully, within the bounds of its discretion.  (Doc. 685-3.) Environmental Plaintiffs in the consolidated action, *Save San Francisco Bay Assoc., et al., v. U.S. Department of Interior, et al.*, 1:98-CV-6140 OWW DLB, oppose Plaintiffs' motion, providing additional legal argument regarding the extent of the Bureau's discretion to refrain from counting certain types of water uses against the 800,000 AF allocation.  (Doc. 690, filed Jan. 7, 2008.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.   **BACKGROUND**

A.   **Statutory Text**.

The dispute concerns the statutory text of CVPIA section 3406(b)(2):

> (b) FISH AND WILDLIFE RESTORATION ACTIVITIES.--The Secretary [of the Interior], immediately upon the enactment of this title, shall operate the Central Valley Project to meet all obligations under state and Federal law, including but not limited to the Federal Endangered Species Act, 16 U.S.C. 1531, *et seq.*, and all decisions of the California State Water Resources Control Board establishing conditions on applicable licenses and permits for the project.  The Secretary, in consultation with other State and Federal agencies, Indian tribes, and affected interest, is further authorized and directed to:
>
> ***
>
> (2) upon enactment of this title dedicate and manage annually eight hundred thousand acre-feet of Central Valley Project yield for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title; to assist the State of California in its efforts to protect the waters of the San Francisco Bay/Sacramento-San Joaquin Estuary; and to help meet such obligations as may be legally imposed upon the Central Valley Project under state or federal law following the date of enactment of this title, including but not limited to additional obligations under the federal Endangered Species Act....

Pub. L. No. 102-575, § 3406(b)(2), 106 Stat. 4700, 4714 (1992).

B.   **District Court and Ninth Circuit Rulings**.

This (b)(2) language has been the subject of a series of protracted lawsuits, culminating in orders in these consolidated cases at the district and appellate court levels.  As those decisions comprehensively recount this history, only a brief recap is necessary.

The CVPIA took effect October 31, 1992.  In 1998, Plaintiffs challenged Federal Defendants' October 5, 1999 "Final Decision on

Implementation of Section 3406(b)(2)...," contending that Federal Defendants were required to credit against the 800,000 AF allocation of CVP yield all water used to satisfy either the 1995 Water Quality Control Program ("WQCP") or post-CVPIA Endangered Species Act ("ESA") requirements. (*See* Doc. 466 at 26.)   The district court granted Plaintiffs' motion for summary judgment, concluding: "[As] a matter of law, [the statutory] language is not ambiguous -- water used to meet WQCP or post-CVPIA ESA requirements is an additional (b)(2) purpose and must be charged against the 800 TAF [thousand acre-feet] (b)(2) mandate if so used."  (*Id*. at 33.)   The district court further found that to "hold otherwise would render the 800 TAF figure superfluous." (*Id*. at 35.)   On March 20, 2002, partial final judgment was entered in favor of Plaintiffs on that claim and the issue was certified for interlocutory appeal to the Ninth Circuit.  (Doc. 491 at 4.)

On appeal, Environmental Plaintiffs argued that the district court's judgment "improperly elevated the subordinate purpose of the (b)(2) dedication over the primary purpose."  (Envt'l Appellants' Opening Brief, 2002 WL 32123196 *36 (9th Cir. Dec. 23, 2002).)   In response, Plaintiffs argued that "the plain words of the statute dictate and Congress intended that all water used to assist the State in protection of the Bay/Delta, or to meet obligations (including ESA obligations) legally imposed upon the CVP under State or Federal law following the date of enactment of CVPIA, would be counted toward the 800,000 acre-feet limit." (Appellants' Brief in Answer to Envt'l Appellants' Opening Brief, 2003 WL 21471613 *27, (9th Cir. Jan. 30, 2003).)   In reply,

**4**

1   Environmental Plaintiffs emphasized that "the CVPIA cannot defeat

2   the statute's specific and non-discretionary directions to

3   Interior to use the 800,000 AF for the 'primary purpose' of

4   implementing the CVPIA's new restoration measures, and to achieve

5   the CVPIA's salmon doubling mandate."  (Envt'l Appellants' Reply

6   Brief, 2003 WL 21471615 *13 (9th Cir. Feb. 18, 2003).)

7        The Ninth Circuit, in a ruling initially issued June 3, 2003

8   and amended January 23, 2004, affirmed the district court's

9   partial final judgment on four points, but reversed with respect

10  to the holding regarding (b)(2) accounting:

> The district court erred in concluding that Interior
> lacks discretion to refrain from crediting the amount
> of Project yield actually used for any (b)(2) purpose
> against the designated 800,000 acre feet of Project
> yield. To hold otherwise would defeat the primary
> purpose for which the 800,000 acre feet were
> designated-fish, wildlife, and habitat restoration.
> Section 3406(b)(2) provides that the "primary purpose"
> to which the 800,000 acre feet should be dedicated is
> the implementation of "fish, wildlife, and habitat
> restoration purposes authorized by this title..."
> Section 3406(b)(2) also provides that the 800,000 acre
> feet may be used to "help" meet obligations under the
> Endangered Species Act and to "assist" in meeting water
> quality standards. If Interior were required to deduct
> some or all the water it uses for water quality and
> Endangered Species Act purposes from the (b)(2)
> dedication, the water needed for implementation of the
> Improvement Act's restoration mandate could be
> relegated to a secondary role, or perhaps no role at
> all. Such a scenario would directly conflict with the
> Interior's mandate to give effect to the hierarchy of
> purposes established in Section 3406(b)(2)

23  *Bay Institute of San Francisco v. United States,* 87 Fed. Appx 637

24  at 639-40 (9th Cir. 2004).

25

26       C.   <u>Federal Defendants' Development of (b)(2)</u>
               <u>Policy/Guidance</u>.

27

28       Following the district court's March 2002 entry of partial

5

final judgment and while the case was on appeal, Interior issued

a "Final Decision on Implementation of Section 3406(b)(2)...,"

dated May 9, 2003.[1]   (AR 2137-2148.)   Interior determined that the

stated purpose of the Decision was to exercise "Secretarial

discretion to implement (b)(2) in accordance with the language of

the CVPIA, the intent of Congress, as well as to make this

Decision consistent with the Rulings of the District Court...."

(AR 2137-38.)   The Decision stated:

> Interior will manage (b)(2) water in order to
> effectuate the purposes and goals of the CVPIA. Among
> the purposes of the CVPIA as set out in the statute are
> to protect, restore, and enhance fish, wildlife and
> associated habitats in the Central Valley and Trinity
> River basins; to address the impacts of the CVP on
> fish, wildlife and associated habitats; to contribute
> to the State of California's interim and long-term
> efforts to protect the San Francisco Bay/Sacramento-San
> Joaquin Delta Estuary; and to achieve a reasonable
> balance among competing demands for use of CVP water,
> including the requirements of fish and wildlife,
> agricultural, municipal and industrial, and power
> contractors, Sections 3402(a), (b), (e) and (f).
>
> Water dedicated under (b)(2) will continue to be used
> to implement the fish, wildlife, and habitat
> restoration purposes and measures authorized by the
> CVPIA, as well as to assist in meeting the 1995 Delta
> Water Quality Control Plan (WQCP) requirements and
> post-1992 obligations under the Endangered Species Act
> (ESA).

(AR 2138.)   The May 9, 2003 Decision provided the following

limited guidance regarding accounting of WQCP and ESA

---

[1]       The Decision addressed public comments solicited on an
earlier draft.   In response to a comment from Plaintiffs
regarding the accounting treatment of (b)(2) water for WQCP and
ESA purposes, the Federal Defendants stated that "only meeting
the WQCP and post-1992 ESA requirements may not be sufficient to
meet the anadromous fish doubling goal and other restoration
purposes and measures included in CVPIA."   (AR 2326 (Response
6j).)

1  obligations:

2          Interior will continue to fulfill the commitment to
        meet the 1995 Bay-Delta WQCP obligations (SWRCB D1641).
3          These costs will be accounted as the increase in
        releases and decrease in exports, compared to releases
4          and exports that would have resulted from simulated CVP
        baseline operations during the same period.  The CVP
5          will be operated in accordance with the WQCP
        obligations and ESA obligations.  Interior will account
6          for the total amount of CVP water costs associated with
        meeting the WQCP obligations and ESA obligations
7          imposed after enactment of CVPIA against the annual
        (b)(2) allocation, up to the balance of (b)(2) water
8          remaining at the time the cost is incurred.

9  (AR 2146 (emphasis added).)

10        The May 9, 2003 Decision also provided details about

11 forecasting, monthly and final accounting processes, potential

12 modifications of CVP operations, water banking and exchange

13 procedures, the use of water to meet WQCP and ESA obligations,

14 and shortage criteria.  (AR 2138-2149.)

15        Shortly after Interior issued its May 9, 2003 Decision, the

16 Ninth Circuit issued its initial ruling on the appeal, reversing

17 the district court's partial final judgment regarding the

18 crediting of (b)(2) water to ensure that "Interior's allocation

19 gives effect to the hierarchy of purposes established in Section

20 3406(b)(2)."  66 Fed. Appx. 734 (9th Cir. June 3, 2002).

21 Thereafter, Interior committed to undertaking a review of its May

22 2003 Decision in light of the Ninth Circuit's ruling.

23        Interior completed its review on December 17, 2003 and

24 issued a joint Bureau-FWS Memorandum:  "Guidance for

25 Implementation of Section 3406(b)(2) of the CVPIA" ("December

26 2003 Guidance Memo").  (AR 2156-58.)  Interior emphasized the

27 Ninth Circuit's holding that the "non-mandatory language" of

28 section 3406(b)(2) gives Interior "the discretion to allocate the

7

1    800,000 acre-feet among fish and wildlife, water quality, and

2    endangered species obligations, as long as Interior's allocation

3    gives effect to the hierarchy of purposes established in

4    3406(b)(2)."  (AR 2156.)  The December 2003 Guidance Memo further

5    explains:

> The October 1 through September 30 accounting period
> described in the May 9, 2003 Decision allows Interior
> to implement actions that effectuate the "hierarchy of
> purposes" referred to in the June 3, 2003 Ninth Circuit
> Decision.  The May 9, 2003 Decision specifically
> provides for a target of up to 200,000 acre-feet of use
> in the October through January period, primarily for
> high priority fish and wildlife uses.  Moreover,
> actions taken pursuant to the 1995 Water Quality
> Control Plan and State Water Resources Control Board
> Decision D-1641 ("the 1995 WQCP") involve the
> dedication and management of Central Valley Project
> yield for long-term fishery beneficial use and
> protection.  Such actions are not taken to help meet
> agricultural or municipal and industrial water quality
> standards that are set forth in the 1995 WQCP.  Most of
> the fishery beneficial uses and objectives under the
> 1995 WQCP and in Reclamation's water rights permits
> help fulfill the fish, wildlife, and habitat
> restoration purposes and measures authorized by Section
> 3406(b).  Consistent with the June 3, 2003 Ninth
> Circuit decision, much of the (b)(2) water that is
> dedicated and managed annually to help meet fishery
> beneficial use and protection objectives of the 1995
> WQCP serves Section 3406(b)(2)'s "primary purpose" of
> fish, wildlife, and habitat restoration.  Therefore the
> implementation of Section 3406(b)(2) in accordance with
> the May 9, 2003 Decision and with this supplemental
> guidance effectuates the "hierarchy of purposes" in
> Section 3406(b)(2).

(AR 2156-57.)

    One month later, on January 23, 2004, the Ninth Circuit

issued its amended decision.  87 Fed. Appx. 637.  Interior

reviewed the amendment and considered it when implementing

(b)(2), (*see* Doc. 685 at 9), but made no further changes to its

written Guidance or other policy documents.

**D.   Implementation of (b)(2) Accounting for the 2004 Water Year**.

**1.   General Approach to Forecasting**.

The (b)(2) accounting year mirrors the CVP water year and runs from October 1 through September 30.   (First Fujitani Decl., Doc. 685, at ¶6.)   Beginning in October 2003, the Bureau prepared a series of forecasts for CVP operations.   (*Id*. at ¶7.)   These forecasts "typically included two forecasted hydrologic scenarios.   One scenario utilized a hydrology with a 90% chance of being exceeded (90% forecast) and the second forecast scenario utilized a hydrology with a 50% chance of being exceeded (50% forecast)."   (*Id*.)   For each of these two hydrologic scenarios, the Bureau prepared a set of forecasts, typically including forecasts of CVP operations: (1) under pre-1992 conditions (the "baseline forecast"); (2) under State Water Resources Control Board ("SWRCB") Decision 1641 ("D-1641") (the "water quality control plan forecast")[2]; and (3) with other (b)(2) actions (the "(b)(2) forecast").   (*Id*. at 8.)

The Bureau developed the (b)(2) forecast by first estimating the projected monthly annual CVP water costs of implementing D-1641.   This was accomplished by comparing the 90% baseline forecast with the 90% WQCP forecast.   In addition, the "fishery costs" of implementing D-1641 were estimated.   (*Id*. at ¶9.)[3]

_____

[2]   D-1641 promulgated the 1995 Water Quality Control Plan ("WQCP") and the two are used interchangeably by the parties.

[3]   Mr. Fujitani does not indicate how the Bureau determines whether the "fishery costs" of D-1641 are counted as (b)(2) costs.   Nor does he explain how WQCP or ESA uses are divided among primary and secondary purposes.

9

Then, the Bureau consulted with FWS to incorporate other planned (b)(2) actions into the forecast. (*Id.*)

## 2. The Mid-March 2004 Trigger of the Port Chicago Objective.

The WQCP objectives contained in D-1641 are sensitive to actual hydrological conditions. (*Id.* at ¶12.) One such objective is maintenance of two-parts-per-thousand of salinity (known as "X2") at Port Chicago in the Delta. (*Id.*) The location of X2 reacts quickly to unregulated storm runoff. Under certain circumstances, the Bureau may be required to significantly increase releases from the CVP reservoirs and reduce exports. (*Id.*) During the relevant period of time, the Bureau accounted for the Port Chicago/X2 objective[4] as (b)(2) fishery costs. (*Id.*)

In mid-March 2004, a series of storms triggered the Port Chicago/X2 objective for April. (*Id.* at ¶13.) Accordingly, in April 2004, the Bureau modified CVP operations to meet the objective. (*Id.*) Because the actual position of X2 is highly dependent upon conditions beyond the operators' control, the Bureau and DWR ensured compliance with the objective by providing the required net Delta outflow, through increasing reservoir releases and reducing pumping from the Delta at the Bureau's Jones pumping plant and DWR's Banks pumping plant. (*Id.*)

These changes, made in April, were not predicted in the March forecasts. For example, the March 90% forecast, predicted

---

[4]   The Port Chicago objective requires either that X2 be maintained west of Port Chicago or that the minimum net Delta outflow index be maintained for the requisite number of days, as set forth in D-1641.

WQCP costs of approximately 1,000 AF for CVP releases and approximately 76,000 AF for export operations, with fishery costs for the entire water year estimated to be 800,000 AF.  (*Id*. at ¶14.)  In the April 90% forecast, which included the actions taken in April to meet the Port Chicago objective, the water costs grew to approximately 317,000 AF for CVP releases and 115,000 AF for CVP export actions.  (*Id*.)  The total estimated fishery costs increased to 1,053,000 AF.  (*Id*.)

In the final daily (b)(2) accounting for the April actions taken to meet the Port Chicago objective, which is based on a comparison of daily CVP operations against the daily hypothetical CVP operations under the baseline (pre-1992) conditions, Interior estimated the fisheries costs in April to be approximately 236,000 AF for CVP release actions and approximately 129,900 AF for CVP Export actions.  (*Id*. at ¶14.)

### 3.   Interior's Response.

Once it "became apparent that the costs associated with implementation of the WQCP were increasing in April, Interior took actions to reduce other (b)(2) actions and sought to utilize Environmental Water Account (EWA) assets to the extent possible to manage the annual (b)(2) operations and accounting."  (*Id*. at ¶15; *see also* First Guinee Decl., Doc. 685-5, at ¶11 (indicating that once it was determined that approximately 775,000 AF would be used by the end of May, the "remaining use of (b)(2) water from June through September was prioritized to dedicate (b)(2) water to the primary purpose of fish, wildlife and habitat restoration, particularly salmon restoration and doubling on

11

1  Clear Creek").)[5]   Multiple responsible agencies used EWA assets in

2  place of (b)(2) assets at Jones pumping plant, totaling 64,000 AF

3  in April and May.   (First Fujitani Decl. at ¶15)

4        Mr. Fujitani asserts that no additional EWA actions could be

5  taken because of limited EWA assets.   (*Id*.)   Mr. Snow disputes

6  this assertion.   (Suppl. Snow Decl., Doc. 692, at ¶5.)

7  Regardless of the availability of EWA assets and/or the extent of

8  Interior's efforts to reduce (b)(2) actions, more than 800,000 AF

9  of CVP yield was used for fishery-related actions during the 2004

10 (b)(2) accounting year.

11

12        [5]   Plaintiffs suggest that after Interior realized that it

13 was going to overshoot the 800,000 AF limit, they considered a
   variety of scenarios, citing AR 1216-17; 21-22; 27-28; 89-93;

14 114-15; 23-27, but chose a "no action alternative."   In support
   of this assertion, Plaintiffs reference a table describing

15 various alternatives at AR 1216.   In that table, the "no action"
   alternative is described as an approach that would "[i]mplement

16 WQCP and other primary purpose actions, let accounting go as
   accumulated, now projected at 978 TAF."   *Id*. (emphasis added).

17 It describes the benefits of this approach as being "[e]asy to
   implement" and "implements all primary purpose actions."   *Id*. The

18 risks are described as:   "B2 costs estimated at 978 TAF, most
   likely to be challenged by stakeholders."   *Id*.   Other

19 alternatives are listed on this chart, but the record does not
   reveal which of these, if any, Interior eventually selected for

20 implementation.   Plaintiffs suggest that, despite not expressly
   choosing an alternative, Interior actually chose the "no action

21 alternative."   This makes some sense, given that, of the listed
   options, the no action alternative's estimate of 978 TAF of

22 (b)(2) costs is closest to the actual amount expended on (b)(2)
   and "Non-B2 Fishery Actions."   However, both Mr. Fujitani and Mr.

23 Guinee take issue with the assertion that Interior decided to do
   nothing in response to the situation.   Both state that Interior

24 took steps to minimize (b)(2) actions in the face of mounting
   water costs.   (First Guinee Decl. at ¶10; First Fujitani Decl. at

25 ¶15.)   Plaintiffs provide no evidence to the contrary.

26

27

28

1   Under the final, daily (b)(2) accounting for the entire 2004

2   water year, 799,000 AF of CVP yield were used for (b)(2)

3   purposes, while 159,200 AF were used for other "Non-B2 Fishery

4   Actions." (*Id*. at ¶10.)  The 159,200 AF for "Non-B2 Fishery

5   Actions" was primarily used for two purposes:  (1) from June 17

6   through June 30, 2004, water was released at Nimbus Reservoir and

7   New Melones Reservoir for fisheries purposes; and (2) from August

8   1 through September 30, 2004, the Bureau pumped less water than

9   it otherwise would have for fishery purposes, representing a loss

10  of replacement export pumping that otherwise would have taken

11  place under D-1485 to compensate for May fisheries actions.

12

13                    III.  **STANDARD OF REVIEW**

14       A.   **Review Under the Administrative Procedure Act.**

15       This case concerns a challenge to administrative agencies'

16  implementation of the CVPIA.  Because CVPIA contains no private

17  right of action or provision for judicial review, the

18  Administrative Procedure Act ("APA") governs judicial review of

19  agency action in this case.  5 U.S.C. §§ 701-706.  Under the APA,

20  federal courts can only review whether agency decisions were

21  "arbitrary, capricious, an abuse of discretion, or otherwise not

22  in accordance with law."  5 U.S.C. § 706(2)(A).  "This

23  deferential standard is designed to ensure that the agency

24  considered all of the relevant factors and that its decision

25  contained no clear error of judgment."  *Pac. Coast Fed'n of*

26  *Fishermen's Ass'ns v. NMFS*, 265 F.3d 1028, 1034 (9th Cir. 2001)

27  ("*PCFFA*").  Agency action should only be overturned if the agency

28  has "relied on factors which Congress has not intended it to

consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 127 S.Ct. 2518, 2529 (2007) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Essentially, a court must ask "whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choice made." *PCFFA*, 265 F.3d at 1034.

As a general rule, a court must defer to the agency on matters within its expertise. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798 (9th Cir. 2005). "Deference to the informed discretion of the responsible federal agencies is especially important, where, as here, the agency's decision involves a high level of technical expertise." *Id.* However, "[t]he deference accorded an agency's scientific or technical expertise is not unlimited." *Id.* "Deference is not owed when the agency has completely failed to address some factor consideration of which was essential to [making an] informed decision." *Id.* (internal citations and quotations omitted). Nevertheless, a court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Home Builders*, 127 S. Ct. at 2530.

14

1          **B.    Consideration of Extra-Record Evidence**.

2          Normally in an APA case, extra-record evidence is not

3    admissible, unless it falls into one of several discrete

4    exceptions to the general rule.  *See N.W. Envtl. Advocates v.*

5    *Nat'l Marine Fisheries Serv.*, 460 F. 3d 1125, 1145 (9th Cir.

6    2006).  In this case, the complaint presents an "as-applied"

7    challenge to the implementation of (b)(2) in the 2004 (b)(2)

8    accounting year.  Accordingly, the "final agency action" is not a

9    single agency "decision," but rather the continued implementation

10   of agency policy over the course of an entire water year,

11   including monthly forecasting and daily adjustments to a complex

12   operation.  The Federal Defendants have prepared an

13   administrative record.  However, all parties have agreed that

14   because of the technical nature of the (b)(2) accounting process,

15   the case requires extra-record expert analysis.  Plaintiffs have

16   filed the declarations of James Snow, an engineer employed by

17   Westlands, and Dan Nelson, the Executive Director of the

18   Authority; Federal Defendants filed the declarations of Paul E.

19   Fujitani, Chief of the Water Operations Division in the Bureau's

20   Central Valley Operations Office, and Roger Guinee, the Water

21   Operations Chief for FWS's Water and Fishery Resources Program;

22   and Environmental Plaintiffs filed the 2001 declaration of Spreck

23   Rosekrans, a water operations expert employed by Environmental

24   Defense.  These declarations, to the extent they contain legally

25   admissible information and opinions, shall be considered to

26   assist the court to understand complex and technical scientific

27   issues raised by accounting under (b)(2) for CVP annual

28   operations.

1

2

IV.   **DISCUSSION**

A.   **Justiciability Issues**.

3    The district court must, either *sua sponte* or at the request

4    of the parties, evaluate the issues of standing and mootness.

5    *See Grupo Dataflux v. Atlas Global Group*, 541 U.S. 567, 593

6    (2004) ("It is the obligation of both district court and counsel

7    to be alert to jurisdictional requirements."); *c.f. Am. Civil*

8    *Liberties Union of Nevada v. Lomax*, 471 F.3d 1010, 1015 (9th Cir.

9    2006) (Court of Appeals has an "independent obligation" to

10   consider standing and mootness *sua sponte* on appeal if issues not

11   raised by parties).   Here, Federal Defendants challenge

12   Plaintiffs' standing to sue and assert that their claims are

13   moot.

14       1.   **Standing**.

15   To maintain an action in federal court, Plaintiffs must

16   satisfy both Article III and APA standing requirements.   *See*

17   *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 872 (1990) ("*Lujan*

18   *v. NWF*").

19           a.   **Article III Standing**.

20   "[T]o satisfy Article III's standing requirements, a

21   plaintiff must show (1) it has suffered an "injury in fact" that

22   is (a) concrete and particularized and (b) actual or imminent,

23   not conjectural or hypothetical; (2) the injury is fairly

24   traceable to the challenged action of the defendant; and (3) it

25   is likely, as opposed to merely speculative, that the injury will

26   be redressed by a favorable decision."   *Friends of the Earth v.*

27   *Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).

28       The burden of establishing these three elements falls upon

16

the party asserting federal jurisdiction.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  The elements of standing are "not mere pleading requirements."  *Id*.  Rather, they are an "indispensable part of the plaintiff's case," and accordingly must be supported at each stage of litigation in the same manner as any other essential element of the case.  *Id*.

### (1)  Injury in Fact/ Causation.

To satisfy the "injury in fact" requirement, Plaintiffs must provide evidence of either actual or threatened injury.  *See United States v. Ensign*, 491 F.3d 1109, 1116-17 (9th Cir. 2007). The second standing requirement, causation, requires that the injury be "fairly traceable" to the challenged action of the defendant, and is not "the result of the independent action of some third party not before the court."  *Tyler v. Cuomo*, 236 F.3d 1124, 1132 (9th Cir. 2000).  Plaintiffs assert that they have suffered actual injury and are threatened with future injury as a result of the manner by which Federal Defendants' implemented (b)(2) in 2004 and plan to implement (b)(2) in the future.

### (a)  Past Harm From Implementation of Accounting Practices in 2004.

Plaintiffs allege that they "have a beneficial interest in the water appropriated by the CVP," and that "[t]hey will suffer most, if not all, of any reductions in water supply resulting from implementation of the 2003 Decision in a manner that causes exceedence of the 800,000 acre-foot statutory limit...especially where such implementation involves CVP export reductions."  (Doc. 656 at ¶11.)  More specifically, Plaintiffs contend that they suffered actual injury in 2004, resulting from:

17

1
2
3
4
5
6
7
8
9
10
11
12

> Interior's over-allocation of water for fish and
> wildlife [purposes] and failure to use available EWA
> assets to compensate for such actions.  In 2004, demand
> exceeded supply; Reclamation's water allocation for
> south of Delta service contractors was 65% of contract
> supplies for most of the irrigation season.  (Snow
> Decl. ¶3.) To compensate for reduced CVP deliveries,
> Westlands, for example, purchased additional supplies,
> and its landowners pumped additional groundwater.  (*Id.*
> at ¶4.) Interior used EWA to compensate for some fish
> actions in 2004, but there were additional EWA assets
> available to Interior in 2004 that it chose not to use.
> (*Id.* at ¶¶6-9.)  Those assets could have been used to
> compensate the CVP for fish actions that were instead
> assigned to the "Non-B2 Fishery Action" columns.  (*Id.*
> at ¶9.)  If interior had used more available EWA assets
> to cover the fish actions in 2004, CVP agricultural
> service contractors would likely have received a higher
> contract allocation in 2004.  (*Id.* at ¶9-10.)  Instead,
> Interior claimed discretion to simply not count these
> uses, and [claimed] that it was not required to
> compensate for these actions.

(Doc. 690 at 17.)

13
14
15
16
17
18
19
20
21
22

     Plaintiffs advance two claims of injury.  First, they claim
their water deliveries were reduced as a result of Interior's
decision to count certain actions as "Non-B2 Fishery Actions."
However, apart from asserting that demand exceeded supply in
2004, that deliveries in 2004 were less than 100%, and that
Plaintiffs had to either purchase alternative supplies or pump
water as a result, Plaintiffs do not specifically explain how
Interior's 2004 Water Year accounting actions resulted in reduced
water deliveries.

23
24

     Mr. Nelson, the Authority's Executive Director, explains
Plaintiffs injury theory, but provides no specific information
about causation.

25
26
27
28

> The CVP water supplies available to [its] member
> agencies are directly affected by the manner in which
> [Interior] dedicates and manages the 800,000 acre-feet
> account....Members are particularly affected by use of
> the (b)(2) account to impose reductions in export
> pumping at Jones Pumping Plaint, as all members receive

18

their CVP supplies through that plant. To the extent Interior fails to count water used for fish and wildlife purposes against the (b)(2) account, Interior may cause a loss of water supply to member agencies by reallocating CVP supplies from municipal and irrigation uses to fish and wildlife uses.

(Nelson Decl., Doc. 691, at ¶4.)

Plaintiffs' most specific causation argument is provided by Mr. Snow, who states:

To a significant extent, the allocation of CVP yield to various uses is a zero sum game. Allocation to one use will usually result in at least a significant reduction in supply available to another, competing use. One of these demands is the dedication of CVP yield under section 3406(b)(2) of the [CVPIA]. Reductions in export pumping pursuant to (b)(2), in particular, can have significant effect upon supply for south of Delta CVP contractors.

(Suppl. Snow Decl., Doc. 692, at ¶10.)

Mr. Fujitani opines that, due to the complexities of operating the CVP, Plaintiffs need additional information before they can show whether the challenged actions affected water supply:

The impact to the available water supply could be affected by several conditions including reservoir fill, export capacity, conveyance losses, Delta carriage losses, and operational criteria at the time of the action. Additional information would be needed on the location, timing and flow rates of any actions to estimate potential water supply impacts.

(Suppl. Fujitani Decl., Doc. 696-2, at ¶18.) The implication of this is that the challenged actions are just one of many causes that impact CVP water deliveries. However, Federal Defendants accounted for these actions as reductions from CVP yield, albeit "Non-B2 fishery action" deductions. If this reduction of CVP annual yield did not cause losses to CVP contractors, Federal Defendants have not explained why. Absent any such explanation,

19

1  Plaintiffs satisfy the injury-in-fact requirement.[6]

2  Plaintiffs alternatively assert that they were injured

3  because they should have been compensated under the EWA for any

4  water lost to fishery actions that exceeded 800,000 AF of CVP

5  yield.  They maintain Interior had additional EWA assets

6  available in 2004 that it chose not to use.  Specifically, Mr.

7  Snow maintains that Federal Defendants had "approximately 275,000

8  acre-feet of water available for EWA actions that they did not

9  use in 2004."  (Suppl. Snow Decl. at ¶7.)  Mr. Snow derived that

10 figure from his review of a table entitled "Environmental Water

11 Account Water Acquisitions in 2003_04 (Fiscal Year)," which

12 indicated that 430,000 AF of water was available for purchase,

13 while only 155,000 AF of water was actually purchased.  (*See id*.

14 at ¶¶ 5-7.)  Mr. Snow does not explain why the entire 430,000 AF

15

16      [6]    Federal Defendants' reliance on the district court's
   decision after remand in *Central Delta Water Agency v. Norton*,
17 327 F. Supp. 2d 1180, 1190 (E.D. Cal. 2004) is misplaced.  In
   that case, the Court of Appeals reversed an earlier district
18 court decision and found that Plaintiffs had standing even though
   a statutory violation had not yet occurred and the probability of
19 future harm was small, finding that a "credible threat of harm"
   was sufficient.  *Central Delta Water Agency v. Norton*, 306 F.3d
20 938, 949 (9th Cir. 2002).  The Ninth Circuit remanded the case
   for further decision on the merits.  Plaintiffs then argued that
21 the Ninth Circuit's finding of a credible threat of harm entitled
   them to summary judgment on the merits of their statutory
22 violation claim.  The district court rejected Plaintiffs' attempt
   "to extrapolate the Ninth Circuit's opinion, to establish,
23 without any evidence, an actual violation of the [statute in
   question]."  327 F. Supp. 2d at 1212.  Although the Ninth
24 Circuit's ruling on the issue of standing was discussed, standing
   was not decided by the district court on remand.  Rather, the
25 district court held that Plaintiffs presented no evidence of
   actual injury required to survive summary judgment on the merits.
26 *Id*.

27

28

of water should be considered "available for EWA actions" before it was purchased by the Federal Defendants from a limited funding pool, or that Interior was under any enforceable duty to purchase external water assets if the water does not exist in the CVP.[7]

Mr. Fujitani declares that use of these assets was "limited by both the location of the assets and the authorized place of use of the assets." (Suppl. Fujitani Decl. at ¶¶8-9.) For example, Mr. Snow argues that the Bureau could have exercised an option to obtain water for the EWA from the Kern County Water Agency. (Suppl. Snow Decl. at ¶8.) However, Mr. Fujitani explains that this potential water transfer would have been limited in its place of use to a State Water Project place of

_____

[7] Mr. Snow also asserts that the Federal Defendants had approximately $28 million available for EWA acquisitions that it did not spend in 2004. Mr. Snow bases this figure on the same table cited above. He compared a $47,197,500.00 figure from that table, representing the total cost of acquisitions if all options to purchase were exercised, to a $19,570,000.00 figure, representing the amount of money spent. Mr. Snow opines that Federal Defendants had but did not spend the difference between the $19,570,000.00 figure and the $47,197,500.00 figure, approximately $28 million, available for EWA acquisitions. (Snow Decl., Doc. 682, at ¶¶5-6.) Mr. Snow does not explain why the difference between these figures represents a balance of available funding. To the contrary, Mr. Fujitani denies that such funding was available, stating that the EWA is managed by numerous government agencies, including FWS, the Bureau, NMFS, DWR, and the California Department of Fish and Game. (Suppl. Fujitani Decl. at ¶6.) "Generally, water acquisitions are funded by both the State of California and the Federal government, and managed by all of the agencies identified above. In water year 2004, very little, if any, of the funding for the EWA water acquisitions came from the Federal Government." (*Id.*) Moreover, no legal authority is provided that this EWA acquisition fund is a non-discretionary source of funding the court could require Interior to expend for CVP water service purposes.

21

use.  (Suppl. Fujitani Decl. at ¶7.)  After April and May,
"[a]dditional EWA actions could not be used at the CVP because of
limited EWA assets."  (First Fujitani Decl. at ¶6.)  Plaintiffs'
evidence does not undermine Mr. Fujitani's declaration.
Nevertheless, Plaintiffs satisfy the injury in fact test on other
grounds, as discussed above.

                    **(b)   Threat of Future Harm**.

       Plaintiffs also claim that they face the threat of future
injury because "Interior claims the discretion to refrain from
counting future fish actions [utilizing CVP yield] required by
the WQP or post- enactment ESA requirements.  While Interior has
not invoked that claimed discretion in the accounting years since
2004, it does not disavow any intention to do so in the
future....To the extent that Interior claims the ability to take
more fish actions in future years by not counting fish actions
against the (b)(2) account, Interior threatens future injury to
CVP water users including the members of the authority."  (Doc.
690 at 17.)

        "[T]he possibility of future injury may be sufficient to
confer standing on plaintiffs; threatened injury constitutes
injury in fact."  *Central Delta Water Agency v. United States,*
*306 F.3d 938, 947-48 (9th Cir. 2002)* (quoting *Ecological Rights*
*Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir. 2000));
*Laidlaw*, 528 U.S. at 180-81 (holding that "the threat
of...'injury in fact'" is sufficient to confer standing).
"Threatened environmental harm is by nature probabilistic....
[P]roducing evidence [of] an increased risk to its member's []
uses...is sufficient to provide injury in fact."  *Friends of the*

1  *Earth v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 159-60 (4th

2  Cir. 2000) (en banc).  The Ninth Circuit explained in *Pacific*

3  *Lumber*, a case involving an alleged Clean Water Act violation,

4  "to require actual evidence of environmental harm, rather than an

5  increased risk based on a violation of the statute,

6  misunderstands the nature of environmental harm, and would

7  undermine the policy of the...Act."  230 F.3d at 1151.

8       The relevant inquiry here is whether Plaintiffs face

9  "significant risk" that their water supply will be reduced in the

10  future as a result of the Bureau's (b)(2) accounting decisions in

11  operating the CVP.  *See Central Delta*, 306 F.3d at 948; *see also*

12  *Covington v. Jefferson County*, 358 F.3d 626, 652 (9th Cir.

13  2004)(heightened risk of serious harm sufficient to provide

14  standing);  *Hall v. Norton*, 266 F.3d 969, 976 (9th Cir. 2001)

15  (holding that "evidence of a credible threat to the plaintiff's

16  physical well-being from airborne pollutants" is sufficient to

17  satisfy the injury requirement); *Churchill County v. Babbitt*, 150

18  F.3d 1072, 1078 (9th Cir. 1998) as amended, 158 F.3d 491 (9th

19  Cir. 1998) (plaintiff need only establish "the reasonable

20  probability of the challenged action's threat to [his] concrete

21  interest").

22       Federal Defendants maintain that Plaintiffs have produced no

23  evidence that suggests they face a "significant risk" of future

24  harm resulting from Interior's (b)(2) accounting procedure.

25  Federal Defendants emphasize that the 2004 (b)(2) accounting year

26  was the only time since enactment of the CVPIA that combined

27  actions under the primary and secondary CVPIA purposes exceeded

28  800,000 AF.  However, Federal Defendants neglect to mention that

Interior had no reason to believe it had discretion to exceed the 800,000 AF limit, which represented a specifically defined upper limit on CVP yield allotted to (b)(2) purposes, until the Ninth Circuit's decision in January 2004.  Although the limit has not been exceeded again since then, they offer no assurances that they will not do so in the future.  It has been exceeded once in the past four full (b)(2) accounting years and current critically dry conditions only add to the likelihood of future exceedences.

### (2)   Redressibility.

Plaintiffs seek (1) a declaration that Federal Defendants do not have discretion to refrain from counting fish actions taken pursuant to the WQCP or post-CVPIA ESA requirements toward the (b)(2) allocation, and (2) an injunction prohibiting Federal Defendants from failing to count such actions against the (b)(2) allocation in the future.  A favorable ruling in this case would redress the alleged injury of loss to Plaintiffs of their full annual allocations of CVP water.

### b.   Associational Standing.

An association has standing to bring suit on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation in the lawsuit of the individual members. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).  The Authority satisfies these requirements.  Its membership includes Westlands and numerous other similarly situated public agencies that contract with Interior for water service.  Westlands and the

1   Authority's other member agencies have standing to sue in their

2   own right under the Reclamation Act, *see* 43 U.S.C. § 511.  The

3   interests the Authority seeks to protect in this lawsuit are

4   germane to the organization's stated purpose, namely to preserve

5   and protect water rights and benefits of the member agencies in

6   the Central Valley Project.  (Nelson Decl. at ¶2.)  There is no

7   reason why the claim asserted requires the participation of the

8   Authority's individual member agencies, which are barred by the

9   Reclamation Act from bringing suit directly against Interior,

10  because they are not directly contracting parties, nor are they

11  in privity with Interior, as their water service contracts are

12  with Plaintiffs' member agencies.  (*See* 43 U.S.C. § 511; *see also*

13  *Sumner Peck Ranch Inc. v. Bureau of Reclamation*, 1:88-cv-00634

14  OWW DLB, Doc. 691 at 65.)

15              c.   APA Standing.

16       Because the CVPIA contains no private right of action to

17  challenge implementation of its provisions, Plaintiffs seek

18  judicial review in this case under § 10(a) of the APA, which

19  provides:

20              A person suffering legal wrong because of agency
            action, or adversely affected or aggrieved by agency
21          action within the meaning of a relevant statute, is
            entitled to judicial review thereof.
22

23  5 U.S.C. § 702.

24       In *Lujan v. NWF*, the Supreme Court explained that "this

25  provision contains two separate requirements."

26              First, the person claiming a right to sue must identify
            some "agency action" that affects him in the specified
27          fashion; it is judicial review "thereof" to which he is
            entitled. The meaning of "agency action" for purposes
28          of § 702 is set forth in 5 U.S.C. § 551(13), see 5
            U.S.C. § 701(b)(2) ("For the purpose of this chapter

                               25

... 'agency action' ha[s] the meanin[g] given ... by
section 551 of this title"), which defines the term as
"the whole or a part of an agency rule, order, license,
sanction, relief, or the equivalent or denial thereof,
or failure to act," 5 U.S.C. § 551(13). When, as here,
review is sought not pursuant to specific authorization
in the substantive statute, but only under the general
review provisions of the APA, the "agency action" in
question must be "final agency action." See 5 U.S.C. §
704 ("Agency action made reviewable by statute and
*final* agency action for which there is no other
adequate remedy in a court are subject to judicial
review" (emphasis added)).

Second, the party seeking review under § 702 must show
that he has "suffer[ed] legal wrong" because of the
challenged agency action, or is "adversely affected or
aggrieved" by that action "within the meaning of a
relevant statute." Respondent does not assert that it
has suffered "legal wrong," so we need only discuss the
meaning of "adversely affected or aggrieved ... within
the meaning of a relevant statute." As an original
matter, it might be thought that one cannot be
"adversely affected or aggrieved within the meaning "
of a statute unless the statute in question uses those
terms (or terms like them)-as some pre-APA statutes in
fact did when conferring rights of judicial review.
*See, e.g.,* Federal Communications Act of 1934, §
402(b)(2), 48 Stat. 1093, as amended, 47 U.S.C. §
402(b)(6) (1982 ed.). We have long since rejected that
interpretation, however, which would have made the
judicial review provision of the APA no more than a
restatement of pre-existing law. Rather, we have said
that to be "adversely affected or aggrieved ... within
the meaning" of a statute, the plaintiff must establish
that the injury he complains of ( his aggrievement, or
the adverse effect upon him ) falls within the "zone of
interests" sought to be protected by the statutory
provision whose violation forms the legal basis for his
complaint. See Clarke v. Securities Industry Assn., 479
U.S. 388, 396-397(1987). Thus, for example, the failure
of an agency to comply with a statutory provision
requiring "on the record" hearings would assuredly have
an adverse effect upon the company that has the
contract to record and transcribe the agency's
proceedings; but since the provision was obviously
enacted to protect the interests of the parties to the
proceedings and not those of the reporters, that
company would not be "adversely affected within the
meaning" of the statute.

497 U.S. at 883.

    As to the first requirement, Plaintiffs have identified an

1  "agency action" -- Interior's decision to refrain from counting

2  certain uses of water as (b)(2) actions during the 2004 (b)(2)

3  accounting year -- that has adversely affected Plaintiffs in a

4  specified fashion.  Those accounting decisions amount to final

5  agency actions for which there is no other adequate remedy in a

6  court of law.

7      As to the second requirement, *Lujan v. NWF* indicates that to

8  be "adversely affected or aggrieved ... within the meaning" of a

9  statute, Plaintiffs must establish that the injury they complain

10 of falls within the "zone of interests" sought to be protected by

11 the statutory provision, the violation of which forms the legal

12 basis for their complaint.  *Id*.  Here, one of the stated purposes

13 of the CVPIA is to "achieve a reasonable balance among competing

14 demands for use of [CVP] water, including the requirements of

15 fish and wildlife, agricultural, municipal and industrial and

16 power contractors."  CVPIA § 3402(f).  Plaintiffs' alleged injury

17 -- reduced water deliveries to agricultural, municipal, and

18 industrial contractors -- falls squarely within the zone of

19 interest of the CVPIA.

20              **d.   Conclusion Re Standing**.

21     Plaintiffs satisfy all the Article III and prudential

22 standing requirements.

23          **2.   Mootness**.

24     Federal Defendants also argue that this action is moot.

25 The case or controversy requirement of Article III of the Federal

26 Constitution deprives the Court of jurisdiction to hear moot

27 cases.  *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70

28 (1983).  "A case is moot when the issues presented are no longer

27

1   'live' or the parties lack a legally cognizable interest in the

2   outcome.  *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000).

3   "To satisfy the Article III case or controversy requirement, a

4   litigant must have suffered some actual injury that can be

5   redressed by a favorable judicial decision."  *Iron Arrow*, 464

6   U.S. at 70.  The test for mootness is whether the court can give

7   the parties "any effective relief in the event that it decides

8   the matter on the merits in his favor.  That is, whether the

9   court can 'undo' the effects of the alleged wrongdoing."  *Reimers*

10  *v. Oregon*, 863 F.2d 630, 632 (9th Cir. 1988) (internal citations

11  and quotations omitted).

12      Here, Plaintiffs assert that a continuing live controversy

13  does exist over the meaning and implementation of 3406(b)(2).

14  However, the specific injury complained of with respect to the

15  2004 water year -- the alleged reduction in deliveries -- cannot

16  be redressed by a favorable judicial decision.  That water year

17  is over and Plaintiffs do not seek damages related to or

18  reimbursement for that 2004 loss.

19      However, Plaintiffs complain that Interior "may refrain from

20  counting the cost of any such [WQCP or ESA] actions" in a future

21  water year.  This invokes an exception to the mootness rule for

22  injuries that are "capable of repetition yet evading review."

23  The exception is met when if "(1) the duration of the challenged

24  action is too short to allow full litigation before it ceases,

25  and (2) there is a reasonable expectation that the plaintiffs

26  will be subjected to it again."  *Greenpeace Action v. Franklin,*

27  14 F.3d 1324, 1329 (9th Cir. 1992).

28      The first part of this test is satisfied here because the

Ninth Circuit has found that a challenged action that will run its course in one or two years does not provide enough time for full review. *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1173-74 (9th Cir. 2002). Plaintiffs assert that the second prong is also satisfied because "there is a reasonable expectation that Interior will continue to implement (b)(2) in the same manner as it did in 2004," because "Interior argues that it [has the discretion to] take (b)(2) actions in excess of 800,000 acre-feet throughout its opposition brief." (Doc. 690 at 20.) It is impossible to predict whether and how often Interior may invoke this authority. Plaintiffs implicitly maintain that it is unlawful for the Bureau to claim unfettered discretion to not account for and charge uses of CVP yield for ESA or WQCP purposes against the 800,000 annual AF dedication, and that harm will arise in any future water year in which the Federal Defendants claim it necessary to exercise that discretion. This presents a case of administrative action capable of repetition but evading review. Adding to the imminence and actuality of this dispute is that the Ninth Circuit's decision considered only one side of the interests served by the CVPIA and (b)(2). The CVPIA represented a compromise between competing needs for limited CVPIA yield. It dedicated 800,000 AF of CVP yield to fish and wildlife restoration purposes. The legislature did not grant an environmental priority to use the remaining CVP yield nor any other available CVP water. The legislature defined agriculture and other uses as co-equals in 3402(f), after the dedication of the 800,000 AF. The Ninth Circuit Decision focused upon the consequence of "undermining (b)(2)'s primary purpose" if

1  all ESA and WQCP and related uses were counted against the

2  dedicated (b)(2) annual 800,00 AF supply.  It did not consider

3  the converse, i.e., the consequences if Interior exercised its

4  discretion to <u>not</u> charge <u>any</u> ESA, WQCP, or related uses against

5  the 800,000 AF supply.

6

7      B.   <u>Evidentiary Objections</u>.

8      Plaintiffs raise four objections to statements made by Mr.

9  Fujitani in his declaration and nine objections to statements

10 made by Roger Guinee.  The objections fall into two general

11 categories.  First, Plaintiffs object that four statements in Mr.

12 Fujitani's declaration and seven statements in Mr. Guinee's

13 declaration concern are improper legal opinions.

14      For example, Mr. Fujitani stated:

15          In water year 2004, Reclamation implemented (b)(2) in
            accordance with the provisions of the "Decision on
16          Implementation of Section 3406(b)(2) of the [CVPIA],"
            dated May 9, 2003 (May Decision)(AR 2137), and
17          "Guidance for Implementation of Section 3406(b)(2) for
            the CVPIA," dated December 17, 2003 (AR 2156), as well
18          as, the Ninth Circuit's rulings in the (b)(2)
            litigation.  Bay Inst. of San Francisco v. United
19          States, 66 Fed. Appx. 734 (9th Cir. 2003), as amended
            by, 87 Fed. Appx. 637 (2004).
20
   (First Fujitani Decl. at ¶6.)  Plaintiffs correctly point out
21
   that this statement at least implies the legal conclusion that
22
   Interior acted lawfully by implementing (b)(2) "in accordance
23
   with" the Ninth Circuit decision.
24
        Both Mr. Fujitani and Mr. Guinee acknowledge that their
25
   challenged statements can be interpreted as legal conclusions.
26
   They have voluntarily revised their declarations to state that
27
   Interior relied on, rather than acted in "accordance with," the
28

1  relevant legal decisions.  (*See* Suppl. Fujitani Decl. at ¶¶ 13-
2  16; Suppl. Guinee Decl., Doc. 686-3, at ¶¶ 6-12.)  This
3  sufficiently resolves Plaintiffs' "legal conclusion" objections.

4      Plaintiffs also object to several additional statements made
5  by Mr. Guinee on the ground that they are "post hoc
6  rationalizations."  (*See* Objections 8-9, Doc. 695 at 6-7.)
7  Plaintiffs eighth objection is to the following statement made by
8  Mr. Guinee about increased flows from Nimbus during late June
9  2004:

10      The Service did not recommend this flow increase to
    meet the primary fish, wildlife and habitat restoration
11      purposes of the CVPIA (AR 2565).  <u>Said another way,</u>
    <u>were it not for the WQCP, the Service would not have</u>
12      <u>recommended that Reclamation increase flow releases in</u>
    <u>June 17, 2004 in the American River for primary fish</u>
13      <u>restoration purposes pursuant to CVPIA, Section</u>
    <u>3406(b)(2)</u>.
14
15  (First Guinee Decl. at ¶13 (emphasis added).)  Plaintiffs
16  maintain that Mr. Guinee's speculation about what the agency
17  would have done, were it not for the WQCP, is based on a single-
18  page document from the record, entitled "Water Year 2004 Fishery
19  Action Costs."  (AR 2565.)  This document does not describe what
20  fish actions Interior would have taken in the absence of the
21  WQCP; rather, it summarizes the costs of fish actions actually
22  taken in 2004, allocating those costs between the "primary" and
23  "secondary" purposes.  Mr. Guinee cannot read the Bureau's mind
24  and has no foundation for this opinion.  The objection is well
25  taken.  Mr. Guinee responds to this objection by amending and
26  simplifying his assertion that Interior did not recommend this
27  increase to meet the primary fish, wildlife, and habitat
28  restoration purposes of the CVPIA.  (Suppl. Guinee Decl. at ¶14.)

1    Plaintiffs' remaining objection is similar.  Mr. Guinee has

2    amended and simplified his statement to eliminate any language

3    that could possibly be interpreted as a post hoc rationalization

4    or speculation.  (*Id*. at ¶15.)   These changes sufficiently

5    resolve Plaintiffs' remaining objections.

6

7    C.   <u>Lawfulness of Interior's (b)(2) Accounting in 2004</u>.

8    CVPIA section 3406(b)(2) provides that the Secretary of the

9    Interior shall:

10           dedicate and manage annually eight hundred thousand
             acre-feet of Central Valley Project yield for the
11           primary purpose of implementing the fish, wildlife, and
             habitat restoration purposes and measures authorized by
12           this title; to assist the State of California in its
             efforts to protect the waters of the San Francisco bay
13           Sacramento-San Joaquin Delta Estuary; and to help to
             meet such obligations as may be legally imposed upon
14           the Central Valley Project under State or Federal law
             following the date of enactment of this title,
15           including but not limited to additional obligations
             under the Federal Endangered Species Act....
16

17    The district court initially ruled that "[a]n a matter of

18    law, this language is not ambiguous -- water used to meet WQCP or

19    post-CVPIA ESA requirements is an additional (b)(2) purpose and

20    must be charged against the 800 TAF (b)(2) mandate if so used."

21    (Doc. 466 at 33.)

22    The Ninth Circuit reversed:

23           The district court erred in concluding that Interior
             lacks discretion to refrain from crediting the amount
24           of Project yield actually used for any (b)(2) purpose
             against the designated 800,000 acre feet of Project
25           yield. To hold otherwise would defeat the primary
             purpose for which the 800,000 acre feet were
26           designated-fish, wildlife, and habitat restoration.
             Section 3406(b)(2) provides that the "primary purpose"
27           to which the 800,000 acre feet should be dedicated is
             the implementation of "fish, wildlife, and habitat
28           restoration purposes authorized by this title..."
             Section 3406(b)(2) also provides that the 800,000 acre

1
2
3
4
5
6

> feet may be used to "help" meet obligations under the Endangered Species Act and to "assist" in meeting water quality standards. If Interior were required to deduct some or all the water it uses for water quality and Endangered Species Act purposes from the (b)(2) dedication, the water needed for implementation of the Improvement Act's restoration mandate could be relegated to a secondary role, or perhaps no role at all. Such a scenario would directly conflict with the Interior's mandate to give effect to the hierarchy of purposes established in Section 3406(b)(2).

7   *Bay Institute,* 87 Fed. Appx 639-40.  The essence of this holding,

8   which is binding upon the parties to this case, is that Interior

9   has discretion to refrain from deducting some or all of the water

10  it uses for water quality and ESA purposes from the (b)(2)

11  account, if such uses are for secondary purposes, but only if

12  doing so would give effect to the statutory hierarchy of purposes

13  and avoid relegating the CVPIA's primary restoration mandate to

14  "a secondary role, or perhaps no role at all."  *Id.*

15          1.   <u>Summary of the Parties' Arguments</u>.

16          Plaintiffs assert that "primary purpose" should be

17  interpreted broadly, to include the 159,200 AF designated as

18  "Non-B2 Fishery Actions" in late June and August/September 2004,

19  because those actions benefitted fish.  (Doc. 681 at 9.)  They

20  suggest that any water used to meet WQCP and/or ESA purposes must

21  be counted <u>unless</u> doing so would <u>not</u> serve any fish, wildlife,

22  and habitat restoration purposes, <u>or</u> if counting the water toward

23  the 800,000 AF limit would "significantly impair" the primary

24  restoration purposes.  (*Id.*)  However, when "water is used

25  pursuant to the mandates of the [WQCP] or the ESA to further fish

26  and wildlife restoration," Plaintiffs maintain that such use

27  "serves the primary purpose and effectuates the hierarchy of

28  purposes set in section 3406(b)(2)."  (*Id.* at 7.)  Plaintiffs

1   maintain that the Ninth Circuit could not have intended to

2   emasculate the 800,000 AF limit by granting Interior "unfettered

3   discretion to exclude from its accounting of (b)(2) water any

4   water dedicated to fulfill environmental obligations emanating

5   from other statutes."  (*Id*. at 8.)  This, they argue, would run

6   afoul of the cannon of statutory construction that requires

7   effect be given to every provision in a statute.[8]

8       Federal Defendants rejoin that Interior properly exercised

9   its discretion to designate the 159,200 AF as "Non-B2 Fishery

10  Actions" in late June and August/September 2004, because that

11  water did not serve the "primary purpose" of the CVPIA.  (*See*

12  Doc. 658-3 at 24.)  Federal Defendants argue that the Ninth

13  Circuit's decision construed (b)(2) broadly to uphold the

14  agency's ability to carry out the CVPIA's "restoration mandate,"

15  holding that if "Interior were required to deduct some or all of

16  the water it uses for water quality and Endangered Species Act

17

18      [8]   Federal Defendants and Environmental Plaintiffs argue
19  that Plaintiffs are merely resurrecting the same argument they
    raised on appeal.  (Doc. 685-3 at 27; Doc. 686 at 7.)  In some
20  places, Plaintiffs do appear to be retracing old ground.  For
    example, Plaintiffs argue that by including uses to protect the
21  Delta and uses to meet post-1992 legal obligations as purposes
22  which must be counted toward the 800,000 AF limit, Congress
    evidenced intent to have these counted.  (Doc. 681 at 8.)  This
23  issue has already been ruled upon by the Ninth Circuit, which
    held that, despite the inclusion as a CVPIA purpose the
24  satisfaction of post-1992 legal obligations, Interior
    nevertheless has the discretion not to count water used to serve
25  those purposes, so long as doing so will further the hierarchy of
26  purposes.  For the most part, however, Plaintiffs raise novel
    issues here, challenging the scope of Interior's discretion,
27  rather than whether Interior has any discretion at all, in light
28  of the CVPIA's (b)(2) and overall purposes.

purposes from the (b)(2) dedication," then the water needed to
implement the restoration mandate could be relegated to a
secondary role, or perhaps no role at all." 87 Fed. Appx. at
640.  That result, "would directly conflict with Interior's
mandate to give effect to the hierarchy of purposes established
in Section 3406(b)(2)." *Id.*  Federal defendants insist that the
Court of Appeals' decision must be read as a command to Interior
to ensure that it exercises its discretion in a manner that will
not frustrate the primary purpose of fish, wildlife and habitat
restoration.  This is a partial truth, as the 800,000 AF cap on
CVP yield that must be annually dedicated to (b)(2) purposes is
not discretionary and can only be reduced in times of water
shortage.

     Environmental Plaintiffs add that the primary purpose of the
CVPIA is anadromous fish doubling and that Interior retains the
discretion to refrain from counting actions that use CVP yield
for other purposes if doing so would give effect to the hierarchy
of purposes. (Doc. 686 at 9.)  Environmental Plaintiffs
emphasize that "since the Ninth Circuit has expressly held that
Interior may -- indeed must -- prioritize (b)(2) water for the
CVPIA's restoration mandate beyond mere compliance with the CVP's
water quality obligations, there will be years in which the sum
of the actions taken under Section 3406(b)(2), the WQCP, and the
ESA will exceed 800,000 AF." (*Id.* at 6.)  Environmental
Plaintiffs maintain that "[t]here is nothing illegal or
inappropriate about this.  Interior is required to provide water
for fishery purposes under several statutes.  As the appellate
court decided, Section 3406(b)(2) did not simply subsume the

35

1  CVP's water quality obligations.  Contrary to the position of

2  [the Authority], the 800,000 AF dedication is not a cap on the

3  CVP's environmental water obligations."  (*Id.*)

4       The parties all agree that under the Ninth Circuit's

5  decision, Interior retains some degree of discretion to refrain

6  from deducting water from the (b)(2) account if doing so will

7  give effect to the hierarchy of purposes in the CVPIA.  The

8  dispute in this case arises over the nature and extent of that

9  discretion.  The fundamental disagreement is, essentially, over

10 the scope and meaning of the phrase "primary purpose," as that

11 term is used in the Ninth Circuit's decision.

12            2.   The Scope of the "Primary Purpose" Language.

13      The Ninth Circuit explained in general that the "primary

14 purpose to which the 800,000 acre feet should be dedicated is the

15 implementation of 'fish, wildlife, and habitat restoration

16 purposes authorized by this title....'"[9] *Bay Institute,* 87 Fed.

17 Appx 639-40 (quoting CVPIA 3406(b)(2)).  Plaintiffs suggest that

18 the "primary purpose" includes <u>any</u> action designed to help fish,

19 while Environmental Plaintiffs and Federal Defendants suggest

20 that the "primary purpose" is the anadromous fish doubling

21 program set forth in section 3406(b)(1).  (Doc. 686 at 9; Doc.

22 696 at 19 n.3 (Federal Defendants "generally agree" with

23 Environmental Plaintiffs' position on this issue).)

24

25 ─────────────────────

26        [9]   The term "wildlife" must refer to species other than
   fish or its inclusion in the statute would be unnecessary and
27 illusory.  "Habitat" must refer to more than aquatic environments
   because wildlife other than aquatic species are expressly
28 delimited as protected by the primary purpose.

Section 3406(b)(2) describes the "primary purpose" as the implementation of the "fish, <u>wildlife</u>, and <u>habitat</u> restoration purposes authorized by this <u>title</u>...," referring to the <u>entire</u> CVPIA.   Therefore, according to the plain meaning of this text, any fish, wildlife and habitat restoration actions authorized by any part of the CVIPA may be relevant.

The CVPIA is organized into twelve sections as follows:

|         |   |                                                                                  |
|---------|---|----------------------------------------------------------------------------------|
| 3401 –  |   | Short Title                                                                      |
| 3402 –  |   | Purposes                                                                         |
| 3403 –  |   | Definitions                                                                      |
| 3404 –  |   | Limitation on Contracting and Contract Reform                                    |
| 3405 –  |   | Water Transfers, Improved Water Management and Conservation                      |
| 3406 –  |   | Fish, Wildlife and Habitat Restoration                                           |
| 3407 –  |   | Restoration Fund (establishing fund to serve as a source of revenue for restoration activities) |
| 3408 –  |   | Additional Authorities (authorizing various operational activities not directly related to fish, wildlife, and habitat restoration) |
| 3409 –  |   | Environmental Review                                                             |
| 3410 –  |   | Authorization of Appropriations                                                  |
| 3411 –  |   | Compliance with State Water Law and Coordinated Operations Agreement             |
| 3412 –  |   | Extension of the Tehama-Colusa Canal Service Area                                |

Only section 3406 authorizes any fish, wildlife, and habitat restoration activities.   Section 3406(b), which is entitled "Fish

37

and Wildlife Restoration Activities," first directs the Secretary
of the Interior to "immediately upon enactment of this title"
"meet all obligations under State and Federal law, including but
not limited to the Federal Endangered Species Act, 16 U.S.C. §
1531, *et seq.*, and all decisions of the California Water
Resources Control board establishing conditions on applicable
licenses and permits for the project."  Plaintiffs maintain that
this reference to the ESA and SWRCB decisions reflects "Congress'
[] understanding that compliance with these requirements would
further fish and wildlife restoration."  (Doc. 690 at 13.)
Assuming, *arguendo*, Congress expressly included these uses in the
preamble to codify its belief that water used for ESA and SWRCB
purposes would further fish and wildlife restoration, this does
not necessarily mean Congress intended ESA requirements and SWRCB
decisions to be considered part of the "primary purpose" of the
CVPIA.  The CVPIA specifically limits the reach of its primary
purpose to those "fish, wildlife, and habitat restoration
purposes <u>authorized by this title</u>...."  A plain language reading
of this provision does not incorporate by reference all ESA
requirements and SWRCB decisions simply because Interior is
directed to comply with those statutes within section 3406(b).
Rather, this language refers only to those fish, wildlife, and
habitat restoration actions specifically enumerated in 3406(b).

     This conclusion is reinforced by the language of section
3406(b)(2), which, as explained by the Ninth Circuit's decision,
delineates multiple priorities.  Primacy is given to those "fish,
wildlife, and habitat restoration purposes and measures
authorized by [the CVPIA]."  Thereafter, Interior is directed by

1  the statute "to assist" the State in its "efforts to protect the
2  waters of the San Francisco Bay Sacramento-San Joaquin Delta
3  Estuary," and "to help" meet obligations imposed upon the CVP
4  under State and Federal law, "including but not limited to
5  additional obligations under the Federal Endangered Species
6  Act...." § 3406(b)(2).

7       Section 3406(b) further directs and authorizes the Secretary
8  of the Interior to implement several specific fish and wildlife
9  restoration programs.[10]  First, section 3406(b)(1) directs
10 Interior to develop a program that "makes all reasonable efforts
11 to ensure that...natural production of anadromous fish in Central
12 Valley rivers and streams will be sustainable, on a long-term
13 basis, at levels not less than twice the average levels attained
14 during the period of 1967-1991...."  Environmental Plaintiffs
15 suggest that this so called "fish doubling" requirement is the
16 only restoration activity that should be considered a component
17 of the "primary purpose."  However, neither the Ninth Circuit
18 decision nor the "primary purpose" language in 3406(b)(2)
19 specifically mention the anadromous fish doubling program or
20 limit the "primary purpose" to that program.  In fact, there are

21 _____

22       [10]    The remaining sub-sections of section 3406 contain
23 provisions requiring Interior to the develop comprehensive
   restoration plans for the San Joaquin and Stanislaus Rivers, §
24 3406(c); to provide water to wildlife refuges, § 3406(d); to
   investigate certain other opportunities for mitigation and
25 restoration, § 3406(e); to report on project fishery impacts, §
   3406(f); to develop models to evaluate the ecological and
26 hydrologic effects of project operations, § 3406(g); and to enter
   into a cost-sharing agreement with the State of California, §
27 3406(h).  None of these sections on their own call for any
28 operational changes that could impact (b)(2) accounting.

several other provisions in section 3406(b) that arguably require the allocation of water for restoration purposes:

- Sections 3406(b)(4) and (b)(5) direct Interior to develop and implement programs to "mitigate" for fishery impacts associated with operations at the Tracy Pumping Plant and Contra Costa Canal Pumping Plant, respectively.

- Section 3406(b)(8) requires Interior to "make use of short pulses of increased water flows to increase the survival of migrating anadromous fish moving into and through the [Delta] and Central Valley rivers and streams."

- Section 3406(b)(9) directs Interior to develop and implement a program to eliminate "to the extent possible" losses of anadromous fish caused by the operation of any CVP storage or re-regulating facility.

- Section 3406(b)(12) requires that Interior develop and implement a comprehensive plan to "provide flows to allow sufficient spawning, incubation, rearing, and outmigration for salmon and steelhead from Whiskeytown Dam...."

- Section 3406(b)(18), directs Interior, if requested by the State of California, to implement management measures to restore the striped bass fishery in the Delta.

- Section 3406(b)(19) requires Interior to reevaluate operational criteria in order to maintain minimum carryover storage at Sacramento and Trinity River

40

1

2

reservoirs to "protect and restore the anadromous fish of the Sacramento and Trinity Rivers...."[11]

3

_____

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[11]     The remaining provisions in section 3406(b) do not direct Interior to undertake specific restoration activities that could impact water releases and deliveries. Section 3406(b)(2), which contains the disputed 800,000 AF dedication, does not on its own require any specific restoration actions.  Section 3406(b)(3) requires that Interior develop and implement a program "for the acquisition of a water supply to "supplement" the 800,000 AF dedicated in (b)(2) and fulfill Interior's obligations under section 3406(d)(2)(requiring the provision of firm water supplies to "maintain and improve wetland habitat areas" in Central Valley National Wildlife Refuge System units, Central Valley State Wildlife Management Areas, and on the Grasslands Resources Conservation District).  Section 3406(b)(5) requires installation and operation of a temperature control device at Shasta Dam.  Section 3406(b)(10) requires that Interior develop and implement measures to minimize fish passage problems for adult and juvenile anadromous fish at the Red Bluff Diversion Dam.  Section 3406(b)(11) requires rehabilitation and expansion of the Coleman National Fish Hatchery.  Section 3406(b)(13) directs Interior to develop and implement a plan to restore and replenish spawning gravel lost due the construction and operation of CVP dams.  Section 3406(b)(14) requires that interior develop and implement a program which "provides for modified operations and new or improved control structures at the Delta Cross Channel and Georgiana Slough during times when significant numbers of striped bass eggs, larvae, and juveniles approach the Sacramento River intake to [those facilities]."  Section 3406(b)(15) requires construction and operation of a barrier at the head of old river to "increase the survival of young out migrating salmon...in a manner that does not significantly impair the ability of local entities to divert water."  Section 3406(b)(16) directs Interior to establish a comprehensive "assessment program" to monitor fish and wildlife resources in the Central Valley and to assess the biological results and effectiveness of actions implemented pursuant to [3406(b)]."  Section 3406(b)(17) requires that Interior develop and implement a program to resolve fish passage problems at the Anderson-Cottonwood Irrigation District Diversion Dam as well as to resolve upstream stranding problems associated with operation of that facility.  Section 3406(b)(20) requires Interior's participation in an ongoing program to mitigate for fishery impacts associated with the

1      Section 3406(b)(7) requires that the Secretary "meet flow

2  standards and objectives and diversion limits set forth in all

3  laws and judicial decisions" applicable to the CVP, specifically

4  referencing the "Agreement Between the United States and the

5  Department of Water Resources of the State of California for

6  Coordinated Operation of the Central Valley Project and the State

7  Water Project" dated May 20, 1985, as well as Public Law 99-546.

8  The language "flow standards and objectives and diversion limits"

9  is not defined.  This language raises several questions.  First,

10 did Congress mean to classify as "fish and wildlife restoration

11 activities" the "flow standards and objectives and diversion

12 limits" required by other statutes, agreements, and judicial

13 decisions?  The placement of this provision within section

14 3406(b), which is entitled "Fish and Wildlife Restoration

15 Activities," suggests that it so intended.  Second, assuming

16 Congress considered the external requirements to be restoration

17 activities, did Congress mean to incorporate all such "flow

18 standards and objectives and diversion limits," by reference,

19 transforming them into primary purpose measures?  As discussed

20 above, a plain language reading of the primary purpose language

21

22 ─────────────────────────

23 Hamilton City Pumping Plant.  Section 3406(b)(21) requires that
   Interior assist the state of California in efforts to develop and
24 implement measures to avoid losses of anadromous fish resulting
   from unscreened or inadequately screened diversions on the
25 Sacramento and San Joaquin Rivers.  Section 3406(b)(22) calls
   upon interior to provide incentives to encourage farmers to
26 participate in a program under which fields will be kept flooded
   during appropriate time periods for the purpose of providing
27 waterfowl habitat.  Finally, 3406(b)(23) contains an expired
   provision regarding the Trinity River Diversion.
28

42

1  ("...for the primary purpose of implementing the fish, wildlife,

2  and habitat restoration purposes and <u>measures</u> <u>authorized by this</u>

3  <u>title</u>....") suggests that Congress intended <u>only</u> actions

4  <u>specifically authorized</u> by the CVPIA to be considered "primary

5  purpose" measures.

6      The "primary purpose" includes <u>all</u> those fish and wildlife

7  restoration activities <u>specifically</u> described in section 3406(b).

8  This includes water dedicated to accomplish the anadromous fish

9  doubling goal set forth in section 3406(b)(1), but also includes

10 water needed to accomplish any of the other specifically

11 enumerated programs listed in section 3406(b) (e.g., 3406(b)(4),

12 (5), (8), (9), (12), (18) & (19)).  The structure and placement

13 by Congress of these express provisions must be considered.

14     Environmental Plaintiffs suggest that additional language

15 contained within 3406(b)(1) indicates Congress' intent to elevate

16 the (b)(1) anadromous fish doubling program above any of these

17 other fish and wildlife restoration programs specifically

18 enumerated in 3406(b).  In pertinent part, section 3406(b)(1)

19 directs the Secretary of the Interior to:

20          develop within three years of enactment and implement a
            program which makes all reasonable efforts to ensure
21          that, by the year 2002, natural production of
            anadromous fish in Central Valley rivers and streams
22          will be sustainable, on a long-term basis, at levels
            not less than twice the average levels attained during
23          the period of 1967-1991... Provided...That the programs
            and activities authorized by this section shall, when
24          fully implemented, be deemed to meet the mitigation,
            protection, restoration, and enhancement purposes
25          established by subsection 3406(a) of this title....

26          (A) This program shall give first priority to
            measures which protect and restore natural channel
27          and riparian habitat values through habitat
            restoration actions, modifications to Central
28          Valley Project operations, and implementation of

**43**

the supporting measures mandated by this subsection....

(B) As needed to achieve the goals of this program, the Secretary is authorized and directed to modify Central Valley Project operations to provide flows of suitable quality, quantity, and timing to protect all life stages of anadromous fish, except that such flows shall be provided from the quantity of water dedicated to fish, wildlife, and habitat restoration purposes under paragraph (2) of this subsection; from the water supplies acquired pursuant to paragraph (3) of this subsection; and from other sources which do not conflict with fulfillment of the Secretary's remaining contractual obligations to provide Central Valley Project water for other authorized purposes....

§ 3406(b)(1).

There is some primacy implied by the positioning of section (b)(1) vis-a-vis (b)(2) and the other specific programs enumerated in (b)(3) through (b)(23). Moreover, (b)(1) is the only CVPIA program that specifically contains language authorizing Interior to "modify Central Valley Project operations." § 3406(b)(1)(B). Section (b)(1) is also the only specific program that contains language explaining that "such flows shall be provided from the quantity of water dedicated to fish, wildlife, and habitat restoration purposes under paragraph (2) of this subsection, i.e., the 800,000 AF; from the water supplies acquired pursuant to paragraph (3) of this subsection; and from other sources which do not conflict with fulfillment of the Secretary's remaining contractual obligations to provide Central Valley Project water for other authorized purposes." *Id.*[12]

_____

[12]   Section (b)(1)(A) expressly directs Interior to design the fish doubling program to meet not only the "fish, wildlife,

44

1      Although this is limiting language, its placement in (b)(1)

2  and not elsewhere within (b)(3) through (b)(23) implies that

3  (b)(1) is in a different category relative to the other

4  provisions of 3406(b).  The language also mandates that the water

5  as used for, inter alia, (b)(2) purposes, not come from other

6  sources that would conflict with Interior's remaining contractual

7  obligations, which includes agricultural contractors.

8      This case does not involve water use justified under

9  3406(b)(3) through (b)(23) and it is unnecessary to decide the

10  relative priority of these programs in relation to (b)(1)

11  programs.  To do so would constitute an improper advisory

12  opinion.

13      Under the Ninth Circuit Decision, Interior has discretion

14  not to count water used for any of the (b)(2) "secondary"

15  purposes, so long as that water is "needed" to effectuate the

16  "primary" restoration programs specifically enumerated in section

17  3406(b), including the fish doubling program contained within

18  3406(b)(1).[13]  The primary purpose language does not globally

19

20  and habitat restoration goals" of the CVPIA, but "other project

21  purposes" as well.  This expressly limits Interior's discretion

    to prevent it from ignoring such purposes.

22

23      [13]  Plaintiffs express a very legitimate concern that such

    an interpretation leaves too much room for discretion, thereby

24  allowing Interior to eviscerate the 800,000 AF limit.  For

    example, if 500,000 AF of water is needed in a particular year to

25  ensure that an ESA-listed species does not go extinct in the

    short term, this water would arguably not contribute to the

26  CVPIA's primary purpose.  Interior could, therefore, refrain from

    counting some or all of this 500,000 AF of water toward the

27  (b)(2) account if it reasonably concluded that more than 300,000

    AF was needed to effectively implement the CVPIA's primary

28

1  encompass every action that benefits fish.  Rather, it applies

2  only to those actions that support the specifically enumerated

3  fish and wildlife restoration programs contained within 3406(b).

4      There is potential for overlap between the "primary" purpose

5  and actions taken pursuant to the fisheries purposes of the WQCP

6  and ESA.  The parties point to language within the CVPIA and

7  various agency documents that acknowledge such overlap.  For

8  example, 3406(b)(1)(c) provides:

9           The Secretary shall cooperate with the State of
            California to ensure that, <u>to the greatest degree</u>
10          <u>practicable</u>, the specific quantities of yield dedicated
            to and managed for fish and wildlife purposes under
11          this title are credited against any additional
            obligations of the Central Valley Project which may be
12          imposed by the State of California following enactment
            of this title, including but not limited to increased
13          flow and reduced export obligations which may be
            imposed by the California State Water Resources Control
14          Board in implementing San Francisco Bay/Sacramento-San
            Joaquin Delta Estuary standards pursuant to the review
15          ordered by the California Court of Appeals in United
            States v. State Water Resources Control Board, 182
16          Cal.App.3d 82 (1986), and that, to the greatest degree
            practicable, the programs and plans required by this
17          title are developed and implemented in a way that
            avoids inconsistent or duplicative obligations from
18          being imposed upon Central Valley Project water and
            power contractors.

19

20  (Emphasis added.)[14]

21  _____

22  restoration mandate. By logical extension, if all CVP yield were
    needed to satisfy ESA and WCQP purposes, there would be no water

23  for CVP contractors.  In practice, however, Interior has only
    exceeded the 800,000 AF limit on the one occasion that provides

24  the basis for this litigation.  Interior maintains that unforeseen
    circumstances caused that single exceedence.

25

26      [14]   Plaintiffs suggest that this language "expressly
    contemplates that the same dedication of water can satisfy both

27  the 'fish and wildlife' purposes of the CVPIA and requirements
    imposed on the CVP by the SWRCB to meet the requirements of the

28  [WQCP]."  (Doc 681. at 9.)  Therefore, Plaintiffs argue, it is

1    Interior recognized the potential for this overlap in its

2  December 2003 Guidance, which provides:

3           [A]ctions taken pursuant to the 1995 Water Quality
            Control Plan and State Water Resources Control Board
4           Decision D-1641 ("the 1995 WQCP") involve the
            dedication and management of Central Valley Project
5           yield for long-term fishery beneficial use and
            protection.  Such actions are not taken to help meet
6           agricultural or municipal and industrial water quality
            standards that are set forth in the 1995 WQCP.  Most of
7           the fishery beneficial uses and objectives under the
            1995 WQCP and in Reclamation's water rights permits
8           help fulfill the fish, wildlife, and habitat
            restoration purposes and measures authorized by Section
9           3406(b).  Consistent with the June 3, 2003 Ninth
            Circuit decision, much of the (b)(2) water that is
10          dedicated and managed annually to help meet fishery
            beneficial use and protection objectives of the 1995
11          WQCP serves Section 3406(b)(2)'s "primary purpose" of
            fish, wildlife, and habitat restoration.  Therefore the
12          implementation of Section 3406(b)(2) in accordance with
            the May 9, 2003 Decision and with this supplemental
13          guidance effectuates the "hierarchy of purposes" in
            Section 3406(b)(2).

14
   (AR 2156-57 (emphasis added).)[15]
15

16   _____

17  appropriate to count WQCP and ESA water toward the (b)(2)
    dedication.  However, the language of section 3406(b)(1)(c)
18  recognizes that the overlap is not comprehensive, by qualifying
    the Secretary's duty to avoid duplicative obligations only to the
19  "greatest degree practicable."

20       [15]  Plaintiffs suggest that this language means that
21  counting WQCP and ESA uses toward the 800,000 AF limit "cannot
    logically be considered contrary to the primary purpose."  (Doc
22  681 at 10.)  But, the December 2003 Guidance's statement that
    "most" of the water dedicated to meet the fishery and beneficial
23  use and protection objectives of the WQCP also serve the CVPIA's
    "primary purpose," impliedly acknowledges that some portion of
24  water dedicated to meet WQCP goals does not serve the primary
    purpose.  Elsewhere in the administrative record, Interior
25  specifically stated that "only meeting the WQCP and post-1992 ESA
    requirements may not be sufficient to meet the anadromous fish
26  doubling goal and other restoration purposes and measures
    included in CVPIA."  (AR 2326 (response 6j).)  According to the
27  Ninth Circuit Decision, Interior has the discretion to exclude

28

1    In practice, many actions taken to fulfill the fishery
2  beneficial uses and objectives of the WQCP and/or actions taken
3  to comply with the ESA may serve the primary purpose of the
4  CVPIA.  In keeping with the general structure of the CVPIA's
5  language, if the "primary" purpose of any action taken under the
6  WQCP and/or the ESA is to support or effectuate a "primary
7  purpose" program, such action must be counted toward the (b)(2)
8  account.  Environmental Plaintiffs advance a helpful definition
9  of the term "primary," the ordinary meaning of which is
10  "predominant," of "first importance," or "principal."  *See Malat*
11  *v. Riddell*, 383 U.S. 569, 572 (1966).  Applying this definition,
12  if an action taken under the WQCP and/or the ESA predominantly
13  contributes to one of the primary purpose programs (e.g., fish
14  doubling), it must be counted toward the 800,000 AF limit.
15  Interior retains the discretion not to count other secondary
16  actions, so long as doing so is necessary to give effect to the
17  hierarchy of purposes.

18         3.   Did Interior Abuse Its Discretion In This Case?

19    Federal defendants maintain that Interior follows prescribed
20  procedures to dedicate and manage the (b)(2) water account,
21  including the development of numerous forecasts designed to help
22  plan and schedule (b)(2) actions.  Interior maintains that the
23  events in the 2004 (b)(2) accounting year took the agency by
24  surprise, requiring unexpected changes in operations.  Interior
25  claims it worked "carefully and conscientiously to stay within
26
27  _____
28  WQCP and ESA actions that do not serve the primary purpose from
   the (b)(2) account.

48

1    the statutory ceiling" and has exercised its discretion to

2    refrain from crediting the (b)(2) water account only in

3    exceptional circumstances.

4         However, none of the guidance documents presented in the

5    Administrative Record directly identify or explain the procedures

6    Interior must follow either in a "normal" (b)(2) year or an

7    "exceptional" one in which the 800,000 AF limit may need to be

8    exceeded.  The May 9, 2008 Decision comes the closest, stating:

9              Interior will account for the total amount of CVP water
               costs associated with meeting the WQCP obligations and
10             ESA obligations imposed after enactment of CVPIA
               against the annual (b)(2) allocation, up to the balance
11             of (b)(2) water remaining at the time the cost is
               incurred.
12
     (AR 2146 (emphasis added).)  This Decision, however, predates the
13
     Ninth Circuit's ruling on the issue.  Federal Defendants
14
     therefore assert that there is no formal administrative decision
15
     in this case to which *Chevron* deference is owed.  (*See* Doc. 696,
16
     at 13-14.)  Instead, the parties stipulated to allow for the
17
     submission of expert declarations to help explain the contents of
18
     this "rather unusual administrative record to the court."  (*Id*.
19
     at 14.)
20
                    a.   Did Interior Abuse Its Discretion With
21                       Respect to the June Actions?

22        From June 17 through June 24, 2004 Interior allocated 9,100

23   AF to Non-B2 Fishery Actions.  The daily accounting for June 17

24   through June 30, 2004 indicates that water costs were being

25   incurred for changes in operations at Nimbus, Clear Creek, and

26   New Melones.  (First Fujitani Decl. at ¶17.)  Only those costs

27   incurred at Nimbus and New Melones were accounted for as Non-B2

28   Fishery Actions.  (*Id*.)  A draft document entitled "Summary of

                                    49

1  (b)(2) Fish Actions for Water Year 2004," dated December 1, 2004,

2  specifies that releases from Nimbus during the "latter part" of

3  June were "to meet Delta demands."[16]  (AR 1521.)  Mr. Fujitani

4  states that releases from Nimbus were required to meet the June

5  Delta outflow standard.  (First Fujitani Decl. at ¶17.)[17]

6  Releases from New Melones were needed to meet San Joaquin River

7  flow requirements at Vernalis.  (*Id.*)  Interior did not count

8  these releases as "(b)(2)" releases, but instead as "Non-B2

9  Fishery Actions."  (*Id.*)

10      The question presented is:  Did either of these actions

11  predominantly contribute to one of the (b)(2) primary purpose

12  programs (e.g., fish doubling)?  The Delta outflow standard was

13  promulgated as part of the 1995 WQCP (D-1641).  The stated

14  purpose of the outflow standard is to protect "estuarine habitat

15  for anadromous fishes and other estuarine-dependent species."

16

17  _____

18      [16]  Mr. Snow suggests in his First Declaration that the

19  June 2004 releases were "to provide suitable habitat for upstream
    migration, spawning, egg incubation, rearing and outmigration for

20  anadromous fish, including listed runs of Chinook salmon and
    steelhead trout, and improved conditions for estuarine species by

21  helping to meet WQCP objectives," citing a document entitled

22  "Summary of (b)(2) Fish Actions for Water Year 2004."  (AR 1521.)
    However, the quoted passage referred to actions taken in the

23  early part of June.  That same document later explains that in
    the later part of the month, releases from Nimbus were increased

24  to "approximately 2,500 cfs to meet Delta demands," which the
    court infers were for exports.  (*Id.*)

25

26      [17]  Although no party attempts to reconcile these slightly
    different explanations for releases from Nimbus, they appear to

27  be consistent (i.e., without increased releases from Nimbus,
    Delta demands would result in exceedance of the outflow

28  standard).

1  (1995 WQCP at 15.)[18]   The Vernalis flow requirement on the San

2  Joaquin River, along with similar flow requirement on the

3  Sacramento River, originate in the WQCP.  The stated purpose of

4  the Vernalis flow requirements are "to provide attraction and

5  transport flows and suitable habitat for various life stages of

6  aquatic organisms, including Delta smelt and chinook salmon."

7  (*Id.* at 15.)

8       Although both of these standards are to benefit anadromous

9  fish species, they do not specifically identify an intent to

10  support the fish doubling goal (or any other specifically-

11  enumerated 3406(b) program).  In fact, the WQCP contains a <u>wholly</u>

12  <u>separate</u> "narrative objective" for salmon doubling, which

13  provides: "Water quality conditions shall be maintained, together

14  with [other] measures in the watershed, sufficient to achieve a

15  doubling of natural production of chinook salmon from the average

16  production of 1967-1991, consistent with the provisions of State

17  and federal law."  (*Id.* at 15 & 18.)  The existence of this

18  separate provision, directed at anadromous fish doubling,

19  suggests that neither the Delta outflow objective nor the

20  Vernalis flow requirement were intended to achieve the CVPIA fish

21  doubling purpose.  Actions taken to comply with the Delta outflow

22  objective and/or the Vernalis flow requirement do not

23  ─────────────────

24       [18]   The first page of the 1995 WQCP is included in the
Administrative Record at AR 4490.  It is not clear whether

25  Federal Defendants intended to include the entire document in the
record.  Plaintiffs attached the entire document to their request

26  for judicial notice.  (Doc. 693.)  As the WQCP is a public record
subject to judicial notice, *see United States v. S. Cal. Edison

27  Co.*, 300 F. Supp. 2d 964, 973 (E.D. Cal. 2004), Plaintiffs

28  request is GRANTED.

"predominantly" contribute to primary purpose programs.  Interior did not abuse its discretion in excluding these actions that consumed approximately 9,000 AF of CVP yield from (b)(2) accounting.

### b.   Did Interior Abuse Its Discretion With Respect to the August/September Actions?

In August and September 2004, the CVP exported 159,000 AF less than it otherwise would have under base case conditions.  For both August and September, the "Summary of (b)(2) Fish Actions for Water Year 2004" indicates:

> CVP exports were not curtailed for fishery purposes.  However, actual exports were reduced from base case exports due to WQCP elimination of replacement pumping.

(AR 1522-23.)

The baseline for (b)(2) accounting in the Delta includes water quality obligations under D-1485, which was superceded in 1995 by the WQCP (D-1641).  (*See* AR 2141.)  D-1485 includes a requirement that the mean monthly pumping by the CVP may not exceed 3,000 cfs in May and June.  (First Fujitani Decl., at ¶18.)  D-1485 identifies young striped bass as the beneficial use protected by the reduced diversions in May and June.  (*Id.*)  The Coordinated Operations Agreement between DWR and the Bureau permitted the CVP to use DWR's Banks pumping plant to replace any CVP pumping lost in May and June.  (*Id.*)  This CVP pumping at Banks was known as "replacement pumping."  (*Id.*)  Historically, Reclamation utilized Banks for replacement pumping July through November.  (*Id.*)  Therefore, in the baseline forecast for 2004, Reclamation assumed that some replacement pumping would take place in August and September.  (*Id.*)

1      However, D-1485's 3,000 cfs pumping limit and the related

2  provision for replacement pumping were not continued under the

3  subsequent D-1641.  Instead, they were replaced by the

4  export/import ratio, Delta outflow, and salinity criteria

5  contained in D-1641, in addition to any other pumping

6  restrictions imposed in accordance with the ESA.  (Snow Decl. at

7  ¶17.)  Interior accounts for any actions taken to comply with D-

8  1641 and post-1992 ESA requirements by evaluating whether those

9  requirements cause departures from the D-1485 baseline.

10      The actual accounting for the months of May and June begins

11  with a baseline pumping rate of 3,000 cfs, reflecting the pumping

12  restriction contained in D-1485.  (Snow Decl. at ¶21.)

13  Curtailments that lowered pumping during May and June below the

14  3,000 cfs baseline were counted toward the (b)(2) account at that

15  time (i.e., in May or June).  However, Interior did not

16  contemporaneously account for the amount of replacement pumping

17  (i.e., the difference between <u>capacity</u> and the 3,000 cfs limit)

18  that would have accumulated each day under D-1485.  Because that

19  "replacement pumping" was historically scheduled for

20  implementation in August and September, it became part of the

21  August and September baseline.  It is the Bureau's practice to

22  account for any curtailments of that replacement pumping at the

23  time the replacement pumping was scheduled to take place (i.e.,

24  in August and September).  (*See* Fujitani Decl. at ¶19.)

25  Plaintiffs point to no authority suggesting that this approach to

26  accounting, a complex process that falls within the agency's

27  discretion, is unreasonable.  Plaintiffs have not argued that

28  this accounting constitutes a prohibited offset or reset.

1      Daily fishery costs for August and September are calculated
2  by taking the baseline operations forecast for each day on which
3  the replacement pumping would have occurred, and then subtracting
4  the total pumping at Banks and Jones.  For example, on August 20,
5  2004, baseline pumping was predicted to be 7,210 cfs, while
6  actual pumping at Jones and Banks was 5,902 cfs, for a difference
7  of 1,308, which was counted as the fishery cost for that day.
8  (*Id.*)  When these fishery costs were incurred in August and
9  September, no (b)(2) water remained, so Interior refrained from
10  counting these losses as (b)(2) actions.  (*Id.* at ¶20.)

11      Again, the key question is:  Did Interior's accounting in
12  for August and September actions fail to count uses that
13  predominantly contributed to one of the primary purpose programs,
14  e.g., fish doubling?  The record evidence on this issue is
15  essentially non-existent.  The final (b)(2) accounting
16  conclusorily states that the reduction in pumping that occurred
17  in August and September was accounted for as a "non-B2 fishery
18  action."  (AR 3185.)  The Federal Defendants rely heavily on the
19  December 1, 2004 "Summary of (b)(2) Fish Actions for Water Year
20  2004," which states that, in August and September 2004, with
21  respect to actions in the delta, "CVP Exports were not curtailed
22  for fishery purposes.  However, actual exports were reduced from
23  base case, due to WQCP elimination of replacement pumping."  (AR
24  1522-23.)  Federal Defendants also point to a table entitled
25  "Water Year 2004 Fishery Action Costs (using DOI's May '03 (b)(2)
26  Decision metrics)," which labels the pumping foregone in August
27  and September as "Replacement Pumping Foregone + Cross Valley
28  Delivery Difference" and classifies that water for accounting

**54**

1   purposes as "WQCP/ESA Actions that contribute to SECONDARY
2   PURPOSE."  (AR 2565.)

3       The record contains absolutely no explanation as to why the
4   "WQCP elimination of replacement pumping" or "Replacement Pumping
5   Foregone" is classified as a non-(b)(2), or "secondary purpose"
6   action.  It is acknowledged by all sides in this case that there
7   is some overlap between WQCP uses and primary purpose uses.  For
8   example, the "Water Year 2004 Fishery Action Costs (using
9   Interior's May '03 (b)(2) Decision metrics)" table indicates that
10  a certain type of WQCP use, namely "Delta Export Reductions (VAMP
11  & Post VAMP)" "contribute" to the primary purpose.  (AR 2565.)
12  In order to lawfully exercise the discretion afforded the Federal
13  Defendants by the Ninth Circuit's decision, the record must, at a
14  bare minimum, provide a basis for understanding why the agencies
15  have classified actions taken pursuant to the WQCP and/or the ESA
16  as "secondary" rather than "primary" (b)(2) purpose actions.  The
17  WQCP eliminated replacement pumping in favor of an alternative
18  regulatory scheme.  In August and September 2004, water that
19  would have been pumped under the baseline (D-1485) scenario was
20  not pumped, presumably because the new (i.e., post- CVPIA) WQCP
21  requirements demanded that pumping be curtailed below the
22  baseline level.  The record does not explain which WQCP
23  requirements triggered the curtailments in these months, making
24  it impossible to determine whether the curtailments served a
25  primary purpose.[19]

26

27        [19]   Although normally judicial review is confined to the
28  administrative record, there may be circumstances to justify

1   Interior did not sufficiently explain the reasons for its

2   actions in August and September 2004.  This is a failure of

3   proof, which makes its decision arbitrary and capricious.  On

4   this record, Plaintiffs are entitled to summary judgment as to

5   the August and September actions.

6   Plaintiffs also seek injunctive relief.  In this case, such

7   relief can only be prospective.  However, without further

8   evidence, there is no reason to believe that Interior will not

9   follow the law and apply Section 3406(b)(2) in accordance with

10  this decision.  Plaintiffs request for injunctive relief is

11  DENIED WITHOUT PREJUDICE.

12

13                      V.   CONCLUSION

14  For the reasons set forth above:

15  (1) Plaintiffs have standing to bring this suit;

16  (2) Federal Defendants' motion to dismiss the claims on

17  mootness grounds is DENIED;

18  (3) Plaintiffs motion for summary judgment is DENIED as to

19  _____

20  expanding the record or permitting discovery.  The broadest
    exception to the rule that review is to be restricted to the
21  record certified by the agency is the one which permits expansion
    of the record when necessary to explain agency action.  When
22  there is "such a failure to explain administrative action as to
    frustrate effective judicial review," a court may receive from
23  the agency, either through affidavits or testimony, "such
    additional explanations of the reasons for the agency decision as
24  may prove necessary."  *Public Power Council v. Johnson*, 674 F.2d
    791, 793-94 (9th Cir. 1982)(quoting *Camp v. Pitts*, 411 U.S. 138,
25  143 (per curiam)).  Here, Federal Defendants were given ample
    opportunity to explain the record with expert declarations, all
26  of which failed to adequately explain the August and September
    actions.

27

28

                              56

the June actions, but GRANTED as to the August and September
actions.

    (4) Federal Defendants' cross-motion for summary judgment,
joined by Environmental Plaintiffs, is GRANTED as to the June
actions, but DENIED as to the August and September actions.

    (5) Plaintiffs request for injunctive relief is DENIED
WITHOUT PREJUDICE.

SO ORDERED

DATED:   September 19, 2008


                               /s/ Oliver W. Wanger
                                  Oliver W. Wanger
                         United States District Court